IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DANNY WILBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 23-cv-951 |
| | ) |
| CITY OF MILWAUKEE, Special | ) |
| Representative for THOMAS CASPER, | ) |
| deceased, GREGORY SCHULER, | ) |
| RANDOLPH OLSON, LOUIS JOHNSON, | ) |
| TIMOTHY DUFFY, JOSEPH ERWIN, | ) |
| RUBEN BURGOS, MICHAEL | ) |
| CABALLERO, and KENT CORBETT, | ) |
| | ) |
| Defendants. | ) JURY DEMAND |

## **COMPLAINT**

Plaintiff Danny Wilber, by and through his attorneys, the People's Law Office, hereby alleges as follows:

### INTRODUCTION

1. Plaintiff Danny Wilber, an innocent man wrongly convicted of a murder he did not commit, spent almost 18 years behind bars because the Defendant Milwaukee police detectives sued in this action coerced and fabricated false inculpatory evidence and suppressed exculpatory evidence.

2. Plaintiff Wilber was arrested for the murder of David Diaz on February 20, 2004, at the age of 24. Although the physical evidence demonstrated that it was impossible for Plaintiff to have committed the crime, the Defendants' fabricated evidence resulted in his prosecution and wrongful conviction for first-degree murder. He was sentenced to life in prison.

1

3. After years of post-conviction efforts during which Plaintiff steadfastly maintained his innocence, a federal district court vacated his conviction on August 4, 2020. The state unsuccessfully appealed that decision, forcing Plaintiff to languish in prison for another year before the Seventh Circuit affirmed the reversal of his conviction.

4. On December 22, 2021, after nearly two decades of incarceration, Plaintiff was released on bond pending a possible retrial. Several months later, the Milwaukee County District Attorney's Office formally dismissed his case.

5. Plaintiff Wilber has spent much of his adult life in prison, separated from his family and friends and robbed of the most basic freedoms. He files this civil rights action to bring Defendants' misconduct to light, to hold Defendants accountable for their actions, and to seek justice for the many years of his life that he lost for a crime he did not commit.

## JURISDICTION AND VENUE

6. Plaintiff brings this action pursuant to the Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13, 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights as secured by the United States Constitution.

7. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this district.

## PARTIES

9. Plaintiff Danny Wilber is a 44-year-old Black and Indigenous man and was at all times relevant to this suit a resident of the State of Wisconsin.

10. At all times relevant to this suit, Defendants Gregory Schuler, Randolph Olson, Louis Johnson, Timothy Duffy, Joseph Erwin, Ruben Burgos, Michael Caballero, and Kent Corbett were police detectives employed by the Milwaukee Police Department.

11. Each of these named Defendants is sued in his individual capacity, and each acted under color of law and within the scope of his employment.

12. Defendant Special Representative for Thomas Casper, to be subsequently appointed by the Court, is named because Thomas Casper is deceased. At all times relevant to this suit, Thomas Casper was a police detective employed by the Milwaukee Police Department. He is sued in his individual capacity and acted under color of law and within the scope of his employment.

13. Defendant City of Milwaukee is a Wisconsin municipal corporation, was the employer of the individual Defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Milwaukee Police Department.

## FACTUAL ALLEGATIONS

### The Crime

14. In the early morning hours of January 31, 2004, 23-year-old David Diaz was shot and killed in his Milwaukee home during an after-hours party.

15. Earlier that night, a large group of people who were out drinking at a local bar had been invited to continue the party at Diaz's home after the bar closed.

16. Plaintiff Danny Wilber (who was sometimes referred to by his nickname, "Slim") was among the guests.

17. Plaintiff was in the kitchen when he got into an argument with a partygoer, Oscar Niles, and grabbed Niles's neck chain.

3

18. At that point, Richard Torres, one of the residents of the house, and Jeranek Diaz, a friend of David Diaz's (and no relation to him), approached Plaintiff and attempted to calm him down or remove him from the party. The three men got into a physical altercation.

19. David Diaz was standing near the entrance to the kitchen watching the altercation but was not involved in it. The altercation was to the north of where Diaz was standing and in front of him.

20. At some point during the fight, someone standing behind and to the south of David Diaz shot him in the back of the head at close range, killing him instantly.

21. Diaz's body fell face-first to the north into the kitchen, towards where Plaintiff was fighting with the other men.

22. Everyone in the kitchen panicked and fled the house.

**The Physical Evidence**

23. The evidence recovered from the body and the crime scene demonstrated conclusively that Plaintiff could not have shot David Diaz.

24. The autopsy showed that Diaz was shot from behind, with the bullet entering the back left of his head 1.5 inches below the top, passing in a straight line through his head, and exiting 4 inches lower through the right cheek.

