**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| DANNY WILBER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-951 |
| | ) | |
| v. | ) | Judge J.P. Stadtmueller |
| | ) | |
| CITY OF MILWAUKEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN**
**SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants the City of Milwaukee (the "City"), Estate of Thomas Casper, by Special Administrator Donal Demet, Estate of Michael Caballero, by Special Administrator Donal Demet, Gregory Schuler, Randolph Olson, Louis Johnson, Timothy Duffy, Joseph Erwin, Ruben Burgos, and Kent Corbett ("Individual Defendants"), hereby submit this memorandum in support of their motion for summary judgment.

**INTRODUCTION**

The Seventh Circuit has ruled that the evidence presented at Plaintiff's 2005 criminal trial was sufficient to support his conviction for the murder of David Diaz beyond a reasonable doubt. Instead of ordering Plaintiff's acquittal, the Seventh Circuit awarded Plaintiff a new trial based upon his visible shackling in front of the jury before and during closing arguments. *Wilber v. Hepp*, 16 F.4th 1232, 1248 (7th Cir. 2021) (finding "no fault with the Wisconsin appellate court's decision as to the sufficiency of the evidence"). It found "there was ample evidence that would have permitted a reasonable trier of fact to find Wilber guilty beyond a reasonable doubt notwithstanding the oddities of the physical evidence." *Id.* at 1249-51 ("But, as we have also discussed, the State's case was not entirely without answers to the questions posed by this

1

[physical] evidence. . . . So the jury might reasonably have surmised that it was not physically impossible for Wilber to have shot Diaz."). Although the State chose not to retry Plaintiff, on July 23, 2024, the Wisconsin Claims Board rejected Plaintiff's efforts to collect Innocent Convict Compensation pursuant to Wis. Stat. § 775.05 because "the evidence is not clear and convincing that Wilber was innocent of the crime for which he was imprisoned." ECF No. 57, Ex. 1, Decision of Wisconsin Claims Board at 5.

Taking advantage of the dismissal of his charges on technical grounds, Plaintiff now claims that Defendants violated his due process rights by framing him for the 2004 murder of David Diaz ("Diaz"). Specifically, the crux of Plaintiff's claims is that Individual Defendants (1) fabricated inculpatory testimony from four witnesses, and a crime scene diagram with false measurements, and (2) withheld one piece of exculpatory evidence – the allegedly coercive interrogation methods they applied when questioning Richard Torres. Plaintiff brings the following Counts pursuant to 42 U.S.C. § 1983: (I) Fourteenth Amendment – Violation of Due Process; (II) Fourteenth Amendment – Failure to Intervene; (III) Conspiracy to Deprive Constitutional Rights; and (IV) *Monell* Policies and Practices. He also asserts an indemnification claim (Count V) pursuant to Wis. Stat § 895.46. ECF. No. 33, First Amended Compl. ("FAC") at 15-19. For the reasons discussed below, including that Plaintiff lacks sufficient evidence to prove his claims, Defendants are entitled to summary judgment.

Notably, Plaintiff brings no Fourth Amendment claim, including any claim for malicious prosecution or unlawful pretrial detention that would require him to show that Defendants lacked probable cause to charge or arrest him. Even though witnesses Antonia West, Jeranek Diaz ("Jeranek"), and Oscar Niles, during each of their respective testimonies at the criminal trial, recanted parts of their statements that they gave to police during the underlying criminal

investigation, those statements to police as well as the statement and trial testimony of Richard Torres supported probable cause to charge and arrest Plaintiff. These statements include Jeranek and Torres stating to police that they saw Plaintiff holding a silver and black gun in his right hand immediately after the shooting; that Jeranek and Torres both heard Plaintiff's sister, Antonia West, shout to Plaintiff that he had to get out of there because he shot the victim; and that multiple witnesses in the kitchen, including West, Niles, Jeranek, and Torres, heard the gunshot come from the area of the tussle. There was also physical evidence that pointed to Plaintiff's guilt, including Plaintiff's 6'7" height compared to Diaz's 5'8" height. *Wilber*, 16 F.4th at 1250-51 (height difference "made [Plaintiff] a more likely candidate for having shot Diaz from above, in a downward direction consistent with the trajectory of the bullet.").

**ARGUMENT**

**I.    Legal Standard for Summary Judgment**

A party seeking summary judgment must show that no genuine issue of material fact exists for trial, entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir. 1990). A factual issue exists when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). In conducting this analysis, courts must draw inferences in favor of the non-moving party, but only if they are reasonable. *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir. 1989).

