# EXHIBIT 9

```
 1                    DEPUTY:  All rise for the jury.

 2                    (Jury in box.)

 3                    THE COURT:  You may be seated.

 4          Thank you for your patience.  We're going to

 5          continue where we left off with the morning

 6          session, with the direct examination of this

 7          witness, Antonia West.  You may continue.

 8                    CONTINUED DIRECT EXAMINATION OF

 9          ANTONIA WEST:

10     BY ATTORNEY GRIFFIN:

11     Q.   Miss West, do you have those exhibits with

12          you, Exhibits 27 and 28, the two statements?

13          You can -- do you have them with you?

14     A.   Yes.

15     Q.   Did you look at -- did you review them over

16          lunch?

17     A.   No.

18     Q.   I'm sorry?

19     A.   No.

20     Q.   You didn't read them?  Any particular reason

21          you didn't read them?

22     A.   I had trouble reading.

23     Q.   You have trouble reading?

24                    THE COURT:  Is that a yes?

25                    THE WITNESS:  Yes.
```

6

```
 1   BY ATTORNEY GRIFFIN:

 2   Q.   If I read along with it can you follow with

 3        me?

 4   A.   Yes.

 5   Q.   We're going to start with Exhibit 27.

 6   A.   Okay.

 7   Q.   That's the one we were talking about before.

 8        You have the one -- the one that has eight

 9        different pages.  Okay?  Can you read okay or

10        you just read slow?  Do you know what I mean?

11        Do you know the difference between not reading

12        well and just reading well, but slowly?

13   A.   No.

14   Q.   In other words, if you -- if we took as much

15        time as you needed to go through that, would

16        you be able to read it on your own?

17   A.   No.

18   Q.   No.  Okay.

19                  ATTORNEY CHERNIN:  I'm going to

20        object to this form of going through it.

21                  THE COURT:  Side bar.

22                  (Side bar.)

23                  THE COURT:  Back on the record.

24        Miss West, I'm just going to remind you that

25        you remain under oath and you must respond to
```

7

```
 1        the questions that are posed to you by both

 2        counsel.

 3                    Mr. Griffin.

 4   BY ATTORNEY GRIFFIN:

 5   Q.   Ms. West, did you go -- did you go at some

 6        point to at least some high school?

 7   A.   North to ninth.

 8   Q.   Can you speak up.

 9   A.   To North Division to ninth.

10   Q.   Ninth grade.  Can you read at all?

11   A.   A little bit.  I ain't that good though.

12   Q.   When you talked to the detectives did you tell

13        them that you can read and write?

14   A.   No.

15   Q.   Never told them that?  Did they ask you?

16   A.   No.

17   Q.   Earlier this morning when you were testifying,

18        were you reading this document?

19   A.   Some of it.  I understood some and some I

20        didn't.

21   Q.   Okay.  Well, did you understand about the

22        part, for example, where when we talked about

23        that you drank five or six beers and wasn't

24        intoxicated, were you able to read that?

25   A.   Yeah.
```

8

```
 1   Q.   So that part was in there, you'll agree with
 2        that?  We saw it earlier this morning;
 3        correct?
 4   A.   Do I agree having five or six beers you said?
 5   Q.   No, no, no.  But you remember seeing that part
 6        in the statement before?
 7   A.   Yeah.
 8   Q.   And it was written in there and you were able
 9        to read that part?
10   A.   Yeah.
11   Q.   Okay.  So when I asked you before about
12        whether from the time you talked to the police
13        on February 2nd to today, you had seen those
14        documents at all, and had you?
15   A.   Yes.
16   Q.   You read them, you said yes, but you couldn't
17        remember when.  Is that -- am I right about
18        that?
19   A.   Yes.
20   Q.   Okay.  Did someone read them to you?
21   A.   My mother.
22   Q.   Okay.  And when your mother read them to you
23        do you recall her reading your statement to
24        you and saying something about your brother
25        patting himself down after the shooting?
```

9

```
 1   A.   No, that wasn't in there.

 2   Q.   It's not in there?

 3   A.   They put some other stuff -- they put some

 4        other stuff that I didn't say.  And what I

 5        didn't say I had my mother underlined it for

 6        me what I didn't say.  And that's what I got

 7        at home.

 8   Q.   And you agree though that you initialed this

 9        document all over the place?

10   A.   Yes.

11   Q.   In fact, whenever the police made a mistake

12        and crossed something out, you initialed it to

13        show that you knew they were crossing

14        something out; isn't that true?

15   A.   No.

16   Q.   Well, look, for example, on page 4 of 8.

17        Right here.  Not the very last line, but one

18        line up, there's a couple of words scratched

19        out, and that looks like those initials AW are

20        right near it.  When did you initial that?  Do

21        you see what I'm talking about?

22   A.   Where it says, She does not know how or where

23        Darnell went, above that, that's what you

24        talking about?

25   Q.   Right.  Right above that.
```

10

```
 1   A.   Yeah.

 2   Q.   You see there's a couple of words, looks like

 3        and Darnell in there, they're scratched out;

 4        right?

 5   A.   Yes.

 6   Q.   And just below the scratch out there are the

 7        initials AW.  Do you see that?

 8   A.   Yes.

 9   Q.   Whose initials are those?

10   A.   Mine.

11   Q.   When did you put them there?

12   A.   What do you mean?

13   Q.   Well, at what point when the police are

14        writing the statement out do you initial that

15        cross out?

16   A.   Did I do that cross out?

17   Q.   No.  Did you put your initials there

18        underneath the cross out?  Do you want me to

19        show you another one?

20   A.   Yes.

21   Q.   For example, on page 3 of 8, down here on the

22        right-hand side there's some cross outs.  Are

23        those your initials AW underneath that and

24        then on the cross out over here on the left

25        are those also your initials AW, ma'am?  They
```

11

```
 1      are; aren't they?

 2  A.  Yes.

 3  Q.  In fact, when the police went through this

 4      document with you they made sure you initialed

 5      those changes so you couldn't say later, hey,

 6      you guys changed something in my statement;

 7      isn't that right?  Isn't that why they had you

 8      do that?

 9              ATTORNEY CHERNIN:  Objection.

10      This is asking her what the police --

11              THE COURT:  What's the basis for

12      the objection?

13  BY ATTORNEY GRIFFIN:

14  Q.  Isn't that what they told you --

15              THE COURT:  One moment.

16              ATTORNEY CHERNIN:  906.02.

17              THE COURT:  Calling for again

18      speculation.  Overruled.

19              ATTORNEY CHERNIN:  Actually it's

20      lack of personal knowledge.

21              THE COURT:  Lack of personal

22      knowledge requires speculation of what the

23      officers were thinking.  Overruled.  I'll

24      allow it.

25  BY ATTORNEY GRIFFIN:
```

12

```
 1   Q.   When the officers asked you to place your
 2        initials next to the changes and cross out,
 3        why did they tell you they wanted your
 4        initials there?  They told you that because
 5        they wanted you to acknowledge that those
 6        changes were made with your knowledge; right?
 7   A.   No.
 8                    ATTORNEY CHERNIN:  Same
 9        objection.
10   A.   To be honest, he was -- I was just trying to
11        get out of there.  I was just signing anything
12        and I wasn't reading it because I -- I'm not
13        good at reading.
14   BY ATTORNEY GRIFFIN:
15   Q.   Well they read it to you though?
16   A.   No.  That's what I'm trying to tell you, no.
17   Q.   Do you know how many times your initials are
18        in this document?  I mean a lot; right?
19   A.   Right.
20   Q.   Is it fair to say that your initials are after
21        every paragraph or just about?
22   A.   Just about.
23   Q.   And you're saying that the only reason you put
24        your initials on this statement was to get out
25        of there?
```

13

```
 1    A.    Yep.

 2                      THE COURT:  That's a yes.

 3                      THE WITNESS:  Yes.

 4    BY ATTORNEY GRIFFIN:

 5    Q.    Did the police make any promises to you to get

 6          you to talk to 'em?

 7    A.    No, they just kept trying to make me say my

 8          brother did it.

 9    Q.    And did the police in fact tell you and make

10          sure that you understood that you were not in

11          custody?

12    A.    No.

13    Q.    Well, on page 2 of 8, for example, where it

14          reads, West did come to the CIB voluntarily

15          and after being conveyed to the CIB by

16          Detective Scott Benton West states she

17          understands she is presently not in custody

18          and no promises were made to her for her

19          statement.  And then your signature is in

20          there.  Do you want me to show you that?  West

21          states.  Can you read that?

22    A.    Um-hmm.

23    Q.    Is that a yes?

24    A.    Yes.

25    Q.    She understands she is presently not in
```