25. Defendant Casper, who collected evidence and took measurements at the crime scene following the murder, recovered fragments of the fatal bullet under the stove directly north of the top of Diaz's head, consistent with a shot that was fired into the kitchen from south to north.

26. The autopsy further established that the bullet severed Diaz's spinal cord, killing him instantly.

27. Diaz would have been unable to walk or take a step, and would have most likely fallen straight forward.

28. The body fell face-down into the kitchen, further establishing that the shooter fired into the kitchen from behind David Diaz.

29. The Medical Examiner concluded that based on the soot and powder deposits surrounding the entrance wound, the shot was fired from approximately 2 to 3 inches away.

30. Thus, all of the physical and medical evidence demonstrated that, at the time of the shooting, the killer was standing just behind David Diaz *outside* the kitchen facing into it.

31. It was and is undisputed that, at the time of the shooting, Plaintiff Wilber was *inside* the kitchen and in front of David Diaz.

32. During their investigation, the Defendants knew that Plaintiff could not have shot David Diaz in the manner the physical and medical evidence definitively established that he was shot.

**The Police Investigation and Fabrication of Evidence**

33. Despite the impossibility based on the physical and medical evidence that Plaintiff Wilber could have been the shooter, the police immediately focused on him as their sole suspect instead of conducting the necessary investigation to solve the homicide and identify David Diaz's actual killer.

34. Although the evidence revealed multiple other plausible suspects, the Defendants never investigated any of them, instead directing all of their efforts towards pinning the crime on Plaintiff while seeking to discredit the evidence that pointed to other suspects.

35. In order to support their obviously false theory and to frame Plaintiff, the Defendants conspired to coerce and fabricate false witness statements that would implicate

5

Plaintiff as the killer by both inserting incriminating details into the statements and omitting exculpatory ones.

36. The Defendants likewise concealed or withheld from Plaintiff's defense handwritten reports and notes that contained exculpatory information.

*Richard Torres's Statement*

37. On February 1, 2004, Richard Torres, who was wanted for probation violations, turned himself in to the police for questioning related to David Diaz's murder. He was immediately arrested.

38. Defendants Olson and Johnson interviewed Torres and, through threats and intimidation, coerced him into providing a false statement incriminating Plaintiff. These Defendants threatened to charge Torres with the murder and made clear that they wanted him to say Plaintiff was the shooter.

39. Defendants Olson and Johnson knowingly fabricated substantial parts of a statement from Torres, including that he saw Plaintiff with a gun in his hand, specifically a silver and black semi-automatic pistol, moments after he heard the gunshot.

40. In fact, Torres did not see Plaintiff with a gun either before or after the shot was fired.

*Jeranek Diaz's Statement*

41. Also on February 1, 2004, at around the same time that Defendants Olson and Johnson were interviewing Torres, Defendant Schuler interviewed Jeranek Diaz.

42. Defendant Schuler fabricated substantial parts of a statement from Jeranek Diaz, including that, seconds before the shooting, Jeranek Diaz saw Plaintiff pull out a silver and black semi-automatic handgun and point it at David Diaz; that Jeranek Diaz then ducked down to

6

avoid being shot; that Jeranek Diaz heard the shot and thought it came from where Plaintiff was standing; and that, after David Diaz's body fell to the ground, Jeranek Diaz saw Plaintiff tuck a gun back into his coat.

43. In an attempt to explain how Plaintiff could have shot David Diaz in the back of the head despite Plaintiff's position inside the kitchen and in front of David Diaz at the time of the shooting, Defendant Schuler invented and inserted into Jeranek Diaz's statement the detail that, at the time of the shooting, David Diaz had just turned around and was about to leave the kitchen.

44. Jeranek Diaz never told the police any of the above information and in fact he never saw Plaintiff or anyone else at the party with a gun.

45. Jeranek Diaz never told Defendant Schuler that he saw David Diaz turn to leave the kitchen before the shooting, and in fact David Diaz was looking towards the kitchen when he was shot.

46. Defendant Schuler never gave Jeranek Diaz an opportunity to review the typewritten version of his statement.

47. Defendant Schuler was taking notes during his interview. Nevertheless, no notes of the interview or handwritten version of Jeranek Diaz's statement were ever produced to the prosecution or to Plaintiff's defense.

*Antonia West's Statement*

48. On February 2, 2004, Defendants Johnson and Olson interviewed Plaintiff's sister, Antonia West, who was present in the kitchen at the time of the shooting.