Because a plaintiff has the burden of proof at trial, a defendant can seek summary judgment by highlighting the absence of the plaintiff's evidence instead of evidence that affirmatively disproves the plaintiff's claims. *Madrowski v. Pigatoo*, 712 F.3d 1166, 1168 (7th Cir. 2013); *see James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) ("The principal function of summary judgment

3

is to prevent unnecessary trials by screening out factually unsupported claims."). Then, the non-movant must respond with evidence that could satisfy its trial burden. *Madrowski*, 712 F.3d at 1168. If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish a cognizable claim, summary judgment is not only proper, but mandated. *See Padula v. Leimback*, 656 F. 3d 595, 600-01 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## II. Plaintiff's Fabrication of Evidence Claims and *Brady* Claims Against Defendants Johnson and Olson Based on the Statement and Interrogation of Richard Torres Fail.

Under Seventh Circuit law, the use of knowingly false evidence to convict someone at trial violates the due process clause and is referred to as a fabrication of evidence claim. *Patrick v. City of Chicago*, 974 F.3d 824, 834-35 (7th Cir. 2020); *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344-45 (7th Cir. 2019) (this is "a high bar to clear" because a plaintiff "must prove not only that [the] statement was false but that [a defendant] 'manufactured' it" and the defendant "knew—with certainty—[that it] was false").

Regarding Plaintiff's *Brady* claim, the Supreme Court recognized in that seminal case that criminal defendants have a due process right to know about certain helpful evidence in the government's possession. *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, a plaintiff must prove that (1) the evidence was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was willfully or inadvertently suppressed by the state, and (3) the evidence was material enough that a reasonable probability exists it could have changed the result of the proceeding. *Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015).

4

In his FAC, Plaintiff alleges that Defendants Johnson and Olson fabricated evidence when they coerced Richard Torres to inculpate Plaintiff in the murder. Specifically, in a section titled "Richard Torres's Statement," Plaintiff alleges:

> Olson and Johnson interviewed Torres and, through threats and intimidation, coerced him into providing a false statement incriminating Plaintiff. These Defendants threatened to charge Torres with the murder and made clear that they wanted him to say Plaintiff was the shooter. [They] knowingly fabricated substantial parts of a statement from Torres, including that he saw Plaintiff with a gun in his hand . . . moments after he heard the gunshot. In fact, Torres did not see Plaintiff with a gun either before or after the shot was fired.

FAC ¶¶ 38-41.

In the Executive Summary on summary judgment submitted to the Court, Plaintiff clarified that he maintains only one *Brady* claim in this case; he alleges that Defendants Johnson and Olson withheld the fact that they used coercive interrogation techniques on Richard Torres. ECF No. 46, Executive Summary for Summary Judgment, at 1 n.1 ("Plaintiff's suppression of exculpatory evidence claim is against only Defendants Johnson and Olson in relation to their alleged suppression of the coercive nature of their interview of Richard Torres.").[1] Even if the FAC viably alleges a *Brady* claim based on the purported failure to disclose the coercion of Torres, that claim fails on summary judgment for the reasons below.[2]

---

[1] Courts in this Circuit have rejected *Brady* claims to the extent they are simply fabrication claims in disguise. *See Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) (Seventh Circuit has foreclosed "an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement."); *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1029 (7th Cir. 2006) ("Nor can *Brady* serve as the basis of a cause of action against the officers for failing to disclose [a coerced confession] to the prosecutor"); *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 720-21 (N.D. Ill. 2016) (no *Brady* claim where fabrication was alleged because the plaintiff sought "to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of *evidence* to the prosecution").

[2] While the "Richard Torres's Statement" section of Plaintiff's FAC does not allege any withholding of exculpatory evidence, he alleges in Count I that Defendants "withh[eld] . . . the fact that these statements and reports were . . . coerced[.]"). FAC ¶¶ 38-41, 101.

**A. The only arguable evidence of fabrication or coercion is the Torres Affidavit, which is inadmissible hearsay and too vague to support liability.**

First, Plaintiff's only evidence that Torres' statement was fabricated, or that Torres was coerced, is Torres' inadmissible 2023 affidavit, which he signed in January 2023 well after the 2005 criminal trial but before this case began. *See* ECF No. 45, Ex. 1 ("Torres Affidavit") (claiming for the first time that "it wasn't true" that he saw Plaintiff with a gun, and that police "threatened," "suggested," and "wanted [him] to" inculpate Plaintiff). Torres has not been located or deposed in this case, so the affidavit is inadmissible hearsay and cannot be considered at trial or on this motion. Defendants here incorporate their arguments about the Torres Affidavit from their motion to bar Antonia West and Richard Torres from trial. *See* ECF No. 57 (arguing the Torres Affidavit is inadmissible hearsay without an applicable exception, and unfairly prejudicial). Without the Torres Affidavit, Plaintiff has no evidence at all that anything in Torres' February 2004 statement to police was false, that Johnson and Olson fabricated anything from their interview of Torres, or that they coerced Torres with threats or intimidation, let alone failed to disclose that coercion.