                                14

```
 1        custody.  Can you read all those words?
 2   A.   Yes.
 3   Q.   And no promises were made to her for her
 4        statement.  Can you read those words?
 5   A.   Yes.
 6   Q.   And is that your signature, not your initials
 7        but your signature, on that line?
 8   A.   Yes.
 9   Q.   Did you agree to go downtown and talk to the
10        police?
11   A.   Yes.
12   Q.   They didn't arrest you; right?
13   A.   No.
14   Q.   And this was not the day after, but really
15        kind of two days after the shooting; right?
16   A.   Right.
17   Q.   What's your brother's nickname?
18   A.   Slim.
19   Q.   S-L-I-M, Slim?
20   A.   Yes.
21   Q.   Do you remember how much you had to drink at
22        the after hours?  At the party?
23   A.   No.
24   Q.   It's been a long time; right?
25   A.   Right.
```

15

```
 1   Q.   Do you remember telling the police that you
 2        had one beer and you were in the kitchen when
 3        everything started to happen?
 4   A.   Yes.
 5   Q.   Is that true, is that about right as you
 6        recall now, do you recall having one beer or
 7        more than one?
 8   A.   Yes.
 9   Q.   Now, I want to ask you if you remember telling
10        the police this.  West denies seeing Danny
11        choke or punch anyone, and she was very upset
12        at Danny now because he wouldn't listen to
13        her.  West states she hears one gunshot go off
14        in the area directly behind her where her
15        brother Danny and the Hispanic males were
16        talking in the kitchen.  West states she then
17        ducks her head down and then looked back up
18        where she thought gunshot came from, and
19        everyone were running out of the front door.
20        Do you remember telling the police that?
21   A.   Not saying that, when you said that I didn't
22        say -- when I said -- when you just said that
23        I said that I didn't see him choke nobody, I
24        did, 'cuz I told 'em that they -- that I seen
25        him fighting with Jay and they was choking the
```

16

```
 1        guy up on the wall.  I told 'em that, now they
 2        switched that up on me.
 3    Q.  They switched it up on you?
 4    A.  Yeah.  They said I didn't say that and I did
 5        say that.  I said that he been -- that he was
 6        choking the guy and arguing with Jay and I
 7        told them that, and they put I didn't say
 8        that.
 9    Q.  So when the police wrote down that you denied
10        seeing it, the police are getting it wrong?
11    A.  Yes.
12    Q.  West states she then ducks her head down and
13        then looked back up where she thought gunshot
14        came from and everyone was running out of the
15        door.  Did you tell them that?
16    A.  Yeah.  Running out the door, yeah.  When I
17        looked up everybody was running out the door.
18    Q.  West denies seeing anyone with a gun and now
19        doesn't even see her brother Danny.  West
20        states she then runs past the victim who's
21        lying on his stomach in the kitchen near a
22        wall.  Denies seeing her brother or his
23        friends once she gets outside.  Is that the
24        way you told it to the police?
25    A.  Yeah.
```

17

```
 1   Q.   There's nothing in here about you seeing your

 2        brother patting himself down; right?

 3   A.   See, I said that and now I didn't know if they

 4        put it in there or not.  But I did say that.

 5   Q.   She then runs up to Jamie's white four-door

 6        car and Jamie and Lea were inside the car

 7        warming it up; is that right?

 8   A.   Yes.

 9   Q.   I'm going to show to you a couple of photos

10        marked 10 and 11.  Do you recognize the person

11        in that photo that's marked Number 10?

12   A.   Yes.

13   Q.   Who is that?

14   A.   This chick Lea.

15   Q.   Who?

16   A.   This girl named Lea.

17   Q.   Lea.  Was she in that car that you got into

18        after the shooting there on West Mineral?

19   A.   Yes.

20   Q.   And how about Number 11?

21   A.   I don't know who that is.

22   Q.   When you got into the car what happened?

23   A.   What do you mean what happened?

24   Q.   What did you say in the car?  Anything?

25   A.   I was just in shock, but I couldn't say
```

18

```
 1          nothing.  Just shocked and we drove off.

 2    Q.    You said nothing?

 3    A.    Nothing.

 4    Q.    Maintained a perfect silence the entire time

 5          in that car?

 6    A.    I was just scared, and --

 7    Q.    Do you recall that at any time saying

 8          something like, my brother, my brother, I

 9          can't believe that shit.

10    A.    Do I remember saying that?

11    Q.    Yeah.

12    A.    No.

13    Q.    Did you say that?

14    A.    No.

15    Q.    And Donald Jennings was in the car with you?

16    A.    Yes.

17    Q.    Along with Oscar Niles?

18    A.    Yes.

19    Q.    Along with Jamie and Lea?

20    A.    Yes.  What I said was, oh shit, where's my

21          brother, because I didn't know if he had been

22          shot and I didn't see him when we was -- when

23          everybody ran out.  I didn't see him run, I

24          didn't see him so I was asking Donald, you

25          know, did you see my brother, is he okay.  And
```

19

```
 1        he said, yeah, I think so.  And I was like,

 2        okay.

 3    Q.  So you didn't maintain total silence in the

 4        car?

 5    A.  No, that's the only thing I said though, was

 6        that.

 7    Q.  Where is my brother, where is my brother?

 8    A.  Yeah.  I didn't say what they said.  I said,

 9        where is my brother.  I just want to know if

10        he was okay.

11    Q.  Well, let me ask you this.  Now, you recall

12        seeing your brother, and even in February you

13        recall seeing your brother pat himself down;

14        is that right?

15    A.  Yeah.  That was in the kitchen.

16    Q.  Where did he go next?

17    A.  I don't know.  After that's when I turned

18        around and I was just scared.  I heard -- I

19        ducked, came back up, I didn't see nobody, I

20        seen everybody running down the hall.

21    Q.  You saw him patting himself down before you

22        ducked?

23    A.  No, after the fact.  It was after it happened.

24    Q.  So the gunshot goes; right?  Where was --

25        where did it come from?
```

20

```
 1   A.   I don't know.

 2   Q.   Well, you were looking right at the group, the

 3        victim was in your line of sight; wasn't he?

 4   A.   Yeah, I think -- I don't know, it came from

 5        the living room.

 6   Q.   The living room?

 7   A.   I think.

 8   Q.   Like -- like out of your line of sight?

 9   A.   It was like -- you know like when you hear it

10        and it go off, like it was on this -- you

11        know, like it was coming from the living room.

12   Q.   Like how far away?  Like way back in the other

13        room somewhere?

14   A.   Like by the front door where the front door

15        is, like around there somewhere.

16   Q.   So, for example, you believe then based on

17        what you heard, that if this is the kitchen

18        area here, that the shooting would have been

19        way back down here, like by the front door?

20   A.   Um-hmm.

21   Q.   Is that right?  In other words, it sounded --

22        the shot sounded to you like it was far away?

23   A.   Yes.  Yeah.

24   Q.   And you heard that boom, then you ducked;

25        right?  And then --
```

Case 2:23-cv-00951-JPS    Filed 12/06/24    Page 17 of 71    Document 59-8

STATE-WILBER-000590

Page 590 of 1869

```
 1   A.   Yes.

 2   Q.   -- you came back up; right?

 3   A.   Yes.

 4   Q.   Did you see the victim fall to the floor?

 5   A.   Yes.  He was already on the floor.

 6   Q.   So he's already on the floor by the time you

 7        turn around?

 8   A.   He was landing on the floor I should say.

 9   Q.   And your brother, Mr. Wilber, is starting to

10        pat himself down?

11   A.   Yeah, 'cuz he was just -- he just looked like

12        he was in shock and he was like --

13   Q.   And you may have been in shock at that point

14        as well; right?

15   A.   Yes.

16   Q.   And do you recall telling the police that you

17        may have said, you shot him, get out of here?

18   A.   No.  See, I didn't say that.  I didn't say

19        that.

20   Q.   Did you tell the police that you may have said

21        that but you would not know who you were

22        talking to when you said that?

23   A.   No, I didn't say that.

24   Q.   Is it possible, ma'am, that you were so in

25        shock you don't remember what you said there
```

22

```
 1        in the kitchen?

 2   A.   No.

 3   Q.   So at this point, between you and that hallway

 4        and that front door you have to go by your

 5        brother; right?  Or does he run out ahead of

 6        you?

 7   A.   I didn't see him, that's what I mean, he -- he

 8        probably ran out in front.

 9   Q.   So he ran out probably before you, although

10        obviously at some point you no longer are

11        worried about him; right?

12   A.   Yeah, I was worried about him.

13   Q.   But you didn't watch to see where he went?

14   A.   No, I was just in shock, I didn't watch where

15        nobody went.

16   Q.   And at some point you get out of the house not

17        knowing where your brother Danny Wilber is;

18        right?

19   A.   Right.

20   Q.   And you run to the car which is parked where?

21   A.   I don't even --

22   Q.   Just out of curiosity, at that point why

23        didn't you follow Mr. Wilber or find his car,

24        which was the one you'd gone to the party in?

25   A.   I didn't.  I just seen Jamie and Lea sitting
```