49. Later that day, Defendants Duffy and Erwin continued the interview.

50. West had a learning disability that impaired her reading and comprehension abilities, making her particularly vulnerable in high-pressure situations like a police interrogation.

51. West told these Defendants that, immediately after the gunshot, she saw her brother patting himself down to check if he had been shot.

52. Despite the exculpatory nature of this evidence, these Defendants omitted any mention of it from their reports.

53. Instead, these Defendants wrote that, at the time of the shot, West ducked her head and when she looked back up, everyone was running out the door and she did not see her brother.

54. These Defendants never read West's statement back to her, and she signed it without knowing its contents.

*Oscar Niles's Statement*

55. Three times over the course of several days, several MPD Detectives, including Defendants Burgos, Caballero, and Corbett, interviewed Oscar Niles, who was present in the kitchen at the time of the shooting.

56. During this course of questioning, these Defendants and their fellow detectives pressured and coerced Niles to provide false information that would incriminate Plaintiff.

57. Niles was first interviewed for over four and a half hours on February 4, 2004.

58. After the first interview, Niles was arrested, based on an open warrant for an unrelated matter, and was not permitted to leave the police station. He was held overnight in a holding cell and never provided with food, water, or a shower.

59. On February 5, Defendant Burgos interrogated Niles from about 2:30 PM until about 4:00 PM.

8

60. Defendant Burgos told Niles that he was "not telling us what we need to hear" and returned Niles to the holding cell.

61. Roughly five hours later, beginning at about 9:00 PM, Defendants Caballero and Corbett questioned Niles.

62. The interview concluded at around 1:35 AM on February 6, over 24 hours after Niles arrived at the police station. In all that time, he was never provided with any food.

63. Throughout the many hours of the three separate interrogations, the detectives, including Defendants Burgos, Caballero, and Corbett, made it clear that they wanted Niles to provide information that would implicate Plaintiff as the shooter.

64. They fed Niles information that they wanted him to repeat back to them, including that he heard the gunshot come from the area of the fight.

65. Niles eventually agreed to sign a materially false statement because he was exhausted and wanted to go home.

66. Niles believed that if he did not do so, the detectives, including Defendants Burgos, Caballero, and Corbett, would have continued harassing him.

67. One of the detectives threatened to "mess with [him] for the rest of [his] life" if he refused to play along.

68. Defendant Caballero knowingly produced a statement that contained false inculpatory information, including that Niles heard the gunshot come "from the tussle area" and that, after the shot, he saw "everybody running away from [the Plaintiff] Slim."

69. In fact, Niles did not know where the gunshot came from, and he did not tell the police that people were running "away from Slim," merely that they were running out of the kitchen and towards the living room.

70. Further, both Defendants Caballero and Burgos omitted exculpatory details from their reports, including that Niles reported that, after the gunshot, Plaintiff "checked himself" to see if he had been shot.

*The Scene Diagram*

71. In addition to the fabricated witness statements, at some point in the investigation Defendant Casper falsified a scene diagram with erroneous measurements in an attempt to make the state's theory that Plaintiff was the shooter more plausible.

72. While at the crime scene on the night of the murder, Defendant Casper took measurements of the kitchen and the location of David Diaz's body.

73. According to Defendant Casper's computer-generated scene diagram, Diaz's head was 6'1" from the north wall of the kitchen, his right foot was 3'1" from the doorway leading into the living room, and his left foot was 3'6" from the doorway.

74. Defendant Casper falsified the distance from Diaz's feet to the doorway in an attempt to create evidence to support the Defendants' false theory that Plaintiff had shot David Diaz.

75. Defendant Casper withheld from the prosecution and Plaintiff's defense his notes of his measurements at the crime scene, which contained exculpatory and impeaching information.

**The Trial and Wrongful Conviction**

76. Despite his innocence, on February 20, 2004 Plaintiff was arrested and charged with first-degree intentional homicide with a dangerous weapon.

10

77. Because the Defendants' false theory that Plaintiff was the killer was wholly contradicted by the physical and medical evidence, the prosecution's case at trial relied almost entirely on the Defendants' fabricated witness statements.

78. The prosecutor introduced the fabricated statements and scene diagram into evidence, used the statements for purposes of impeachment, and referenced them heavily throughout both his opening and closing arguments.

79. The prosecution called to the stand multiple detectives, including several of the Defendants, to read their false reports into the record. In furtherance of their conspiracy to frame Plaintiff, the Defendants falsely testified that their reports were true and accurate.

80. Richard Torres testified consistent with his false, fabricated statement, but he has since recanted. He was the only witness who testified that he saw Plaintiff with a gun the night of the murder.