Second, even if the Torres Affidavit is considered, it is too vague to lay blame at the feet of Johnson and Olson, because the affidavit does not explain *how* officers suggested to him what to say or *who* these officers were. *See James v. Hale*, 959 F.3d 307, 315, 317 (7th Cir. 2020) (finding that the affidavit's "lack of detail here vitiates any evidentiary value"); *Mestayer v. Wisconsin Physicians Serv. Ins. Corp.*, 905 F.2d 1077, 1079 (7th Cir. 1990) (vague and conclusory affidavit was insufficient to defeat summary judgment); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir. 1983) (noting Section 1983 liability required "direct responsibility for the improper action."). Neither does it provide a clear timeframe for the alleged coercion. Instead, it says, "I [Torres] was interrogated at the police station and *the police* threatened to charge me with the

6

murder. The *detectives who interrogated me* suggested and wanted me to say that Danny was the shooter and that I saw him with a gun." Torres Affidavit ¶¶ 13-14 (emphasis added). Undisputed evidence shows that Torres was in custody for nearly 36 hours after the murder and was also interviewed by non-defendant detectives, including Detective Blaszak. Ex. 15, Johnson Dep. at 84-86. In those hours, Torres may have interacted with numerous other members of law enforcement that, to his mind, qualified as "police" or "detectives who interrogated [him]." Because Torres has failed to appear for a deposition and his location is unknown, we will never know the specific individuals that he intended to implicate or what Torres allegedly claims these unnamed officers actually did. For this additional reason, the evidence cannot sustain Plaintiff's fabrication and *Brady* claims against Johnson and Olson based on Torres' statement.

### B. The fabrication claims also fail because there is no evidence that Defendants Johnson and Olson knew that Torres' initial statement was false.

The critical question for purposes of analyzing a fabrication claim "is not the label on the claim, but whether the officers 'created evidence that *they knew to be false*.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014)). While a police officer can violate a plaintiff's due process rights by manufacturing evidence, "there is a difference between coercing witnesses to testify and fabricating witness testimony." *Petty*, 754 F.3d at 422. A fabrication claim does not necessarily arise when the evidence is a coerced statement, because even though "[c]oerced testimony is testimony that a witness is forced by improper means to give[,] the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false . . . it is testimony known to be untrue by the witness *and* by whoever cajoled or coerced the witness to give it." *Id.* (emphasis added) (internal citation and quotations omitted). Put succinctly, "a prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may

7

be true.'" *Id.* Thus, while obtaining statements through coercive tactics may violate the *witnesses'* rights, it "[does] not violate the *arrestee's* due process rights." *Id.* (emphasis added). In *Petty*, the Seventh Circuit held that coercing a witness by threatening him with jail time if he did not cooperate, locking him up without food or water for 13 hours, badgering him, and pressuring him to identify the plaintiff as an assailant did not constitute an evidence fabrication claim against the plaintiff. *Id.* at 422-423. Ultimately, Plaintiff must have evidence that Individual Defendants – including Johnson and Olson – knew the witness statements were false.

Again, regarding Torres, Plaintiff alleges that Defendants Olson and Johnson "coerced him into providing a false statement incriminating Plaintiff" and "knowingly fabricated substantial parts" of Torres' statement, including that Torres saw Plaintiff with a gun after the gunshot. FAC ¶¶ 39-41. But even accepting the allegations in the inadmissible Torres Affidavit, and assuming Torres in fact did not see Plaintiff with a gun on the night of the murder, the affidavit does not support that Johnson or Olson *knew* Torres' statement was false. *See Coleman*, 925 F.3d at 344-45 (a plaintiff must prove the defendant "knew—with certainty—[the evidence] was false"). To support Plaintiff's due process claim under *Petty*, the affidavit would need to allege that the officers had knowledge of falsity beyond merely coercing Torres to speak by threats, suggestions, and desires. Torres Affidavit ¶¶ 13-14. It does not. Instead, it only alleges that Torres told Johnson and Olson what he thought they wanted to hear. According to his affidavit, Torres "went along with it and told the detectives [he] saw [Plaintiff] with a gun, even though it wasn't true," but there is no indication that he told the officers he was lying. *Id.* ¶ 15. The officers may have coerced Torres, but without more, that cannot prove fabrication. *Petty*, 754 F.3d at 423 ("threatening [the witness] with jail time if he did not cooperate" did not equate to allegations "that [the] officers manufactured evidence that they knew to be false.").