23

```
 1        out there, so I ran out to that car, asked if
 2        they could take me home.
 3   Q.   Why not go to your brother -- with your
 4        brother, the guy that had taken you to the
 5        party?
 6   A.   Because I didn't see him at the time or I
 7        would have probably went with him, but I
 8        didn't see him.
 9   Q.   And Donald and Oscar and Jamie and Lea are all
10        in this car along with you; right?
11   A.   Yes.
12   Q.   And all you said was, where is my brother,
13        where is my brother?
14   A.   Right.
15   Q.   Did you tell the police that?
16   A.   Tell the police what?
17   Q.   That in the car afterwards you were saying,
18        where's my brother, where's my brother?
19   A.   Yeah, but they didn't put that in there
20        either, I don't think.
21   Q.   Now, the police on February 2nd interviewed
22        you a second time, right, to show you some
23        photos of different people that might have
24        been at the bar or at the party or both.  Do
25        you remember that?
```

24

```
 1   A.   Yeah.  Yes.

 2   Q.   And when you talked to them, for example, did

 3        you mention anything that you might have

 4        forgotten in the first statement?

 5   A.   Pardon me?

 6   Q.   Did you, during the first time you talked with

 7        the police and the second time, were you able

 8        to recall other details or things you might

 9        have forgotten, or did you tell the other

10        detectives things that -- the second set that

11        you hadn't told the first?  Anything like that

12        that you recall?

13   A.   I'm not sure.

14   Q.   You have Exhibit 28 there with you; is that

15        right?

16   A.   Yes.

17   Q.   Do you see the exhibit sticker on that one is

18        28?

19   A.   Yes.

20   Q.   These detectives actually took out sort of a

21        rough sketch, a drawing of that location;

22        right?

23   A.   Yes.

24   Q.   And is it fair to say that as best you could,

25        you kind marked down where you recall everyone
```

25

```
 1      being?
 2   A.   Yes.
 3   Q.   And were you writing down where they were at
 4        the time of the shooting?
 5   A.   Pardon me?
 6   Q.   Were you writing down to the best of your --
 7        of your ability, where everyone was at the
 8        time the gunshot went off?
 9   A.   No, 'Cuz I don't remember.  I don't remember.
10   Q.   Well, back then on February 2nd, it was just a
11        couple days after the shooting, was your
12        memory a little better then than it is today?
13   A.   Yes.
14   Q.   And what were you doing when you pointed to
15        the police and they wrote in the names like,
16        Jay, me, Donald Jennings, Torres, Danny,
17        victim, Jeranek Diaz, Nevada Medrow, all that,
18        what was all that?
19   A.   That's where I was thinking they was at, I
20        didn't know for sure.  They was just telling
21        me, just let the -- you know, just tell them
22        if I know, and, you know, and those stuff like
23        that.  But I'm not sure, if you know, I don't
24        remember.
25   Q.   But that's what you told 'em back on February
```

```
 1        2nd?

 2   A.   Yes.

 3   Q.   Do you remember, for example, telling them

 4        that Richard Torres, the guy in the photo that

 5        we saw before, Number 8, had also told your

 6        brother to chill out?

 7   A.   Who you say?

 8   Q.   You know Vato or Bato?

 9   A.   No, I don't know them.

10   Q.   Was this guy telling your brother to chill out

11        too?

12   A.   I don't know.  I just remember him walking up.

13   Q.   Did you tell the police in the second

14        interview when they showed you a picture of

15        that man, do you remember telling them that he

16        told them to chill out?  That a lot of

17        different people were telling your brother to

18        chill out; weren't they?

19   A.   I don't know.  I know I -- I know I was.

20   Q.   What about Jay?

21   A.   I don't know about anybody else.

22   Q.   What about Jay?

23   A.   I don't know.

24   Q.   What about Donald Jennings?

25   A.   I think Donald said chill out or he said some
```

27

```
 1        little words, but --
 2   Q.   And in this particular statement when you
 3        talked about the shooting, West stated she
 4        ducked and was scared.  She thought for a
 5        moment that she may have been shot because she
 6        felt something bump her arm.  Do you remember
 7        telling the police that?
 8   A.   No.
 9   Q.   She turned and looked back.  She saw that
10        Danny was gone.  Is that what you told the
11        police?
12   A.   Yes.
13   Q.   And Diaz was lying on the floor near some
14        blood.
15   A.   Yes.
16   Q.   West stated she is unable to state whether
17        Danny did or did not have a gun because her
18        back was turned when the shooting occurred.
19   A.   No, I didn't say that either.
20   Q.   West stated she has not seen Danny since the
21        shooting occurred.  Is that true?  So you
22        didn't see him the next day?
23   A.   I seen him the next day, but that was it.
24   Q.   You mean the day after talking to the police
25        or the day before?  Well, let's ask it this
```

28

```
 1       way.  You were at Bacardi's on Friday night;
 2       right?
 3   A.  Right.
 4   Q.  And early Saturday morning, 3:00 o'clock,
 5       3:30, the shooting happens; right?
 6       Technically it's Saturday morning now because
 7       it's after midnight; right?
 8   A.  Right.
 9   Q.  And after the shooting you went home?
10   A.  Yeah, I went to McDonald's and then I went
11       home.
12   Q.  So that would have been -- you went to
13       McDonald's to get something to eat; is that
14       right?
15   A.  Right.
16   Q.  Kind of calm the shock down a little bit?
17   A.  Yes.
18   Q.  And you then went home, so it's now Saturday
19       morning.  What did you do that Saturday?
20   A.  Nothing, just stayed at home.
21   Q.  Which is -- which was where?
22   A.  On 26th and Burnham.
23   Q.  And when did you see your brother again?
24   A.  I don't know.
25   Q.  Before or after the police came and got you?
```

29

1   A.   I'm not sure.  I don't even remember.

2   Q.   Well, when did you next talk to your brother,

3        as best you recall?  How many days went by

4        before you saw him again?

5   A.   I don't remember.

6   Q.   More or less.

7   A.   A couple days probably, I don't know.  I don't

8        know.

9   Q.   Well, did you guys like go out to the bar that

10       next Friday?

11  A.   Did we what?

12  Q.   Did -- you went to Bacardi's that Friday

13       night, the next Friday night did you go out to

14       Bacardi's again like with your brother?

15  A.   No, I was at -- I stayed at home.

16  Q.   What about that next Saturday night?

17  A.   I didn't do nothing, I just stayed at home.  I

18       had no baby-sitter so I had to stay home

19       anyway.

20  Q.   Well, did you talk to your brother about going

21       out and said, I can't do that, I got -- I got

22       kid problems?

23  A.   No.

24  Q.   So did you talk to him by phone or in person?

25       The next time you talked to your brother,

30

```
 1        Danny Wilber, was it by phone after the
 2        shooting or in person?
 3   A.   I don't remember.  I didn't talk to him, no, I
 4        didn't.
 5   Q.   Well, he eventually got arrested on this;
 6        right?
 7   A.   Yes.
 8   Q.   Between the shooting and when he got arrested
 9        did you talk to him?
10   A.   No, I don't think so.  I can't remember.
11   Q.   You just went all those days without talking
12        to your brother?
13                    THE COURT:  You're shaking your
14        head.
15                    THE WITNESS:  No, I'm thinking.
16        I'm just -- I can't remember.
17                    THE COURT:  Okay.
18   BY ATTORNEY GRIFFIN:
19   Q.   I mean, your last words in the car were, oh
20        shit, where's my brother, where's my brother.
21        Where did that concern go?  Weren't you
22        worried?  Didn't you want to talk to him, make
23        sure he wasn't hit?
24   A.   No, once I found out he wasn't hit I was okay.
25   Q.   How did you find that out?
```