81. As a proximate result of the above-described wrongful conduct on the part of the Defendants, and on the basis of the false evidence that they fabricated, the jury convicted Plaintiff of the murder, and he was sentenced to life in prison.

82. Plaintiff spent nearly 18 years in prison for a crime he did not commit before a federal court vacated his conviction. He was released on bond pending a possible retrial, and the Milwaukee County District Attorney's Office eventually formally dismissed his case on May 27, 2022.

**The Defendants' Misconduct was Committed in Furtherance of a Conspiracy**

83. All of the Defendants, acting jointly and with other MPD police investigative, supervisory, and command personnel, as well as other unknown co-conspirators, together reached an understanding, engaged in an ongoing course of conduct and joint action, and

otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.

84. This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below, including, but not limited to, fabricating inculpatory evidence, suppressing exculpatory evidence, and discrediting and failing to investigate alternative suspects. By and through these overt acts, each Defendant, jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived, and continues to deprive, Plaintiff of his constitutional rights.

**Policies and Practices**

85. The constitutional violations that caused Plaintiff's wrongful conviction were the result of the City of Milwaukee's policies and practices of, *inter alia*, pursuing wrongful convictions through reliance on materially flawed investigations and coerced and fabricated evidence including witness statements; failing to produce to criminal defendants exculpatory material including handwritten notes of interviews and other investigative activities; failing to properly investigate or seeking to discredit alternative suspects; failing to adequately train, supervise, monitor, and discipline Milwaukee police officers; and maintaining the police code of silence.

86. The practices described above and below were consciously approved at the highest policy-making level for decisions involving the Milwaukee Police Department (MPD) and proximately caused Plaintiff's injuries.

87. Consistent with the municipal policies and practices described above and below, Defendants in this case fabricated witness statements, both by inserting false incriminatory details and by omitting exculpatory details, and also failed to investigate and attempted to

12

discredit alternative suspects. In addition, the Defendants presented their fabricated statements as evidence at Plaintiff's criminal trial.

88. The Defendants' coercion of false statements from witnesses was also undertaken pursuant to, and proximately caused by, a policy and practice on the part of the MPD of using coercive interrogation tactics in order to elicit false statements from witnesses in criminal cases, which has caused numerous wrongful convictions.

89. Also consistent with the municipal policies and practices described above and below, Defendants in this case concealed exculpatory evidence in files and records which were never disclosed to Plaintiff's criminal defense attorneys.

90. The wrongful convictions of innocent persons based on coerced and fabricated evidence including witness statements include numerous cases in which MPD detectives used similar tactics to those employed by the Defendants against Plaintiff in this case. These tactics include: (a) psychological intimidation, manipulation, and physical deprivation; (b) fabrication of evidence; (c) concealment of exculpatory information; (d) failing to investigate and discrediting alternative suspects; (f) false testimony; and (g) other unlawful tactics to secure the arrest, prosecution, conviction, and imprisonment of innocent persons.

91. Cases in which Milwaukee police officers used similar tactics to secure wrongful convictions include, *inter alia*, the wrongful convictions of William Avery and Chaunte Ott.

92. As a matter of both policy and practice, municipal policymakers and MPD supervisors condoned and facilitated a code of silence within the Milwaukee Police Department.

93. In accordance with this code, MPD officers, including, but not limited to, the Defendants, refused to report and otherwise lied and committed perjury about misconduct committed by their colleagues, including the misconduct at issue in this case.

94. As a result of the City of Milwaukee's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false witness statements, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, MPD officers, including the Defendants named herein, have come to believe that they may violate the constitutional rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

95. The City's failure to train, supervise, monitor, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices, customs, and *de facto* policies, as alleged above, and these policies, practices, and customs were implemented with deliberate indifference and were a moving force behind these violations.

96. The City of Milwaukee and officials within the Milwaukee Police Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken to remedy Plaintiff's ongoing injuries.

## Damages

97. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff sustained injuries and damages, including loss of his freedom for almost 18 years, loss of his youth, personal injuries, pain and suffering, severe mental anguish, and emotional distress. In addition, he also sustained further

injuries and damages, including inadequate medical care, humiliation, indignities, embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression, for which he is entitled to monetary relief.