8

**C. The *Brady* claims also fail because the alleged coercion was discoverable by reasonable diligence.**

Second, even if a jury could find that Torres was coerced, Plaintiff cannot establish that the evidence was "suppressed" under *Brady* because reasonable diligence could have revealed the coercion to the defense. As noted, Plaintiff must show that evidence was suppressed to prevail on his *Brady* claim. "[E]vidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Here, Torres' statement was obtained the day after the murder and disclosed to the prosecution and defense. Torres would obviously have knowledge about his own treatment during the interrogation. And if Plaintiff in fact did not have a gun on the night of the murder, he and his counsel would have known that, for some reason, Torres made a mistake or lied when he gave his statement to Johnson and Olson.

Any reasonably diligent counsel would seek to probe the nature of Torres' interrogation and determine whether Torres was tempted, pressed, or coerced into inculpating Plaintiff. Even if Johnson and Olson did coerce Torres, there is no evidence that any Defendant somehow prevented Torres from subsequently revealing the nature of his interrogation before or at trial. Instead, by his own volition, Torres testified consistent with his previous statement to Johnson and Olson, and did not reveal any exculpatory information in his testimony. The jury's verdict supported his credibility on the stand. Because any improper tactics employed by Defendants Johnson and Olson were therefore discoverable before and at trial, Plaintiff cannot establish that Defendants Johnson and Olson suppressed evidence, and they are entitled to summary judgment on Plaintiff's *Brady* claim. *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011) (rejecting *Brady* claim based on officer's alleged failure to disclose "pressure" put on witness because a defendant "has the

9

'responsibility to probe the witnesses and investigate their versions of the relevant events.'"); *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) ("But a lying witness is certainly not a *Brady* violation. . . . Moreover, both [officer witnesses] were accessible to the defense . . . It is [the plaintiff's] responsibility to probe the witnesses and investigate their versions of the relevant events.").

      **D.  The *Brady* claims also fail because there is no constitutional requirement that handwritten notes be turned over, or that any handwritten notes from this case contained exculpatory information that was concealed or withheld.**

Finally, Plaintiff's FAC specifically alleges the failure of police officers to turn over handwritten notes, which would appear to support his *Brady* claims against Johnson and Olson for the Torres interview. FAC ¶ 86. Certain Defendants like Johnson admittedly took handwritten notes when interviewing witnesses. And Johnson did not proactively give those notes over to prosecutors, instead doing so when asked. Johnson Dep at 90-95, 99, 106, 108. However, *any handwritten notes were copied into police reports before being destroyed*. And that is the glaring flaw in Plaintiff's claim. There is no constitutional requirement that investigative notes be turned over when all relevant and exculpatory information from the notes is transferred and recorded in a report, which is then turned over to prosecutors. Even if such practice were an internal policy infraction, it was not a constitutional violation. Instead, to turn this practice into a potential claim, Plaintiff must show that exculpatory notes were taken, were destroyed, and that the substance of what was in the notes was not placed into an official report and disclosed to the prosecutor. However, Detective Gregory Schuler testified that the information from police notes would be included into an official police report before the notes were shredded. Schuler Deposition at 84. Plaintiff has no evidence to the contrary.

**III. Defendants Are Also Entitled To Summary Judgment On Plaintiff's Fabrication Of Evidence Claims That Are Based On Statements From Witnesses Antonia West, Jeranek Diaz, and Oscar Niles.**

First, while Antonia West and Jeranek testified at the criminal trial that they did not actually state certain parts of their initial statements to Individual Defendants, Oscar Niles did not testify to that effect. Rather, he testified, for example, that he could not recall certain things, that detectives harassed him, that he told police what they wanted to hear, and that they put his testimony in their own words. None of this shows that Defendants Burgos, Corbett, or Caballero *knew* that Niles' original statement was false. *Petty*, 754 F.3d at 422-23. Summary judgment should be granted in their favor.

But even if Plaintiff can prove that certain evidence was false and manufactured, "if the fabricated evidence was immaterial, it cannot be said to have caused an unconstitutional conviction and deprivation of liberty." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) (jury instruction was error when it "failed to explain that [the plaintiff] had the burden to prove that the fabricated evidence was used against him at his criminal trial and was material."). Evidence is material "if there is a reasonable likelihood the evidence affected the judgment of the jury." *Id.*

Here, at Plaintiff's criminal trial in 2005, Antonia West was a witness *for the defense*, and testified that parts of her initial statement were not true and that police twisted her words.[3] Similarly, at the criminal trial, witnesses Jeranek and Oscar Niles told the jury that certain portions of their initial statements were not true or explained to the jury that their words had been added to or twisted. Ex. 1, pp. 40, 61, 74-76, 79-82, 85, 89; Ex. 5, pp. 114-119, 126-133, 141-145, 156-157,

---

[3] Antonia West has not been deposed in this case and cannot be located. Defendants have moved to bar her testimony at trial because they have not had the opportunity to depose her. *See* ECF No. 57.