31

STATE-WILBER-000600
Page 600 of 1869

```
 1   A.   'Cuz he said.

 2   Q.   Well, you found it out somehow; right?

 3        Somebody besides your brother, Danny Wilber,

 4        told you that Danny Wilber was okay; right?

 5        Maybe your sister, maybe his girlfriend,

 6        somebody; is that right?

 7   A.   Right.  I'm still thinking.

 8   Q.   And at what point did you want to maybe talk

 9        with Danny about this and say, wow, that was

10        some crazy stuff that went down there, wasn't

11        it, Brother?  When did that happen?  The day

12        after?  The day after that?  The day after

13        that?  The day after that?  Ever?  Didn't

14        Antonia West want do tell her brother, man, I

15        thought somebody shot you?  You know, brother

16        sister conversation kind of a thing?

17   A.   I think it was the day after I talked to the

18        detecs, talked to the police, it might have

19        been the day after.  I'm not sure, I don't

20        remember.

21   Q.   Did you tell 'em, hey, they're trying to get

22        me to say you did this?

23   A.   Yeah, I told him that.

24   Q.   And what did he say?

25   A.   He was like, tell the truth.  Tell 'em the
```

32

```
 1        truth.

 2   Q.   And what's the truth?

 3   A.   That he didn't shoot nobody.

 4   Q.   Did he see any shooter?

 5   A.   No, I don't think so.

 6   Q.   Did he ever tell you he saw the shooter?

 7   A.   No.

 8   Q.   Did you guys talk about it?

 9   A.   No.

10   Q.   So other than that, did you ever talk about

11        the details of it, and did you ever tell him,

12        man, I thought you were hit, I saw you patting

13        him down and all that, man, I thought you must

14        have been hit?  You never had that

15        conversation with him; did you?

16   A.   I don't remember.

17   Q.   Isn't it true, Miss West --

18                  THE COURT:  One moment.  I'm not

19        sure we got your answer.  What did you say?

20                  THE WITNESS:  I don't remember

21        it.

22                  THE COURT:  You may continue.

23   BY ATTORNEY GRIFFIN:

24   Q.   Isn't it true that this whole story of your

25        brother patting himself down came from Donald
```

33

STATE-WILBER-000602
Page 602 of 1869

```
1            Jennings in March, specifically when he talked

2            to the police on March 14th of 2004?  Isn't

3            that where that story comes from?

4     A.     He probably said that too, but I know what I

5            seen too, so, we both might think the same

6            thing, who knows.

7     Q.     Isn't it true that your story has changed

8            from, I didn't see the shooting and I wasn't

9            looking at my brother Danny, which is --

10    A.     No, I didn't say that though.  They -- they --

11           them detecs added their own little stuff in.

12    Q.     That you weren't looking, that you had your

13           back turned, that's what the detecs --

14    A.     Yeah --

15                    THE COURT:  One moment.  I'm

16           going to ask you that once you ask her the

17           question let her have an opportunity to

18           respond.  All right.  What was the question

19           again?

20    BY ATTORNEY GRIFFIN:

21    Q.     The detecs added that kind of stuff in?

22    A.     Yes.

23    Q.     They changed what you were saying?

24    A.     They changed it all around on me, that's what

25           they did.
```

34

```
 1    Q.   And made you -- made it look like you were

 2         saying you didn't --

 3    A.   Make it --

 4    Q.   -- see the shooting?

 5    A.   Yeah.

 6    Q.   And today you saw Danny Wilber, when the shot

 7         went off your eyes were on him?

 8    A.   Yeah, see, I'm standing right there, I can see

 9         my brother.  He's tall and big, I can see him.

10    Q.   And you were looking right at him?

11    A.   Yes, I was.

12    Q.   Were you looking at his stomach or his back?

13    A.   I was looking at his -- like here, his stomach

14         you could say.

15    Q.   Where was he facing?  Was he looking -- facing

16         right toward you?

17    A.   I think that's when he was talking to Jay or

18         somebody.  Into it with Jay or the guy on the

19         wall.

20    Q.   No, when the gunshot went off, Miss West, was

21         your brother turned looking at you or was his

22         back to you and he was facing the victim and

23         the guy he was choking and other Hispanic

24         males?

25    A.   I'm not sure.
```

35

Case 2:23-cv-00951-JPS    Filed 12/06/24    Page 31 of 71    Document 59-8
STATE-WILBER-000604
Page 604 of 1869

```
 1   Q.   You're not sure?  You were right there.

 2   A.   I'm not sure.

 3   Q.   Because so much time has passed?

 4   A.   I was right there but I'm not sure.

 5   Q.   When he patted himself down were you looking

 6        right at him as he went like this?

 7   A.   Oh yeah.  Yeah, I was.

 8   Q.   And before that was his -- was he looking

 9        towards you or was his back to you?

10   A.   That I don't remember.

11   Q.   So after this night when was the next time

12        between that and the day that your brother got

13        arrested, when was the next time you guys went

14        out?

15   A.   We haven't went out.

16   Q.   You never went out again in the following

17        three weeks; did you?

18                   THE COURT:  You're shaking your

19        head side to side, does that mean no?

20                   THE WITNESS:  No.  I'm sorry.

21   BY ATTORNEY GRIFFIN:

22   Q.   Did the police, in the way they talked to you

23        and things like that -- I know they made

24        things up and I'll get to that in a minute --

25        but were the police disrespectful to you?
```

36

```
 1   A.   Kind of.  When he said something and he
 2        started getting all jazzy and all smart and I
 3        just sat there.  I didn't say nothing, I just
 4        sat there.
 5   Q.   Who was that?
 6   A.   I don't know.  I'm not sure.
 7   Q.   Well, was it the first time you were
 8        interviewed or the second time?  If you
 9        recall.
10   A.   The second time, yeah, the second time.
11   Q.   And the first time when you were interviewed
12        the detectives were okay with you?
13   A.   Yeah.
14   Q.   But it's clear that they must -- maybe they
15        were doing that to try to fake you out so they
16        could change what you were saying maybe, huh?
17   A.   Could be.
18   Q.   And there's no question in your mind that when
19        you talked to the detectives in February you
20        told 'em the part about you were looking at
21        your brother when the shooting happened, you
22        were looking right at him?
23   A.   Yes, and that's when they put that -- they add
24        that other little stuff in there.
25   Q.   And you told 'em that right after the shooting
```

37

```
1         you saw your brother?
2    A.   Yes, 'cuz I seen him patting himself down to
3         see if he'd been hit.
4                        ATTORNEY GRIFFIN:  Nothing
5         further.
6                        THE COURT:  Cross.
7                        CROSS EXAMINATION:
8    BY ATTORNEY CHERNIN:
9    Q.   Ms. West, you'd like to help your brother in
10        this case; wouldn't you?
11   A.   Yes.
12   Q.   And if you could you'd make something up to
13        say he wasn't even there; right?
14   A.   Right.
15   Q.   But you haven't done that; have you?  Is that
16        no?  You haven't made anything up?
17   A.   No.  Did I make anything up --
18   Q.   Yes.
19   A.   -- you asking me?  No, I didn't make nothing
20        up.
21   Q.   And Mr. Griffin was asking you questions about
22        reading.  You have some -- is it true that you
23        have some learning disabilities?
24   A.   Yes, it is.
25   Q.   And were you in special classes when you were
```

38

```
 1        in school?

 2   A.   Yes, I was.  Small class.

 3   Q.   And where was that?  Was that before you went

 4        to North Division?

 5   A.   That was at North.  And it was at my other

 6        schools I went to.

 7   Q.   What other schools did you go to?

 8   A.   I went to Forest home, I went to Audubon,

 9        North, I think that's about it.

10   Q.   And this area of the kitchen, first of all,

11        the fight -- or you saw your brother first of

12        all engage in a fight with Jay; is that

13        correct?

14   A.   Yes.

15   Q.   And he snatched a chain from Jay's neck?

16   A.   Yes.

17   Q.   And Danny was acting pretty bad; right?

18   A.   Right.

19   Q.   And you were trying to get him to calm down;

20        right?

21   A.   Yes.

22   Q.   And Jay was his friend; right?

23   A.   Right.

24   Q.   Had he and Jay known one another a long time?

25   A.   Pardon me?
```

39

```
1   Q.   Had Jay and Danny known one another a long
2        time?
3   A.   Yes.
4   Q.   Do you know approximately how long?
5   A.   No.
6   Q.   Now, when you went to the bar, to Bacardi's,
7        you walked to Bacardi's; correct?
8   A.   Yes.  Yeah.
9   Q.   And in your earlier testimony you said that
10       you drove with Danny from Bacardi's to the
11       party; correct?
12  A.   Right.
13  Q.   And was that in Danny's car or Javier Denoyos'
14       car?
15  A.   No, it wasn't my brother's car.
16  Q.   It was somebody else's car?
17  A.   Yes.
18  Q.   And you told that to the detectives in your
19       second -- in your -- is it true that you told
20       the -- some detectives that at some point; is
21       that true?
22  A.   Right.
23  Q.   So when you went looking for a ride
24       afterwards, you weren't looking for Danny's
25       car; were you?
```