## COUNT I – 42 U.S.C. § 1983
### Fourteenth Amendment – Violation of Due Process

98. Each paragraph of this Complaint is incorporated as if restated fully herein.

99. As described more fully above, all of the individual Defendants named in this complaint while acting individually, jointly, and/or in concert and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

100. In the manner described more fully above, the Defendants, individually, jointly, and/or in concert and in conspiracy, caused and/or continued Plaintiff's wrongful charging, prosecution, conviction, and imprisonment by committing or causing to be committed one or more of the following acts: coercing, constructing, and fabricating the false and totally unreliable witness statements, reports, and diagrams as described above, which formed the basis for Plaintiff's charging, prosecution, and conviction; withholding from the prosecutors, judges, and defense attorneys involved in Plaintiff's prosecution the fact that these statements and reports were false, unreliable, fabricated, and coerced; suppressing, withholding, destroying additional exculpatory and impeachment evidence; and failing to investigate, and attempting to discredit, alternative suspects.

101. Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been jailed, convicted, imprisoned, and otherwise deprived of liberty.

102. The Defendants' misconduct directly and proximately caused the unjust and wrongful pre-trial detention, criminal conviction, wrongful imprisonment, and deprivation of liberty of Plaintiff, thereby denying him his constitutional right to fair hearings and a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

103. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

104. As a direct and proximate result of this violation of his constitutional right to due process, Plaintiff suffered injuries and damages as set forth above, including but not limited to loss of liberty, physical injury, and emotional distress.

## COUNT II – 42 U.S.C. § 1983
### Fourteenth Amendment – Failure to Intervene

105. Each paragraph of this Complaint is incorporated as if restated fully herein.

106. The individual Defendants named in this complaint were aware of the constitutional violations as set forth above and had the opportunity and duty to intervene and prevent the violation of Plaintiff's constitutional rights, but they failed to do so.

107. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

108. As a direct and proximate result of these Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries as set forth above, including but not limited to loss of liberty, physical harm, and emotional distress.

## COUNT III – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

109. Each paragraph of this Complaint is incorporated as if restated fully herein.

110. The individual Defendants named in this complaint reached an agreement between and amongst themselves and other unnamed co-conspirators to frame Plaintiff for the murder of David Diaz, and to thereby deprive him of his constitutional rights.

111. Before and after Plaintiff's conviction, each of the individual Defendants further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to the more timely reversal of his wrongful conviction and his exoneration of the false charges.

112. In this manner, the individual Defendants named in this complaint, acting in concert with other unknown co-conspirators, including other MPD officers, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

113. In furtherance of the conspiracy, each of the co-conspirators committed one or more overt acts including, but not limited to, those set forth in the facts above, and was an otherwise willful participant in joint activity.

114. The individual Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

115. As a direct and proximate result of the illicit prior agreement, conspiracy, and joint action referenced above, Plaintiff's rights were violated and he suffered the damages and injuries as previously set forth.

## COUNT IV – 42 U.S.C. § 1983
## *Monell* Policies and Practices

116. Each paragraph of this Complaint is incorporated as if restated fully herein.

117. The actions of all the individual Defendant Officers were undertaken pursuant to policies, practices, and customs of the Milwaukee Police Department, described above, which were approved, encouraged, and/or ratified by policymakers for the City of Milwaukee with final policymaking authority for the actions and omissions alleged above.

118. These policies, practices, and customs, as set forth in greater detail above, included the failure to adequately train, supervise, monitor, and discipline MPD officers who engaged in the constitutional violations, the pursuit of wrongful convictions through reliance on materially flawed investigations, coerced and fabricated evidence including witness statements, the suppression of exculpatory evidence, and the police code of silence.

119. One or more of the policies, practices, and customs described in this Count and in the facts above were maintained and implemented by the City of Milwaukee with deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights.

120. As a direct and proximate result of the City's actions and inactions, Plaintiff's constitutional rights were violated, and he suffered injuries and damages, as set forth above.

## COUNT V – Indemnification

121. Each paragraph of this Complaint is incorporated as if restated fully herein.

122. In Wisconsin, pursuant to Wis. Stat. § 895.46, public entities must pay any tort judgment for damages for which employees are liable for acts within the scope of their employment.

123. At all times relevant to this action, Defendants Casper, Schuler, Olson, Johnson, Duffy, Erwin, Burgos, Caballero, and Corbett committed the acts alleged above in the scope of their employment with Defendant City of Milwaukee. Therefore, Defendant City of Milwaukee is liable as their employer for any resulting damages or award of attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, from Defendants City of Milwaukee, Special Representative for Thomas Casper, deceased, Gregory Schuler, Randolph Olson, Louis Johnson, Timothy Duffy, Joseph Erwin, Ruben Burgos, Michael Caballero, and Kent Corbett, and he further demands punitive damages against the individual Defendants set forth above, plus attorneys' fees, the costs of this action, and whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff Danny Wilber demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: July 17, 2023

Respectfully submitted,

/s/ Ben H. Elson
Ben H. Elson, G. Flint Taylor,
Nora Snyder, Hakeem Muhammad
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070