11

163-165, 181. At their depositions, Jeranek and Niles merely confirmed their trial testimony. Ex. 17, Diaz Dep., pp. 24-26; Ex. 24, Niles Dep., pp. 13-34.

The jury, therefore, heard and considered that these witnesses recanted parts of their initial statements. It still convicted Plaintiff based on the totality of the evidence, including Torres' statements, the physical evidence like Plaintiff's height and the trajectory of the bullet, and un-recanted statements from Lea Franceschetti and Jaimie Williams, including testimony about the Plaintiff's belligerence and role in escalating violence at the murder scene. The allegedly fabricated statements by West, Jeranek, and Niles were therefore immaterial to Plaintiff's conviction, and they cannot support Plaintiff's fabrication of evidence claims here. *See Olson v. Cross*, 714 F. Supp. 3d 1034, 1053 (N.D. Ill. 2024) (granting summary judgment on fabrication claim because the "ample evidence, apart from the allegedly fabricated statements" supported the jury's finding and there was no "basis on which a reasonable jury could conclude that [the evidence] would qualify as material at the original trial.").

## IV. There Is No Evidence That Defendant Casper Fabricated Any Evidence, Including The Scene Diagram, And That Evidence Was Immaterial.

Plaintiff alleges that Defendant Casper "falsified a scene diagram with erroneous measurements in an attempt to make the state's theory that Plaintiff was the shooter more plausible . . . [and] falsified the distance from Diaz's feet to the doorway in an attempt to create evidence to support the Defendants' false theory that Plaintiff had shot David Diaz." FAC ¶¶ 72-75. But there is no evidence to support these claims. Defendant Casper died before he was able to be deposed in this case, and Plaintiff has not produced any evidence suggesting that the measurements in Casper's scene diagram were incorrect, mistaken, or faulty, let alone purposefully fabricated. Any measurements from other sources that deviate slightly from Casper's would be no evidence of manufacture or fabrication, but merely the result of human error, if not natural measurement

12

imprecision or deviation. Because the jury will hear no evidence that the diagram was fabricated evidence, the claims based upon the scene diagram must fail. And because neither the FAC nor the evidence implicates Defendant Casper in any other aspect of this case, he should not be required to proceed to trial.

Even if the evidence was fabricated, there is no indication that the measurements made by Casper were in any way material to the jury's determination. Given the plethora of other physical and testimonial evidence, no reasonable jury could find that the measurements affected the judgment of the jury. *Patrick*, 974 F.3d at 835.

## V. The Conspiracy Claims Should Be Dismissed Because There Is No Evidence of an Unlawful Agreement.

The conspiracy claims should be dismissed on summary judgment because Plaintiff failed to adduce evidence that Individual Defendants formed an "agreement" to commit an unlawful act. In order to state a conspiracy claim under § 1983, Plaintiff must allege: (1) an agreement between two or more people; (2) to participate in an unlawful act; (3) causing an injury by reason of the commission of an overt act; (4) which overt act was done pursuant to and in furtherance of the common scheme. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007). Absent evidence of an unlawful agreement, any conspiracy claim fails. *Kelley v. Myler*, 149 F.3d 641, 649 (7th Cir. 1998).

In this case, there is no evidence that the Individual Defendants made any agreement to violate Plaintiff's federal rights. In addition, under the intra-corporate conspiracy doctrine, Individual Defendants cannot be party to a conspiracy as a matter of law because they are members of the same municipal entity. *Scott v. City of Chicago*, 619 Fed. Appx. 548 (7th Cir. 2015). Therefore, summary judgment should be granted as to the conspiracy claims.

13

**VI.    The Failure to Intervene Claims Should Be Dismissed Because There Is No Evidence That Individual Defendants Had A Realistic Opportunity To Prevent The Constitutional Violations of Other Individual Defendants.**

In order to prevail on his failure to intervene claims, Plaintiff must "demonstrate that the Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Similar to the conspiracy claims, the evidence fails to show that the various Individual Defendants had a realistic opportunity to prevent the allegedly unconstitutional behavior of their co-Defendants. There is no evidence that: any Defendant besides Casper had anything to do with the relevant scene diagram or knew it was fabricated; any Defendant besides Johnson and Olson interrogated Torres, or knew anything about related fabrication or coercion; anyone besides Defendant Schuler interrogated Jeranek, or knew anything about related fabrication; anyone besides Defendants Johnson, Olson, Duffy, and Erwin interrogated Antonia West, or knew anything about related fabrication; or anyone besides Defendants Burgos, Caballero, and Corbett interrogated Oscar Niles, or knew anything about related fabrication. For each of these pieces of alleged fabricated evidence, Plaintiff cannot show that the other Individual Defendants – who were not part of the creation of the evidence – had a realistic opportunity to prevent it. Even if the specific Individual Defendants who allegedly fabricated those pieces of evidence may be liable as to those pieces of evidence, they cannot be liable for failing to intervene to prevent the other alleged instances of fabrication. The failure to intervene claims must fail.