40

```
 1   A.   No, 'cuz -- no.

 2   Q.   'Cuz Danny's car wasn't there?

 3   A.   No, it wasn't.

 4   Q.   So when Mr. Griffin asked you that question,

 5        that was -- is it fair to say that that

 6        confused you in some way?

 7   A.   Yeah.

 8   Q.   Now, before the gunshot occurs there's lots of

 9        stuff going on in the kitchen; correct?

10   A.   Right.

11   Q.   And in that kitchen area relative to the

12        counter top, where was Danny getting into it

13        with the person in -- who you identified in

14        photograph Number 8 and photograph 21?  Where

15        was that fight taking place?

16   A.   Like --

17   Q.   Relative to the --

18   A.   By the wall and like the -- the table, like

19        the wall.

20   Q.   Okay.  Let me ask it this way.  Was it on this

21        side of the table?

22   A.   It was like --

23   Q.   And I'm now pointing to the west of the

24        table.

25   A.   I think it was up.
```

41

```
 1   Q.   It was up?

 2   A.   Yeah, like in the middle.

 3   Q.   Up in here?

 4   A.   No, above the table, no.

 5   Q.   Up here?

 6   A.   Yeah, but over more.  Yeah.  No, over there

 7        more.

 8   Q.   Over this way?

 9                  THE COURT:  Mr. Chernin, the

10        record's going to be very muddled.  What

11        you're going to need to do is you're going to

12        need her to take the diagram and instead of

13        you sort of inserting yourself into the

14        proceedings, have -- have her point to where

15        it is.

16                  ATTORNEY CHERNIN:  Thank you,

17        Your Honor.  That's probably a better way to

18        do it.

19   A.   It's like he was right -- like right there.

20        This is the wall, that's the -- the table,

21        it's like right in this area.

22   BY ATTORNEY CHERNIN:

23   Q.   Where was the stove?  Do you recall seeing the

24        stove?

25   A.   I'm not sure.
```

42

```
 1   Q.   Do you recall where the door was to the
 2        outside?
 3   A.   The back door?
 4   Q.   The back door.
 5   A.   I don't know if that was the back door or not,
 6        but it was a door right there though.
 7   Q.   A door right where?
 8   A.   Like on the side of where they was.  Like they
 9        was right here, I think like on the -- like on
10        the side right here there was a door.  I'm not
11        sure.
12   Q.   I'm showing you what's been marked as Exhibit
13        15.  Is that the door you're talking about?
14   A.   It looked like it.  I'm not sure.  It looked
15        like it.
16   Q.   It looks like it?
17   A.   Yeah.
18   Q.   Now, in looking at Exhibit 15, does this
19        refresh your recollection as to where this
20        door was in relationship to the counter top?
21        Does that help you?  No?
22   A.   No.
23   Q.   You can't see --
24   A.   I don't remember.
25   Q.   And so when you say what is clear in your mind
```

43

```
 1         is that the fight between Danny and Mr. --
 2         Number -- photograph 21 and Number 8, that
 3         took place somewhere near the back door; is
 4         that what you --
 5    A.   Yeah, like by the table, yeah.
 6    Q.   Near the table and by the back door; correct?
 7    A.   Right.
 8    Q.   And so wherever the photographs might show
 9         that back door, that's where the fight was
10         taking place; correct?
11    A.   Right.
12    Q.   So you don't exactly remember where by looking
13         at the diagram, but by looking at the picture
14         you know that your recollection is that the
15         fight was taking place somewhere near the
16         door; correct?
17    A.   Right.
18    Q.   Now, when -- was there ever a point in time
19         prior to the shooting that you saw or observed
20         your brother Danny behind the man who got
21         shot?
22    A.   Was he behind the man that got shot?
23    Q.   Yes.
24    A.   No.
25    Q.   I'm talking about your brother Danny.
```

44

```
 1   A.   Yeah.  Was he behind the man that got shot you
 2        asking me?
 3   Q.   Yes.
 4   A.   No, he wasn't.
 5   Q.   And after you heard the gunshot, did you see
 6        your brother in front of or behind the man who
 7        got shot?
 8   A.   That I don't remember.  I don't remember.
 9   Q.   You did observe -- did you see where the man
10        who got shot?
11   A.   I seen after -- after everybody was running
12        out and I seen him laying there, I just -- I
13        don't remember.  I know I seen him laying
14        there though.
15   Q.   Okay.  The man who got shot is the person
16        we're talking about?
17   A.   Yeah, he was laying.
18   Q.   Sitting there laying there?
19   A.   Yeah, he just landed on the floor when I
20        looked, he just landed on there.
21   Q.   Did you hear a -- the man landing on the
22        floor?
23   A.   Yeah.  Like a -- not -- I couldn't hear it
24        that good, but just a little -- yeah, just a
25        little bit.
```

45

```
1    Q.   When you say a little bit of -- was it like
2         a --
3    A.   Yeah.
4    Q.   -- a thud or a --
5    A.   Yeah.
6    Q.   A heard a clap is --
7    A.   Yeah, like a --
8              THE COURT:  One at a time so
9         that -- wait till he asks the questions and
10        then you respond, wait till she answers and
11        then you can start again.
12   BY ATTORNEY CHERNIN:
13   Q.   Now, did you see or observe anyone after the
14        man got shot move his body in any way?
15   A.   No, I don't know.  I can't tell you that 'cuz
16        I don't know.
17   Q.   Now, when the fighting was taking place
18        between your brother and the two Hispanic
19        guys, was that all taking place this -- to the
20        north, toward the top of the picture, Exhibit
21        1, or toward the bottom?
22   A.   The top.
23   Q.   Toward the top.  And at the time the gunshot
24        went off, to your recollection was your
25        brother engaged in a fight with those Hispanic
```

46

```
1       guys?

2   A.  Yes.  I think so.  Yes.

3   Q.  Now --

4   A.  'Cuz I seen the guy coming like pull his coat,

5       or did something to his coat.  I think like

6       pulled it off way off is what I seen.

7   Q.  From the back?

8   A.  Yeah.

9   Q.  Or the front?

10  A.  The back.  He came from the back and tried to

11      like -- I think he pulled his coat off, like

12      pulled it halfway off.  That's when the

13      gunshot went off.

14  Q.  While the guy was pulling on your brother?

15  A.  Pulling, yeah, pulling his coat, and then the

16      gunshot went off.

17  Q.  Was it the -- was it the man who was closer to

18      the --

19  A.  See, I don't know these guys so I don't know

20      who was who and what's what.

21  Q.  So you're not sure?

22  A.  No, but I know somebody grabbed him from the

23      back.  I know that.

24  Q.  In terms of the guy who grabbed him from the

25      back, was it a guy who was closer to the
```

47

```
1        counter top or closer to the stove that pulled
2        your brother from the back?
3   A.   I think it's the counter top, but like by the
4        counter.
5   Q.   By the counter and that guy was physically
6        pulling your brother --
7   A.   His coat.
8   Q.   -- away?
9   A.   Yeah.
10  Q.   So that at that point if -- if that means that
11       your brother's back would have been facing
12       towards you if the guy was pulling the back of
13       his coat; right?
14  A.   Right.
15  Q.   And your brother, if the guy's pulling the
16       back of his coat, would have been facing
17       forward toward the wall or the door; correct?
18  A.   Yeah.  Correct.
19  Q.   He would have been facing toward the door or
20       toward the stove?
21  A.   He was like towards the wall, like looking
22       towards, you know, looking at the dude that,
23       you know, on the wall.
24  Q.   So the --
25  A.   And then somebody came behind and tried and
```

48

```
 1          did something to his coat.

 2    Q.    Tried to pull your brother away --

 3                      THE COURT:  Let her finish her

 4          response.

 5                      ATTORNEY CHERNIN:  Sorry.

 6                      THE COURT:  Go ahead.

 7    A.    Like he was pulling his, you know, just

 8          pulling his coat from the behind, you know,

 9          from the back.

10    BY ATTORNEY CHERNIN:

11    Q.    Now, in your interviews with the detectives --

12          first of all, Mr. Griffin and the detectives

13          have characterized this as a voluntary

14          interview.  When -- when you first made

15          contact with those detectives did you call the

16          detectives and say, hey, I'm Antonia West, I

17          was at 1128 West Mineral on January 31st,

18          2004, and I observed a fight going on and

19          somebody got shot?  Is that how you -- how you

20          came to be in contact with those police

21          officers?

22    A.    No.  They came to my mother's house.

23    Q.    They came looking for you?

24    A.    Yes.

25    Q.    And when they -- when they voluntarily took
```

49

1      you, did you say, you know, I'm not

2      comfortable talking to you here at my mother's

3      house, I'd much rather get in the police car

4      and take a trip downtown with you and go talk

5      to you someplace else?  Is that what happened?