**VII.   Similarly, Individual Defendants Can Only Be Liable For Misconduct In Which They Were Personally Involved.**

Plaintiff brings each of his claims and Counts against every Individual Defendant and the City. FAC at 15-19. But while his complaint identifies numerous pieces of allegedly fabricated and withheld evidence, only one or a subgroup of specific Individual Defendants are alleged to

14

have been responsible for the creation and manufacture of each piece of evidence. And the undisputed evidence in this case confirms that only certain Individual Defendants were involved in any given witness statement, scene diagram, or interrogation. For example, as noted above, Defendant Casper is the only Individual Defendant tied to the allegedly fabricated scene diagram. To the extent that the Court grants summary judgment as to certain pieces of evidence like the scene diagram, and the Individual Defendants involved with that evidence are accused of no other wrongdoing, those Individual Defendants should not proceed to trial. *See Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("An *individual* cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional deprivation.") (emphasis in original); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1158 (N.D. Ill. 2022) ("There is no genuine dispute that Detective Fine was personally responsible for the document's creation, so Fine is entitled to summary judgment on [the evidence-fabrication] claim.").

## VIII.   The City Is Entitled To Summary Judgment On Plaintiff's *Monell* Claim.

A city cannot be liable for a constitutional violation on a *respondeat superior* theory. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). Instead, a plaintiff must establish a city's direct liability by proving that the "execution of a government's policy or custom . . . inflict[ed] the [plaintiff's] injury[.]" *Id.* This can be shown in one of three ways: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) [a showing] that the constitutional injury was caused by a person with final policymaking authority." *Id.* Under the second approach, a plaintiff must prove that city policymakers were aware of the widespread practice and were

15

"deliberately indifferent" to its obvious consequences. *Id.* To meet the widespread practice element, Plaintiff must be able to present evidence beyond mere individual conduct and instead prove the existence of "a *widespread practice* that permeates a critical mass of an institutional body." *Rossi v. City of Chi.*, 790 F.3d 729, 737 (7th Cir. 2015) ("In other words, *Monell* claims focus on institutional behavior; for this reason, misbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole."); *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (isolated examples are not a widespread practice); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("[W]hat is needed is evidence that there is a true municipal policy at issue, not a random event.").

Additionally, the deliberate indifference element of a *Monell* claim "is a high bar. Negligence or even gross negligence on the part of the municipality is not enough. A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Finally, the plaintiff must meet a "rigorous causation standard" by demonstrating that the municipality's action was the "moving force" behind the constitutional deprivation. *Id.* This requires the plaintiff to show a "'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *Id.* at 987.

The Seventh Circuit has recently emphasized that these elements "must be scrupulously applied in every case alleging municipal liability." *First Midwest Bank Guardian of Estate of LaPorta*, 988 F.3d at 987 (citing *Bd. of County Com'rs of Bryan Couty, Okl. V. Brown*, 520 U.S. 397, 415 (1997) ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in

16

*Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights.")).

Plaintiff's FAC provides notice that his *Monell* claims are based on the following alleged policies and practices: "[1] pursuing wrongful convictions through reliance on materially flawed investigations and coerced and fabricated evidence including witness statements; [2] failing to produce to criminal defendants exculpatory material including handwritten notes of interviews and other investigative activities; [3] failing to properly investigate or seeking to discredit alternative suspects; [4] failing to adequately train, supervise, monitor, and discipline Milwaukee police officers; and [5] maintaining the police code of silence." FAC ¶ 86 (section titled "Policies and Practices"); *see id.* ¶¶ 89, 91 (alleging "policy and practice . . . of using coercive interrogation tactics in order to elicit false statements" and listing tactics including "(a) psychological intimidation, manipulation, and physical deprivation; (b) fabrication of evidence; (c) concealment of exculpatory information; (d) failing to investigate and discrediting alternative suspects; (f) [sic] false testimony; and (g) other unlawful tactics[.]"); *id.* ¶ 93 ("As a matter of both policy and practice, municipal policymakers and MPD supervisors condoned and facilitated a code of silence within the Milwaukee Police Department."). To support his claims, Plaintiff in his FAC cites, with no detail, only two other convictions – those of William Avery and Chaunte Ott. FAC ¶ 92.