6  A.  No.  They came and they just asked me, would I

7      refuse to come with them, and I was like no, I

8      don't refuse, I'll come with you, wherever we

9      gotta go.  And I went and went down there and

10     talked.

11 Q.  And you met with -- do you recall those first

12     detectives, there's a black detective named

13     Louis Johnson?

14 A.  Louis, yeah, I remember that name.

15 Q.  You remember Louis?

16 A.  Louis Johnson.

17 Q.  Louis Johnson was one of those people that

18     treated you with respect; right?

19 A.  Yes.

20 Q.  And Louis Johnson didn't try and beat a

21     confession out of you or beat something out of

22     you; did he?

23 A.  No, he was just -- they just kept telling me,

24     you know, just if he did it just tell us he

25     did it and tell the truth.  And I was like, I

50

```
 1        am telling the truth, he didn't do it.   I

 2        didn't see him do it.   And then it was just

 3        talking and kept trying to say my brother did

 4        it.

 5   Q.   And when you said you didn't see your brother

 6        do it, is it that you couldn't see your

 7        brother doing it or that you didn't see your

 8        brother?

 9   A.   I didn't see him do it.

10   Q.   And when they were taking down this was one of

11        the detectives -- and I'm sorry, I couldn't

12        read the other one's name real easily -- I'm

13        sorry, there was a white detective with a gray

14        beard, Randy Olson.  Do you remember him?  He

15        was with Louis Johnson.

16   A.   No, I don't remember him.

17   Q.   Was it mostly Mr. Johnson or Detective Johnson

18        that was talking to you?

19   A.   It was both of them.  It was both talking.

20   Q.   And Mr. -- Detective Johnson's a friendly guy

21        with a nice smile, is that -- is that fair to

22        say?

23   A.   Yes.

24   Q.   And he smiled at you during this and he tried

25        to just find out what was going on; right?
```

51

STATE-WILBER-000620
Page 620 of 1869

```
 1    A.    Yes.

 2    Q.    Now, who's -- was somebody writing things

 3          down?  I mean, if Mr. Griffin had you identify

 4          your initials on this piece of paper was

 5          somebody writing on that piece of paper?

 6    A.    I'm not sure.

 7    Q.    Well, Exhibit Number -- Exhibit 27, that

 8          document that Mr. Griffin asked you to read

 9          before at page 1, Exhibit 27, who was writing

10          that down?  Do you remember?  Who's writing

11          the words that were -- that you found -- that

12          you find on Exhibit 27?

13                    ATTORNEY GRIFFIN:  We're talking

14          about not counting initials and signatures?

15                    ATTORNEY CHERNIN:  Yeah.

16    BY ATTORNEY CHERNIN:

17    Q.    Not counting what you wrote, because you

18          acknowledge that you wrote your initials and

19          signature; right?

20    A.    Right.

21    Q.    Who wrote that stuff?

22    A.    I'm not sure.  I don't remember.

23    Q.    Well, was it -- was there -- were there more

24          than the two detectives with you at that time?

25    A.    Yeah.
```

52

```
1    Q.   Were there more people in there?

2    A.   No, just the two, just the two detecs.

3    Q.   Okay.  A white guy and a black guy; right?

4    A.   Right.

5    Q.   And -- but you don't remember as you sit here

6         today which one was writing; correct?

7    A.   Yeah, I don't remember.

8    Q.   And you didn't write the bulk of that stuff;

9         did you?  I mean, the majority of the words on

10        Exhibit 27 you didn't write, it was written

11        down by one of those two detectives; right?

12   A.   Right.

13   Q.   And was it -- did you -- did anybody suggest

14        taping this conversation?

15   A.   I don't know.  What do you mean taping the

16        conversation?

17   Q.   Well --

18   A.   Who?

19   Q.   Like taking a microphone and a -- and an audio

20        tape, I don't know if young people remember --

21   A.   Yeah, I know what --

22   Q.   -- audio tape, do you know what I'm talking

23        about?

24   A.   Yeah, I know what you mean.

25   Q.   Like tape --
```

53

```
1    A.   Tape recorder.

2    Q.   Tape player?

3    A.   Yeah.

4    Q.   Did anybody suggest taping this conversation

5         so that there wouldn't be any question as to

6         what you said?

7    A.   Not that I know.  I don't know.

8    Q.   Okay.  Well, this all took place at the

9         detec's house, not your house; right?

10   A.   Right.

11   Q.   And not literally their house, but where they

12        controlled the situation; right?

13   A.   Right.

14   Q.   And nobody suggested taking out a video

15        camera; did they?

16   A.   No.

17   Q.   And when you had this diagram attached to

18        Exhibit Number 28 -- first of all, did you

19        draw the diagram?

20   A.   This?

21   Q.   Yeah, did you make the -- the picture?

22   A.   When they asked me I was just like I, you

23        know, I think he was there, I think this

24        person was there, 'cuz I don't know.  I don't

25        remember.
```

54

```
1   Q.   Okay.  I'm trying to remember, if you can, was
2        this when the shooting took place or when
3        something else took place?  I mean, what were
4        you trying to portray in the items that you
5        placed on that now six-page document with the
6        with the diagram, Exhibit 28?  What were you
7        trying to portray?  Do you remember?
8   A.   Was I what?
9   Q.   What were you trying to show?  Were you trying
10       to show where somebody was when the shots were
11       fired or when they were fighting?  What were
12       you trying to show?
13  A.   I think it was when they was fighting, when
14       they got into the little argument and that.
15  Q.   But not when the shots were fired?
16  A.   What do you mean, not when the shots were
17       fired?
18  Q.   Well, were you trying to show where people
19       were before the shots were fired, after the
20       shots were fired?
21  A.   You mean when I was talking to the detecs?
22  Q.   Yeah, in that diagram that's in front of you.
23  A.   Yeah.
24  Q.   Do you know what you were trying to show?
25  A.   'Cuz they was asking me who was standing in
```

55

```
 1        the kitchen, and then I just said -- I said
 2        who was in there, in the kitchen, but I didn't
 3        know for sure where everybody was standing at.
 4   Q.   Okay.  But do you even know what point in time
 5        you were trying to draw?  If you're looking at
 6        that today what does that show, in your mind?
 7   A.   What do you mean, what it shows?
 8   Q.   Does it show -- does it show a point in time
 9        you locate people on that picture; right?
10   A.   Right.
11   Q.   Does it show where people were after the
12        shooting, before the shooting or during the
13        time of the shooting?
14   A.   I don't know.
15   Q.   You don't?
16   A.   (Shakes head no.)
17             THE COURT:  Are you saying no?
18             THE WITNESS:  Yeah, I'm -- no,
19        yeah, I don't remember.  No, I don't remember.
20   BY ATTORNEY CHERNIN:
21   Q.   Or you just don't know?
22   A.   I just don't remember.
23   Q.   Okay.  Let me ask you this another way then.
24        After the shooting your brother is clearly
25        behind Mr. Diaz, the dead man, because he runs
```

56

```
 1          out the door; right?  So at that point in time
 2          he's behind him; is that fair to say?
 3    A.    What do you mean, behind him?
 4    Q.    Well, if he -- if Mr. Diaz is -- is as
 5          portrayed on Exhibit 1, is lying on the floor,
 6          your brother at some point goes down in this
 7          diagram away from where Mr. Diaz is; right?
 8          Away from Mr. Diaz's head, after Mr. Diaz is
 9          down on the floor; right?
10    A.    Right.
11    Q.    Before Mr. Diaz is down on the floor, your
12          brother is in front of -- of where Mr. Diaz is
13          on the floor; correct?
14    A.    Right.  That sound right.
15    Q.    And at the time of the shooting, if you know,
16          was your brother behind Mr. Diaz?
17    A.    No.
18                      (Defense counsel confers with
19          defendant.)
20                      ATTORNEY CHERNIN:  Subject to any
21          redirect, I have no additional questions at
22          this time, Your Honor.
23                      THE COURT:  Redirect.
24                      REDIRECT EXAMINATION:
25    BY ATTORNEY GRIFFIN:
```

57

STATE-WILBER-000626

Page 626 of 1869

```
 1   Q.   Miss West, I'm going to show you a photograph,

 2        it's marked as Exhibit Number 30.  Do you

 3        recognize that person?

 4   A.   Um-umm (meaning no).  Who is that?  What's her

 5        name?

 6   Q.   Pardon me?

 7   A.   What's her name?

 8   Q.   Nevada.

 9   A.   No, I don't know her.

10   Q.   Do you recall seeing her?  I know you don't

11        know her, but do you recall seeing her at the

12        after hours?

13   A.   I don't remember if she was at the after set.

14        I don't know 'cuz I don't know her, so I don't

15        know.

16   Q.   Let me ask you this.  On Exhibit -- sorry,

17        Judge -- 28, that's the drawing where the

18        police showed you pictures of who's there, and

19        as best you could you tried to tell 'em who

20        was at the party and where they were in or

21        near in that kitchen; right?

22   A.   Right.

23   Q.   And this X right down here, does that say

24        Nevada Medrow?  Can you read that?

25   A.   Yes.
```