Plaintiff's *Monell* claims fail because Plaintiff cannot establish (1) that any of the alleged widespread policies or practices existed; (2) that if such a practice existed, City policymakers were aware of it; or (3) that any such practice caused the deprivation of Plaintiff's rights.

**A. Plaintiff has no evidence of the widespread practices he alleges.**

Simply put, Plaintiff has not produced evidence in this case to support his claims of widespread practices or customs at the City. While he alleges two separate cases of wrongful convictions in the FAC, the discovery in this case does not provide evidence that establishes a pattern or practice of wrongful convictions being pursued "through reliance on materially flawed investigations[,]" coerced or fabricated evidence, withholding of exculpatory evidence, or a failure to properly investigate. Plaintiff's FAC merely alleges that "Milwaukee police officers used similar tactics to secure wrongful convictions" but the record is devoid of sufficient evidence indicating that the William Avery case and Chaunte Ott case cited to in Plaintiff's FAC are in any way similar to this matter. Plaintiff did depose Katherine Spano, a detective that worked on the Avery matter; however, that evidence alone is insufficient to establish the existence of a widespread pattern or practice because, at most, it establishes the pattern or practice of a single detective, and individual conduct alone cannot support a *Monell* claim. *Rossi*, 790 F.3d at 737; *Thomas*, 604 F.3d at 303.

This analysis also applies to Plaintiff's allegations that Defendants Johnson and Olson recorded exculpatory information from their questioning of Torres on a notepad and then destroyed the pad before copying the notes. Even assuming *arguendo* that Plaintiff's allegations are true, that would not establish a "widespread" practice of withholding exculpatory evidence. Nor does the evidence in the record prove the existence of a widespread practice of discrediting or failing to investigate alternative suspects. The Seventh Circuit has cautioned that one, or even three instances of misconduct do not constitute a widespread practice supporting municipal liability. *Thomas*, 604 F.3d at 303. Even if this Court finds that the evidence in the record supports Plaintiff's own, individualized experience of constitutional violation (though it does not), without any evidence of

18

other, similar experiences, Plaintiff has failed to prove a pattern of widespread misconduct and thus, his *Monell* claim fails.

**B. Even if the alleged widespread practices existed, Plaintiff cannot show a City policymaker knew about them.**

In order for a government official's knowledge of a widespread practice to support *Monell* liability, the official "must be responsible for establishing final government policy on a particular issue." *Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (internal citations omitted). State law is used to identify such policymakers. *Id.* at 676. The Seventh Circuit has recognized that under Wisconsin law, the Chief of Police is the appropriate policymaker for police departments. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 749 (7th Cir. 2004). To properly allege notice on behalf of a municipality, Plaintiff must present evidence of a "pattern of similar constitutional violations . . . to show that the City had notice of the widespread practice[,]" and while there is no set amount of similar incidents Plaintiff must present, it must be enough incidents to establish a clear pattern of misconduct. *Fix v. City of Chi.*, 2022 WL 93503, at *2 (N.D. Ill. Jan. 10, 2022) (citing *Fields v. City of Chi.*, 981 F.3d 534, 562 (7th Cir. 2020)).

Plaintiff has presented no evidence that the Chief of the Milwaukee Police Department ("MPD") knew about and condoned any allegedly unconstitutional practice. Plaintiff also has not presented evidence of similar incidents, other than merely alleging that two other MPD cases constitute "wrongful convictions." Despite those allegations, the record does not contain evidence establishing how those two other "wrongful convictions" are in any way similar to Plaintiff's conviction in this case or to the underlying criminal investigation that occurred in this matter. Without such evidence, Plaintiff has failed to meet the high bar of deliberate indifference.

### C. Plaintiff has no evidence that any practice was the "moving force" behind any of the alleged violations.

Plaintiff has no evidence that any of the alleged unconstitutional City practices were employed in this case. For the reasons explained *supra*, Plaintiff's fabrication and *Brady* claims fail, because the only evidence supporting a *Brady* claim is the inadmissible Torres Affidavit. Even if the fabrication or *Brady* claims survive, Plaintiff has no evidence that the *City's policies*, as opposed to the unlawful decisions of one or a few of its employees, caused those violations. This warrants summary judgment for the City. *See Brown v. City of Chi.*, 2022 WL 4602714, *37 (N.D. Ill. Sept. 30, 2022) (granting summary judgment in favor of the City on plaintiff's *Monell* claims where plaintiff "failed to set forth evidence of causation[.]"). Nor is there an indication from the evidence that a "code of silence" or training and/or disciplinary deficiencies were the moving force behind alleged unconstitutional conduct by the officers in this case. *See Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019) (affirming grant of summary judgment in favor of the City where plaintiff failed to provide evidence that would support any reasonable jury finding that the City did not properly train its officers "much less evidence that a failure to train or supervise was the moving force" behind plaintiff's constitutional injuries) (internal quotation marks omitted).