58

```
1   Q.   And Nevada Medrow is this woman; correct?  And
2        the police showed you her picture and you
3        identified her as one of the people that was
4        there and you said you recalled her being
5        right in that doorway right just -- just by
6        the doorway where you have the victim and
7        Jeranek Diaz; correct?
8                      ATTORNEY CHERNIN:  At what point
9        in time?
10                     ATTORNEY GRIFFIN:  On that
11       diagram.
12  A.   I don't remember.
13  BY ATTORNEY GRIFFIN:
14  Q.   That's where you put her.
15                     THE COURT:  Is there an
16       objection?
17                     ATTORNEY CHERNIN:  Yeah.  It
18       assumes facts that are not in evidence.  The
19       man was not a victim at that time.  She said
20       she doesn't know what was represented.
21                     THE COURT:  That's not what was
22       asked.  I'm going to overrule the objection.
23       If I understood the question, Mr. Griffin,
24       you're asking her whether or not she
25       recognizes the individual depicted in Exhibit
```

59

1  30, she's indicated that she does not.  You've

2  now referred her to Exhibit 28 and asked her

3  how the name of that individual ended up on

4  that document, that diagram, as being in that

5  kitchen.

6              ATTORNEY GRIFFIN:  Right.

7      Right.  I'll back it up in a minute, Judge.

8  BY ATTORNEY GRIFFIN:

9  Q.  Miss West, this particular page of that

10     exhibit is a diagram kind of like this one,

11     Exhibit 1; correct?

12  A.  Right.

13  Q.  Okay.  And when the police were talking to

14     you, one of the things they asked you is where

15     was everybody when the shooting happened as

16     best you could recall; correct?

17              ATTORNEY CHERNIN:  Objection.

18  A.  Right.

19              ATTORNEY CHERNIN:  Now, that

20     assumes a fact not in evidence because I've

21     asked her when that was supposed to depict and

22     she said she didn't know.

23              ATTORNEY GRIFFIN:  I asked her if

24     it was correct and she said right.  I know

25     what Mr. Chernin asked her, I think I can ask

                        60

1          her the same questions.

2                    THE COURT:  I'm going to overrule

3          the objection.  I'll allow it.

4     BY ATTORNEY GRIFFIN:

5     Q.   The police said and asked you to identify

6          where people were, as best you could recall,

7          when the shooting happened; right?  Isn't that

8          what this is?

9     A.   Right.

10    Q.   And you put yourself way over here by the

11         bathroom; didn't you?

12    A.   Um-hmm (meaning yes).

13    Q.   Is that a yes?

14    A.   Yes.

15    Q.   And you put Jay over by the corner of the

16         table; right?

17    A.   Right.

18    Q.   And you put your cousin Donald right here by

19         the 'frig; correct?  Back when you talked to

20         the police, you may remember it differently

21         today, but do you agree that's what you told

22         the police?  Or did they just put the names in

23         and you signed it?  Do you follow me or do you

24         want me to repeat that?

25    A.   No, I follow you.  I'm just thinking.

```
 1   Q.   Well, let me put it to you this way,
 2        Ms. West.  The police aren't necessarily
 3        interested in you showing where everyone was
 4        after the shooting; are they?  And the police
 5        aren't asking you to put on the diagram where
 6        everyone was before the shooting.  What the
 7        police want to know and what they want you to
 8        show 'em here is where was everyone when the
 9        shooting happened, isn't that what that
10        diagram is supposed to represent, as best you
11        could recall when you talked to them of
12        course?
13   A.   Yes.
14   Q.   Okay.  And isn't it true that you told them
15        that Nevada Medrow was where her name is on
16        that diagram?  I know you didn't know her
17        name, but as they were showing you pictures of
18        people at the party didn't you say, yeah, that
19        girl was right there, a little bit below where
20        the victim as he's called there on that
21        diagram and Mr. Jay Diaz were, right in here;
22        right?
23   A.   Right.
24   Q.   Is that right?
25   A.   Yes.
```

62

```
 1    Q.   So between the shooter down here somewhere,

 2         and where the victim and the -- Mr. Diaz, the

 3         guy that was getting choked by your brother,

 4         is Nevada Medrow, according to you; right?

 5    A.   I'm confused.

 6    Q.   Okay.  Here's the shooter right here where I'm

 7         pointing.

 8    A.   Um-hmm (meaning yes).

 9    Q.   Let's just say you said you thought he was

10         back by the door somewhere; right?

11    A.   Who was back by the door somewhere?

12    Q.   The shooter.  That's where you heard the

13         gunshot come from, back down here by the door

14         somewhere; right?  Down that hallway?

15    A.   Down a little walkway to get to the --

16    Q.   The front door.

17    A.   Yeah.  To get to the living room; right?

18    Q.   Right.  Down in that hallway there; right?  To

19         get out of the kitchen toward the living room,

20         that's where you thought the shooter was.

21         That's where the gunshot seemed to come from,

22         down in the living room somewhere; right?

23    A.   Right.

24    Q.   Okay.  On that diagram there where you told

25         the police where everyone was when the
```

63

```
 1        shooting happened --

 2   A.   I didn't -- I didn't remember, so they was

 3        just telling me to tell -- I gotta tell them

 4        something, but I didn't remember though, so I

 5        was just like, I don't remember.  And they was

 6        like, you gotta tell me something.

 7   Q.   So you think the police put the name Nevada

 8        Medrow in there?

 9   A.   No, I didn't say they did.  I'm just saying

10        that they was telling me I had to tell them

11        where everybody was standing, I don't

12        remember, but I had to tell them something.

13   Q.   Where did you come up with Nevada Medrow?

14   A.   That's the girl; right?

15   Q.   In that picture.

16   A.   Yeah.

17   Q.   Where did you come up with her?  Just

18        something else you made up?

19   A.   I don't remember.  No, I ain't made up

20        nothing.

21   Q.   Well, let me ask you this.  If we take away

22        Nevada Medrow for a minute, who are the three

23        people closest to the victim on your diagram?

24        If you just want to say the letters of their

25        names, if you're not sure how to read their
```

64

```
 1        names, just read the letters.
 2   A.   What are you asking me?
 3   Q.   I'm saying take away Miss Medrow for a minute,
 4        to take that away, do you see where there's an
 5        X for the victim?
 6   A.   Um-hmm (meaning yes).
 7   Q.   Who in your diagram are the three people
 8        closest to him?
 9   A.   Closest to the victim?
10   Q.   Yep.
11   A.   Torres and --
12   Q.   Torres?
13   A.   Diaz.
14   Q.   Diaz?  And who's the third one?  Who's this
15        one right here?
16   A.   Danny, my brother.
17   Q.   Danny, that's your brother; isn't it?
18   A.   Right.
19   Q.   So you told the police that at the moment of
20        the shooting the three people closest to the
21        victim were Torres, Diaz, Jay Diaz, right, and
22        your brother; is that right?
23   A.   What do you mean?  Now I don't understand.
24   Q.   The police asked you to mark on here as best
25        you could, to tell them where everyone was
```

65

1      when the shot went out; right?

2   A.    Right.

3   Q.    Okay.  And you told them the victim was

4         standing approximately right where you

5         marked -- where they marked X with victim,

6         right, although it says V-I-C-T there;

7         correct?

8   A.    Correct.

9   Q.    Just below that there was another X and they

10        wrote in Jay Diaz; right?  You don't know his

11        name, but that would have been the picture you

12        pointed to, said this guy was right next to

13        the victim; right?

14  A.    Right.

15  Q.    Okay.  The other guy that was closest would

16        have been Mr. Torres.  In fact, you have

17        Mr. Torres right here along this line that

18        would be like the cabinets for the counter for

19        the kitchen; right?  Am I correct?