Like the plaintiff in *Brown*, Plaintiff has failed to present evidence, beyond mere allegations, of any causal link between his injuries and a City policy or practice. 2022 WL 4602714 at *37. There is no evidence in the record of specific City policies, City actions or inactions, specific deficiencies in training, or deficiencies in disciplinary measures that were the cause of his injuries. At most, Plaintiff has alleged that the Individual Defendants were the cause of Plaintiff's injuries, but that alone is not evidence that the City was the moving force behind Plaintiff's injuries; individualized actions cannot support a *Monell* claim. *Rossi*, 790 F.3d at 737; *Thomas*, 604 F.3d at 303. Thus, based on the evidence in the record, no reasonable jury could conclude that

20

any causal link exists between the City's policies, practices, or alleged failure to train or discipline, and Plaintiff's alleged injuries *in this case*.

### D. Plaintiff has no *Monell* claim based on a lack of training, supervision, or discipline, or a code of silence.

Plaintiff has no evidence of a failure to train, supervise, or discipline officers, or evidence of the existence of a "code of silence." "Showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Connick v. Thompson*, 563 U.S. 51, 68 (2011) (alterations and internal quotation marks omitted).

Here, at most, Plaintiff has alleged that the City should have provided more training to its officers. That alone is insufficient to support a finding that the City was deliberately indifferent to training deficiencies. Rather, the depositions taken in this matter support the opposite position. For example, in the deposition of Katherine Spano, the detective who worked on the Avery matter, she stated that she received training on taking statements from witnesses and suspects, the importance of writing thorough reports as well as detective training on how to conduct investigations and proper procedures in terms of translating handwritten notes into typed police reports. Ex. 32, Spano Dep., pp. 9-11, 16-21. Additionally, the Defendants in this matter testified at their depositions that they received over twenty weeks of officer training, additional training each year on topics including report writing, interviewing witnesses and suspects, death investigations, the Reid technique, and additional detective training. Ex. 16, Schuler Dep., pp. 15-17; Ex. 15, Johnson Dep., pp. 15, 35-41; Ex. 19, Olson Dep., pp. 17-20, 40-41, 45-46, 48. Plaintiff has not provided any evidence to refute the Defendants' deposition testimonies regarding their training. Nor has Plaintiff presented evidence of the City's disciplinary procedures and investigations of misconduct.

21

Further, based on the evidence in the record, Plaintiff has no evidence to present to a jury that a lack of supervision over its police officers caused the alleged constitutional violations here, or indeed, any others. And Plaintiff presents no evidence of other cases where the City and its policymakers learned of constitutional violations like those alleged here and failed to discipline police officers like Individual Defendants.

Last, there is no evidence in the record sufficient to support a finding that the City was deliberately indifferent toward a widespread practice of a "code of silence." Rather, the City's standard operating procedures at the time of this investigation support the opposite finding. Specifically, one of the general rules and regulations of the MPD requires its officers to "promptly report . . . to the Chief of Police" if "any unlawful order is given to any member." Ex. 33, Rule 4 – General Rules and Regulations. Additionally, MPD required its officers to "promptly communicate in writing to their commanding officer any violation of the Department Rules and Procedures Manuel or disobedience of orders by any other member that may come to their knowledge." Ex. 33.

Based on the evidence, and lack of evidence, in the record, it is clear that Plaintiff failed to meet the high bar necessary to prove that the City was deliberately indifferent to a widespread practice of constitutional violations, deficiencies in its training and disciplinary measures, and a code of silence. Thus, the *Monell* claim should fail.

## IX. To The Extent That The Underlying Constitutional Claims Fail, the Derivative Conspiracy, Failure to Intervene, and Indemnification Claims Fail As Well.

A failure to intervene claim fails if the court finds that no other constitutional claims are viable. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). This is equally applicable to any respondeat superior, indemnification, and conspiracy claims. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021); *Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir. 2004).

22

Therefore, if summary judgment is granted on the underlying constitutional claims, then the failure to intervene, conspiracy, and indemnification claims cannot independently proceed.

## CONCLUSION

For the reasons stated above, the Court should grant Defendants' motion for summary judgment.

Respectfully Submitted,

By:      *s/ Shneur Nathan*
Shneur Nathan
Nathan & Kamionski, LLP
206 S. Jefferson
Chicago, Illinois 60661
312-612-1928
snathan@nklawllp.com