20  A.    Right.

21  Q.    And then the other guy, since Mr. Paniagua is

22        kind of over here, the next guy that's also

23        closest to the victim is Danny.  When you told

24        the police as best you could recall where

25        everyone was, the three people closest to the

66

```
 1      victim were Jay Diaz, Torres and your brother;
 2      correct?
 3   A. Right.
 4   Q. And you signed that with your name and dated
 5      it February 2nd of 2004; right?
 6   A. Right.
 7   Q. And you have Mr. Diaz and the victim right in
 8      this area right in here; correct?
 9   A. Pardon me?
10   Q. You -- on that diagram you show the victim and
11      Mr. Jeranek Diaz sort of right in this area
12      here; correct?  Strike that.  Never mind
13      that.  You don't have to answer that.
14              ATTORNEY GRIFFIN:  Judge, I'm
15      going to ask that this diagram be labeled and
16      published to the jury separate from -- well,
17      it's been marked as Exhibit 28 but at this
18      point I don't think it's appropriate for the
19      entire document to go in, I'm just going to
20      ask that the diagram page that's been
21      testified to be separated from it and
22      published to the jury.
23              ATTORNEY CHERNIN:  Why don't --
24              THE COURT:  Any objection?
25              ATTORNEY CHERNIN:  Sure.  Why
```

67

```
1    don't --
2                THE COURT:  Side bar.
3                ATTORNEY CHERNIN:  Well, it's
4    just --
5                THE COURT:  Side bar.  Side bar.
6    Bring the document.
7                (Side bar.)
8                THE COURT:  Any objection to the
9    court receiving 28A into the record?
10               ATTORNEY CHERNIN:  No.
11               THE COURT:  Court will receive
12   28A into the record.  And the State is asking
13   for it to be published to the jury at this
14   time.  Any objection?
15               ATTORNEY CHERNIN:  No, Your
16   Honor.
17               THE COURT:  Okay.
18               (Exhibit 28A was received into
19   evidence.)
20               THE COURT:  Miss Burzynski,
21   you're going to be handed what has been marked
22   for identification and received into the
23   record 28A.  After you have completed your
24   view of it please tender it to the juror next
25   to you and so on and so on until each of you
```

68

```
1          have had an opportunity to review that.  Miss
2          Silkey, I think you'll be the last one, you'll
3          tender it back to my deputy.
4                       (Jury views exhibit.)
5                       THE COURT:  You may continue.
6    BY ATTORNEY GRIFFIN:
7    Q.    Miss West, I'm going to show you a couple more
8          pictures, they're marked with Exhibits 19 and
9          20.  Do you recognize those guys?  First 19.
10   A.    Yes.
11   Q.    Who is that?
12   A.    I seen him before.
13   Q.    Who is that?
14   A.    Javy.
15   Q.    Javy.  And what's his relationship to your
16         brother, Daniel Wilber?
17   A.    His friend.
18   Q.    His friend.  When you went from Bacardi's to
19         the party did you go in Javy's car?
20   A.    That's right, yes.
21   Q.    And did Javy in fact drive it?
22   A.    Yes.
23   Q.    Is it true that he's about five six?
24   A.    I don't know.
25   Q.    He's way shorter than your brother?
```

69

```
 1   A.   Yeah.

 2   Q.   And this guy in Exhibit 20, do you recognize

 3        him?

 4   A.   Isaiah.

 5   Q.   Isaiah.  What's his relationship to your

 6        brother, the defendant?

 7   A.   Friend.

 8   Q.   Another friend?

 9   A.   Yes.

10   Q.   That's Exhibit 20.  And is he about five ten?

11   A.   Yes.

12   Q.   Are any of these guys in that house that night

13        even as close to as tall as your brother, that

14        you recall?

15   A.   No, not that I know of.

16   Q.   Did you see Isaiah that night fight your

17        brother?

18   A.   No.

19   Q.   Did you see your brother punch this guy,

20        Mr. Torres, the guy you saw before in Exhibit

21        8, which -- this is actually Exhibit 9 but --

22        I'm going to show you Exhibit 9, is that the

23        same guy you saw before in Exhibit 8?  There

24        it is.

25   A.   Oh yeah.
```

70

```
 1   Q.   That's the same guy; right?

 2   A.   Yeah.

 3   Q.   Did you see your brother punch him?  Or you

 4        know that's what Mr. Torres said happened;

 5        right?

 6   A.   Right.

 7   Q.   Right?

 8   A.   Right.

 9   Q.   You know what all of the different witnesses

10        in this case are saying now; don't you?  You

11        didn't back in February, but now you do.  You

12        have some idea of what everyone's told the

13        police, what's in all the reports, you know

14        all of those things now; right?

15                  ATTORNEY CHERNIN:  Objection.

16        Foundation.

17                  THE COURT:  Overruled.

18   BY ATTORNEY GRIFFIN:

19   Q.   Correct, Miss West?

20   A.   What do you mean?

21   Q.   What I mean is you know that Mr. Torres says

22        your brother punched him; right?

23   A.   Did I know that?

24   Q.   Yeah.  You knew that, you know it today, you

25        didn't know it in February?
```

71

```
 1   A.   Yeah, I know it now.

 2   Q.   You know that Mr. Torres says he hit his head

 3        on the cabinets and kind of like saw stars and

 4        that; right?  You heard these things before

 5        today?

 6                  THE COURT:  Mr. Griffin, just let

 7        her have an opportunity to respond and then

 8        you may ask the next question.

 9   A.   So you want to know, did I see him fall and

10        hit his head, is that what you saying?

11   BY ATTORNEY GRIFFIN:

12   Q.   Nope.  I want to know if between the time the

13        shooting happened and today, you've looked at

14        other reports or had your mother read 'em or

15        in your family you've talked about what the

16        different witnesses are saying?

17   A.   No.

18   Q.   No idea; is that right?

19   A.   Well, you need to explain.  Can you explain

20        that?  What do you mean?

21                  THE COURT:  You don't understand

22        the question?

23                  THE WITNESS:  No.

24                  THE COURT:  Rephrase.

25   BY ATTORNEY GRIFFIN:
```

72

```
 1   Q.   Did you see your brother punch the guy in
 2        picture Number 8, Exhibit 8, or Exhibit 9,
 3        it's the same guy, did you see your brother --
 4   A.   Did I see him punch him?
 5   Q.   Did you see the defendant, Danny Wilber, punch
 6        that guy there in the after hours the night
 7        the shooting happened?
 8   A.   I'm not sure, but yes, I think so.  I'm not
 9        sure though.
10   Q.   Did you see Isaiah punch your brother or try
11        and stop your brother, grab on to him?
12   A.   No.
13   Q.   Anything like that?
14   A.   No, no, no.
15   Q.   And you know, correct, Miss West, that I
16        believe you're telling the jury today that the
17        police basically lied on you in this
18        statement; right?  They made things up?
19   A.   Some of it, yeah, they made up.
20   Q.   Some of it?
21   A.   Yes.
22   Q.   The important parts?
23   A.   Yep, they made it up.
24   Q.   They never wrote down, it isn't in your
25        statement anywhere, Antonio West saw her
```

73

```
 1        brother shoot David Diaz, it's not in there
 2        anywhere; is it?
 3   A.   No.
 4   Q.   They could have written that in there; right?
 5        You didn't read it anyway.  And that's what
 6        they wanted you to say; right?  That's what
 7        you're telling this jury?
 8   A.   Right.
 9   Q.   They didn't write that; did they?
10   A.   What?
11   Q.   That you saw your brother --
12   A.   No.
13   Q.   -- shoot David Diaz?
14   A.   No.
15   Q.   It would have been pretty easy for 'em;
16        wouldn't it?
17   A.   Yeah, 'cuz I didn't read it.
18                    ATTORNEY GRIFFIN:  Nothing
19        further.
20                    THE COURT:  Recross.
21                    ATTORNEY CHERNIN:  Thank you.
22        I'm going to be very brief, Your Honor.
23                    RECROSS EXAMINATION:
24   BY ATTORNEY CHERNIN:
25   Q.   Ms. West, from your vantage -- from the place
```

74

```
 1       that you're in at the time the shot was fired,

 2       could you see into this area behind where

 3       Mr. Diaz fell?  In other words, into this area

 4       in the stairs, could you see that area --

 5  A.   No.

 6  Q.   -- from where you were standing?

 7  A.   No, I wasn't -- I wasn't paying attention

 8       anyway.  I don't know, no.

 9  Q.   But you did hear a shot and you're certain

10       that it came from the direction --

11  A.   It sound like it came from the living room.

12  Q.   From the -- okay.  You don't know --

13  A.   No.  No.

14  Q.   -- how far in the living room?

15  A.   No, no, I don't know.

16            ATTORNEY CHERNIN:  I have no

17       additional questions for this witness, Your

18       Honor.

19            THE COURT:  All right.  Ladies

20       and gentlemen, we're going to take our

21       afternoon break.  It will be about a 15-minute

22       break.  We'll be back on the record at quarter

23       to four.  I suggest you stretch, it's kind of

24       that part of the afternoon where everybody

25       gets a little foggy, so stretch, get yourself
```

75