IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| DANNY WILBER | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-951 |
| | ) | |
| v. | ) | Hon. J.P. Stadtmueller |
| | ) | |
| CITY OF MILWAUKEE, et al, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO BAR PLAINTIFF'S CRIME SCENE RECONSTRUCTION EXPERT TIMOTHY PALMBACH

Plaintiff disclosed Timothy Palmbach as Plaintiff's scene reconstruction expert. (*See* Ex. A (Palmbach Report).) For the reasons discussed below, Defendants now ask the Court to bar Palmbach from testifying.

### ARGUMENT

Plaintiff filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights stemming from his prosecution and conviction for the murder of David Diaz which occurred on January 31, 2004. Specifically, Plaintiff alleges his due process rights were violated when he was convicted based on fabricated witness statements and reports. In support of his claims, Plaintiff retained Timothy Palmbach, a crime scene reconstruction expert. Palmbach prepared a report and several shooting reconstruction diagrams containing his assumptions about the facts in this case while offering a number of unsupported and unreliable opinions.[1] Opinions 1, 5, 6 and 14 are purported summaries of excerpts from the record reviewed by Palmbach. They do not offer any analysis and contain hearsay. It is inappropriate and unnecessary for an expert to

---

[1] This motion will consider each of the report's fourteen paragraphs as an independent opinion offered by Palmbach since there is no distinction within the report between opinions and record summaries.

1

provide summaries of prior criminal trial evidence. *See Klaczak v. Consolidated Medical Transport*, 458 F.Supp.2d 622, 666 (N.D. Ill. 2006) ("Expert testimony is not necessary to summarize voluminous documents or records"); *SFG, Inc. v. Musk*, No. 19-cv-02198, 2019 WL 8353110, *2 (N.D. Ill. July 31, 2019) (granting motion to strike expert's report and exclude his testimony where "much of [expert's] report appears to do nothing more than collect and summarize evidence from the record favorable to [plaintiff], a task the Court expects [plaintiff's] counsel to accomplish at the hearing."); *see also* Fed. R. Evid. 1006.

The remaining ten opinions are as follows:

- Opinion 2: These factors are most consistent with a loose, angled contact wound (back to front and downward). The gun would have been held above and toward the rear of David Diaz's head when discharged. It should be noted that David Diaz is 5'8" in height. All of these factors are consistent with the shooter located behind David Diaz when the shot occurred. In addition, Dr. Mainland noted the presence of bullet fragments within the cranium. There is a high probability that some of the bullet fragments exited the wound track. Thus, no additional, post-muzzle impact would be necessary to further fragment the projectile (bullet).

- Opinion 3: Given the traumatic nature of the head wound to David Diaz, as identified and described by Dr. Mainland, it is most probable that David Diaz was facing the North when he was shot from behind, and then moved forward, landing in a prone position.

- Opinion 4: There are elongated bloodstains on the East wall, door trim and baseboard, consistent with blood drops falling downward, adjacent to the wall, as David Diaz's body is moving into the kitchen toward the final resting position. (See Photo #4).

- Opinion 7: It should be noted that Detective Casper stated that an examination of objects and surfaces within the kitchen area of the scene failed to yield any indications of a bullet strike. This will have bearing on the potential orientation of David Diaz's body and head when he received the fatal gunshot wound and provide a basis for identifying the more probable orientation of Diaz's head.

- Opinion 8: There is no definitive explanation regarding the presence of the lead bullet jacket fragment on the kitchen table. As determined by available evidence and my subsequent reconstruction David Diaz would have been facing the north wall when shot from behind. The entrance wound was on the back portion of his head and travelling in a forward, left to right direction. That is most likely the pathway that the bullet fragments and jacket would travel. That is not consistent with the bullet lead fragment jacket landing on top of the kitchen table, given that there were no signs of a bullet impact or deflection in the kitchen. However, it is possible that a bullet fragment was

created with the angled entrance shot in Diaz's cranium, and then landed on the kitchen table.

- Opinion 9: There appears to be discrepancies in measurements taken at the crime scene. In his report dated 2/1/2004, Det. Casper stated that "the kitchen measured 10'7" x 13'." In his trial testimony, Det, Casper stated that "The kitchen from the North wall to the doorjamb is approximately 11' 8". The diagram, marked as Exhibit 24, shows the overall distance of the kitchen from the North wall to the entrance into the living room as 11'8". (It should be noted that the depth of the stove in the northeast corner of the kitchen is only 1'2" in the diagram. Yet, in the diagram it is drawn as a 4-burner unit and appears to be a larger unit in the scene photo showing the overall stove. Thus, the distance from the front of the stove to the North wall is likely greater than 14".) (See Photograph #5). In addition, William Kohl, Private Investigator measured the kitchen and living room areas in 2005 and obtained the following measurements: 1) The distance from the North edge of the living room wall to the South edge of the kitchen is 3' 7 ½". 2) The distance from the North edge of the kitchen wall to the South edge of the kitchen wall is 11' 6". 3) The distance from the East wall of the kitchen to the West wall of the kitchen is 13'.

- Opinion 10: The determination of the bullet trajectory that passed through David Diaz's head can be calculated by the measurements obtained of the entrance and exit wounds, as documented by Dr. Mainland during the autopsy. The trajectory angle was calculated to be 24 degrees. (See Appendix A for additional information and a view of the trajectory.)

- Opinion 11: After calculating the trajectory angle of approximately 24 degrees it is possible to determine how far from David Diaz would the bullet that exited from his nose region travel before striking the kitchen floor. That distance was determined to be approximately 12'7". (See Appendix C for additional details and a view of the trajectory to the floor.) Even if the stove was only 14" in depth, the minimum distance from the North wall to David Diaz was minimally 13' 9". Since no bullet strike damage was observed on the face of the stove or surrounding walls it is less likely that David Diaz would have been any closer to the North wall than depicted in this diagram. Most likely, the bullet fragments stuck the floor at a low angle, reducing the potential for clearly visible damage to the floor, and came to a rest under the stove.

- Opinion 12: The trajectory depicted in Appendix C assumed that David Diaz's head was essentially level, facing forward when he was shot. If his head was facing downward then the trajectory would result in the bullet fragments striking the floor further from the north wall. However, this increased angle of impact (relative to the floor) would most likely increase the potential of damage to the floor. If his head was facing upward then the trajectory would result in the bullet fragments striking the oven, walls, or ceiling rather than the floor. Therefore, given the lack of visible defect damage from the bullet fragments on the stove face, walls, ceiling, or floor south of the oven the most probable head orientation of David Diaz when he was shot is essentially level. (See appendix B to view these three approximate potential head positions.)

- Opinion 13: The position of David Diaz when he was shot from behind would have been minimally 13' 9" from the North wall with his head in a relatively level position. This position is located South of the kitchen. The actual distance of the kitchen from

3

the north wall to the south wall has been reported at various distances; 10'7" (Casper), 11'8 (Casper) or 11' 6" (Kohl). Assuming that David Diaz was located at the minimal distance of 13' 9" from the North wall of the kitchen, he would have been standing within the walkway area between the North wall of the living room and the South wall of the kitchen. This would require the shooter to be standing behind David Diaz, minimally at the North edge of the living room, and possibly standing fully within the living room. (See Photo #6). Det. Casper's measurement of the walkway between the north edge of the living room and south edge of the kitchen was 3', while Investigator Kohl's measurement of that area was 3' 7 ½". Casper's diagram shows the left foot of Diaz 3'6" from the kitchen South wall and the right foot of Diaz 3' from the kitchen South wall. These measurements are demonstrably incorrect. Photographs # 3 and 6 depict Diaz's feet nearly adjacent to the kitchen south wall. All of the observed data is inconsistent with the shooter located anywhere within the kitchen at the time David Diaz was shot. (See Photo # 7).

Federal Rule of Evidence 702, which governs the admissibility of expert witness testimony, provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent of the expert demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (The proponent of the expert bears the burden of demonstrating the admissibility of the expert's testimony). The Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) that a federal trial judge's role is to act as "gatekeeper" by ensuring that expert testimony is both relevant and reliable. *Id.* at 597. To make this determination, courts consider: "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) whether the testimony will 'assist the trier of fact to understand the evidence or

4

to determine a fact in issue.'" *Driver v. Apple Illinois, LLC*, No. 06 C 6149, 2011 WL 4007337, at *2 (N.D. Ill. 2011) (citing *Myers v. Ill. C.R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

Palmbach should be barred from testifying as to the above ten opinions as he is not qualified to offer opinions on wound or external ballistics trajectories and forensic pathology. Additionally, Palmbach should be barred from testifying as his report does not sufficiently state what methodology he used to arrive at his opinions. There are no citations to any peer reviewed studies, empirical evidence, or other sources for his opinions. Moreover, Palmbach appears to make several factual assumptions about unknown circumstances of the shooting, without acknowledging that he is making assumptions or the effect those assumptions have on his opinions. These assumptions, such as the position of the victim's head at the time of the shooting, result in opinions and diagrams that are not based on facts, thus making the opinions speculative, irrelevant, and unduly prejudicial. Finally, many of Palmbach's opinions do not require expert testimony and will not assist the jury in determining a material fact at issue. As such, and as articulated further below, Palmbach's opinion testimony should be excluded from trial.

I.  **Palmbach does not possess the specialized knowledge or experience required to opine on subject matters such as ballistics trajectory analysis and forensic pathology.**

The first inquiry under Rule 702 is whether the proposed expert witness is qualified to testify competently regarding the matters he intends to address. Fed. R. Evid. 702(a); *see also Myers v. Ill. C.R.R. Co.*, 629 F.3d 639, 643-44 (7th Cir. 2010). Although an expert may be qualified to render opinions based solely on their experience, the expert's experience must inform the specific opinions they intend to offer. *See Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("[A] court should consider a proposed expert's full range of practical experience as well as

5

academic or technical training when determining whether that expert is qualified to render an opinion in a given area.") Palmbach's opinions lack a discernible methodology because, to the extent his opinions are based solely on measurement comparisons easily understood by a lay juror, or speculation based on assumed facts, there is no indication of how his experience led him to the ballistics conclusions he reached in his report. Specifically, Palmbach's experience as a crime scene reconstructionist is insufficient for him to form his opinions in this report. (*See* Palmbach C.V. and testimony list, attached hereto as Exhibit B).

Palmbach offers opinions without the required qualifications and experience in forensic pathology and ballistics. Palmbach is neither a forensic pathologist or a terminal, external or wound ballistics expert, yet in opinion 2, he opines on the pathology of the victim's gunshot wound and extrapolates on the medical examiner's autopsy that there "is a high probability that some of the bullet fragments exited the wound track. Thus, no additional, post-muzzle impact would be necessary to further fragment the projectile (bullet)." (Ex. A). In opinion 3, Palmbach opines on the position of the victim at the time of his death based on the autopsy, even though the medical examiner herself did not draw any such conclusions about the victim's positioning. Most concerningly, in opinion 10, Palmach uses the medical examiner's entry and exit wound descriptions to calculate a wound trajectory angle of 24 degrees. He then plots this trajectory in Appendix A of Exhibit A. Palmbach is not a doctor, let alone a pathologist. There is no indication in his materials that he has ever been qualified as a wound or external ballistics expert or has had specialized ballistics training. He is not qualified to offer opinions on the victim's gunshot wound or analyze the findings of the medical examiner. *See, e.g., Dura Automotive Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (finding that a "scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."); *Hall v. Flannery*, 840 F.3d 922, 929–30 (7th Cir. 2016) (pediatric neurosurgeon could not opine about the

6

likelihood a heart condition caused a death when the only basis for that opinion was reviewing several scientific papers); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999) (material science and metallurgy expert could not offer an opinion that was "derived primarily, if not completely, from [a medical doctor's] expertise" and was "rooted in medical knowledge and training which [the expert] did not have").

In *Garrit v. City of Chicago*, the proposed expert was a firearms and tactics instructor and attorney with extensive firearms training who had a shooting scene reconstruction certificate and designed and led police officer training programs. No. 16-cv-7319, 2022 WL 124554, *1 (N.D. Ill. January 13, 2022). However, the court barred him from testifying as to bullet trajectory analysis after finding that such testimony required specialized expertise such as extensive experience or formal training. *Id.* at * 8. The court also found that it was not an expert's role to summarize relevant facts, even those used in developing his opinion and because the proposed expert was not a doctor or pathologist, the court found he was "not qualified to render an opinion as to what the autopsy shows or summarize the autopsy to the jury." *Id.* The same result should follow here.

According to Rule 702, a person may be qualified as an expert based on his knowledge, skill, experience, training, or education. Fed. R. Evid. 702. However, in evaluating a witness's qualifications to testify as an expert, "[t]he question the Court must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). This Court should be "mindful that Rule 702, especially after the recent amendments, requires a focus on an expert's qualifications and the reliability of his methodology." *Brown v. City of Chicago*, No. 19 CV 4082, 2024 WL 3791634, *3 (N.D. Ill. August 13, 2024) (citing *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019)). Palmbach's qualifications do not allow him to answer specific questions regarding ballistics analysis and trajectory or analyze autopsy findings. There is no

7

indication he has ever taught or written on the subjects of conducting autopsy analysis or wound or external ballistics. Accordingly, Palmbach's opinions regarding these topics should be barred.

**II.     Palmbach's opinions are the product of an unreliable and insufficient methodology**.

An expert witness "must explain how he reaches his conclusions – either by linking them to generally accepted standards in the field or by citing information within his own practical experience." *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 21296465, *3 (N.D. Ill. Aug. 30, 2022) (citing *Manpower, Inc. v. Ins. Co. of Pa*., 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered."); *Potts v. Manos*, No. 11-cv-3952, 2017 WL 4365948, *5 (N.D. Ill. Sept. 29, 2017) ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard for reliability under Daubert and the Federal Rules of Evidence."); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") Palmbach frequently does not state or explain what his methodology is, as opposed to stating his conclusions. *See Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc*., 521 F.3d 790, 791 (7th Cir. 2008) (asserting that *ipse dixit* testimony is inadmissible).

Opinions 2-4 and 7-13 in Palmbach's report make conclusory and/or speculative statements with no explanation of how the opinions relate to his specialized knowledge or experience. Nor does Palmbach provide any citation to data, authoritative literature, or specific professional standards. There is nothing in these opinions indicating Palmbach's reconstruction methodology was peer reviewed or that it could be tested. Simply put, Palmbach fails to bridge his opinions to any sound, verifiable basis for those opinions. As such, his methodology is unreliable, and his opinions must be barred.

8

For example, in opinions 2 and 3, Palmbach offers no methodology or basis for his opinions that "the gun would have been held above and toward the rear of David Diaz's head when discharged. All of these factors are consistent with the shooter located behind David Diaz when the shot occurred" and "it is most probable that David Diaz was facing the North when he was shot from behind, and then moved forward, landing in a prone position." (Ex. A). Palmbach does not quantify what "most probable" means and what standard of measurement he is relying on to make such an opinion. Palmbach offers no accounting for the validity of his opinions when it has not been established what the victim's exact head and body positions were at the time he was shot. Any tilt of the victim's head or turn of the victim's body would affect the analysis of the location of the muzzle of the gun at the time it was discharged. Palmbach fails to acknowledge that he is making assumptions about the position of the victim and fails to address how variations of the victim's position could change the location of the shooter.

In opinion 4, Palmbach states "there are elongated bloodstains on the East wall, door trim and baseboard, consistent with blood drops falling downward, adjacent to the wall, as David Diaz's body is moving into the kitchen toward the final resting position." (Ex. A). Palmbach offers absolutely no support for this opinion. He does not cite any forensic testing conducted on the stains he references, nor does he cite to any trial testimony regarding the stains. Palmbach did not conduct any forensic testing in this case and no blood splatter recreation simulations to provide any sort of basis for his opinion. To the extent he looked at a photograph of the crime scene and deduced that the elongated stains indicated a substance dripped downward, that observation does not require expert testimony.

In opinion 7, Palmbach makes vague and conclusory statements without utilizing any expertise. Similarly in opinion 8, Palmbach does not aid the jury's understanding of any fact in consequence and instead, offers mere speculation and conjecture. Unable to account for how the

9

Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 9 of 18    Document 102

bullet jacket wound up on the kitchen table if his assumption that the victim was directly facing the north wall was true (an assumption Palmbach makes only based on vague description of "available evidence and my subsequent reconstruction"), Palmbach guesses that "it is possible that a bullet fragment was created with the angled entrance shot in Diaz's cranium, and then landed on the kitchen table." This opinion is based on absolutely no science, methodology or data. It is a guess. *See Andersen v. City of Chicago*, 454 F.Supp.3d 808, 814 (N.D. Ill. 2020) ("[An expert] may rely on disputed facts to reach his opinions, as long as there is evidence to support such facts.") Again, Palmbach is not a ballistics expert, he did not conduct any test firing to confirm the victim could only have been facing north, head level, when he was shot. Even when confronted with facts that disprove that conclusion, such as the bullet jacket on the table, Palmbach just makes guesses to explain away the bad fact.

In opinion 9, Palmbach opines there are discrepancies in measurements taken at the crime scene. There is no expert opinion being offered here. In fact, Palmbach is comparing different measurements from different parts of the kitchen to create an illusion of inconsistency. Palmbach is not utilizing any expertise or expert methodology in this opinion. He is doing what any juror can do themselves, look at two measurements and compare them. Moreover, these measurements are not new information— the measurements were addressed at Plaintiff's trial and Plaintiff was able to alert the jury to any inconsistencies he perceived, without the use of an expert witness. *See* David H. Kaye, David E. Bernstein and Jennifer L. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence, § 2.1.2 ("If an expert's testimony does nothing more than attorneys can do in final arguments, it is not admissible because it is providing not knowledge, but mere opinion and advocacy.")

In opinion 10, Palmbach opines the bullet trajectory angle was 24 degrees. He memorializes this calculation in Appendix A. Notably, Dr. Mainland, who conducted the autopsy,

10

did not determine wound trajectory, which could have been done using a trajectory rod following the path of the bullet between entry and exit wound. So Palmbach, who is not a doctor, is independently making this trajectory analysis for the first time. He is doing so without accounting for the possibility the bullet did not follow a linear path, given that the autopsy report indicates the bullet struck bone multiple times. *See Andersen,* 454 F.Supp.3d at 814 (finding that the expert must "explain how he reaches his conclusions – either by linking them to generally accepted standards in the field or by citing information within his own practical experience"); Fed. R. Evid. 702, Advisory Comm. Notes ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.")

The only way to glean any sense of Palmbach's methodology in Appendix A is through an esoteric calculation at the bottom that is not self-explanatory to a layperson and which he makes no effort to actually explain in his report, much less support with any references that this is the proper way to make such a calculation. (*See* Ex. A, p.11.) However, one thing that is discernable from this Appendix is that in making his calculation, Palmbach used the "***average length of [an] adult male head.***" (*Id.* (emphasis added).) There is nothing in Palmbach's report indicating whether David Diaz's head length was the same as the "average" length Palmbach uses. And given this data point seems to affect the very angle Palmbach is trying to calculate (and upon which his later opinions seem to be based), that is an absolutely vital piece of information. Palmbach pulls a datapoint out of thin air – a hypothetical "average…adult male head" – without making any effort to explain why that is appropriate to use for calculating the actual bullet trajectory through David Diaz's head. To put it simply, ***the head depicted in Appendix A apparently does not represent David Diaz's head***, and so the measurements used do not represent the actual measurements one would need to calculate the real bullet trajectory (assuming the rest of Palmbach's equation in

11

Appendix A is the correct way to even do this calculation – something he does not support). This represents a total breakdown of the requirements of Rule 702.

The lack of expertise becomes more apparent when looking at Palmbach's diagrams in Appendix B and C, where it appears Palmbach conflates wound ballistics with external ballistics. In other words, Palmbach assumes the angle at which the bullet entered the victim's head is the same as the angle at which the bullet traveled when it left the muzzle of the gun. But the way to determine external ballistics is through test firing a gun, using the same weapon and ammunition as was used in a shooting, under the same circumstances, to account for velocity and air resistance. Palmbach did not conduct any test-firing in this case, as a ballistics expert would have been able to do. Indeed, there are far too many unknown fact variables in this case to support a verifiable trajectory angle calculation and Palmbach does not offer any methodology for how he accounted for trajectory variables in coming up with his angle of 24 degrees. For example, the position of the victim's head, whether it was angled up or down, the position of the victim's body, whether the bullet struck bone inside the victim's head resulting in a non-linear wound trajectory, whether the bullet struck an unobserved object in the kitchen, resulting in a non-linear trajectory (which would also account for the jacket on the table), are all unknown and unaccounted for variables in Palmbach's opinion.

Expert opinions that merely set forth conclusions, but without any basis or reasonable analysis, are of no assistance to a jury. *Davis v. Duran*, 277 F.R.D. 362, 372 (N.D. Ill. 2011) (excluding testimony of expert who was "unqualified to testify about bullet wound trajectories" and provided no proper explanatory reasoning for his bullet trajectory analysis) citing *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (affirming the district court's exclusion of an expert's affidavit that was "devoid of analysis"). In *Davis,* the court excluded an expert's ballistics testimony where he seemed simply to cobble "together testimony from the

12

medical examiner's deposition and selected eyewitness testimony describing Tyrone's position when Officer Duran shot him. That opinion is not the product of any expertise at all—any juror could just as easily have drawn the same conclusion…Like his opinions comparing the police report with deposition transcripts…the testimony would not assist the jury." *Id.*

Palmbach's conclusions in opinion no. 11 suffer from the same deficiencies. Again, without any explanation of what established guidelines he's using to make his calculation, or how he is making the calculation, Palmbach opines the distance the bullet travelled after exiting the victim's head was 12'7 and guesses that "[m]ost likely, the bullet fragments stuck the floor at a low angle, reducing the potential for clearly visible damage to the floor, and came to a rest under the stove." Palmbach provides *no* basis for this opinion or qualification for what "most likely" connotates, or why a bullet striking the floor at a "low angle" somehow reduced the "potential for clearly visible damage to the floor." Opinion 11 is entirely speculative without any reliable methodology. Palmbach makes various assumptions, relying on his unsubstantiated trajectory angle of 24 degrees (again, using head measurements that were not from David Diaz's head) to reach his conclusions. While experts are allowed to make certain assumptions in arriving at their opinions, in this scenario, Palmbach's factual assumptions render his opinions irrelevant because the opinions are not grounded in fact or methodology.

In opinion 12, Palmbach attempts to justify his assumption in Appendix C that the victim's head was level and facing forward, with speculation regarding what he would expect to see if the head was not level, but this results in more speculation and conjecture where Palmbach provides no basis for his opinions— no test firing, no literature, no crime scene software data analysis. There was no evidence presented at the criminal trial as to the likely trajectory of the bullet after it left the victim's body or as to any blood-spray patterns. Thus, it is unclear how Palmbach, two decades after the shooting, without conducting any forensic analysis on the evidence in this case, without

13

having conducted any ballistics testing or any other type of live testing, has made conclusive ballistics determinations. Palmbach's diagram at Appendix C offers no explanation for its figures or the assumptions necessary to calculate the figures. For example, the diagram shows the victim's head level, staring straight at the wall— an assumption that would significantly alter the trajectory and distance calculations Palmbach offers in Appendix C. But at least one witness at the trial testified that the victim's head was *not* level staring forward, but was turning away from Plaintiff at the time he was shot. In fact, the Seventh Circuit, in affirming the sufficiency of the evidence to convict Plaintiff, noted these facts:

> [T]here was no testimony in the trial record as to how Wilber and Diaz were positioned relative to one another at the precise moment of the shooting or as to how Diaz's body fell to the floor of the kitchen after he was struck by the bullet (whether his body may have spun around or instead fell straight downward, for example). As the State argued in closing, the kitchen was crowded with people and the moments just before and after the shooting were chaotic. Jeranek told the police that Diaz had turned away from and had his back to Wilber before the shooting, which would explain how Wilber could have shot him in the back of the head, if not how Diaz's body ended up facedown on the kitchen floor in a south-north direction. It is possible that Diaz's body was jostled while it was falling or after it fell to the floor.

*Wilber v. Hepp*, 16 F.4th 1232,1250-51 (7th Cir. 2021). Palmbach's opinions 10-12 and the accompanying appendices, are not reliable such that they can be presented to the jury— either through the testimony of Palmbach or utilized in any animation prepared by another expert.

In opinion 13, Palmbach does not offer any bate-stamped citations to the record, making it difficult to determine which dimensions he is referring to and in what context. Again, Palmbach does not offer any expertise in this opinion, he simply pulls numbers from the record and then makes conclusory possibility statements without providing any methodology. To the extent he is indicating there are discrepancies in the recordings of various distances in the kitchen, that conclusion does not require expert testimony. But to the extent he is making probability determinations, what could and could not be possible with respect to the position of the victim and

14

shooter at the time of the murder, he is employing no verifiable methodology or analysis. These sorts of determinations require live-testing, generally in the form of ballistics testing to reenact possible scenarios. But Palmbach does not employ any such methods, he essentially offers the same inferences an attorney would make in a closing argument.

It cannot be underscored enough that it is *incumbent on Plaintiff*, as the proponent of the expert, to demonstrate that Palmbach's report *reflects a reliable methodology* and application of that methodology to the facts of this case. In fact, recent changes to Rule 702, which took effect on December 1, 2023, amended the rule's language to address the concern that courts were not sufficiently gatekeeping expert opinions. Prior to the amendment, the requirement in Rule 702(d) read "the expert has *reliably applied* the principles and methods to the facts of the case." But in 2023 the requirement was amended to read, "the expert's *opinion reflects a reliable application* of the principles and methods to the facts of the case." Fed. R. Civ. P. 702(d) (emphasis added). This amendment highlights the deficiency in Palmbach's opinions— they do not reflect a reliable application of any methodology to the facts of the case. Instead, the opinions merely state Palmbach's opinions as bald, unsupported conclusions.

The 2023 amendment also added the language that a proponent of expert testimony must demonstrate that it is "more likely than not" that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b). These amendments were partly a response to the failure by some courts to gatekeep expert opinions based on the mistaken belief that applicability and reliability concerns about expert opinions could simply be addressed through cross-examination instead of the prohibition of testimony. The Committee noted that the amendments "respond to the fact that many courts have declared the requirements set forth in Rule 702(b) and (d)…are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible." Proposed Amendments, Excerpt from May 15, 2022,

15

Report of the Advisory Committee on Evidence Rules. The Committee found that "these statements *misstate* Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence." *Id*. (emphasis added). Ultimately, it is the Court's role "to examine the methodology the expert has used in reaching his conclusions." *Skaggs v. Ferrellgas, Inc*., No. 1:21-cv-02406-TWP-MJD, 2023 WL 8711898, *2 (S.D. Ind. Dec. 18, 2023). Accordingly, due to Palmbach's failure to appropriately link his opinions to any reliable methodology, he should not be allowed to testify at trial.

**III. Palmbach's opinions will not assist the trier of fact because they are speculative, do not address the issues of the case, and do not require expert knowledge.**

"The touchstone of admissibility under Rule 702 is helpfulness to the jury." *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) amended on unrelated grounds, 957 F.2d 301 (7th Cir. 1992). "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Id.* Although an expert witness may provide opinions regarding factual issues and rely on factual assumptions in forming those opinions, "[u]nless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury…" *U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

To be admissible, expert testimony must assist the trier of fact in understanding the evidence or determining *a material fact* in question. *See Daubert*, 509 U.S. at 592-93. Palmbach's opinions are not helpful to the jury because they are not based on the facts of the case but instead based on unproven assumptions that alter the relevancy of the opinions themselves. As such, the speculative nature of his opinions render his testimony irrelevant. An expert "may be barred under

16

Rule 702 where the opinion proffered calls for speculation or expertise in a field outside of the expert's purview." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 822 (N.D. Ill. 2013).

Moreover, Plaintiff's complaint alleges evidence fabrication in the form of witness statements and reports. Palmbach's opinions do not inform these issues. In other words, Palmbach's testimony would not illuminate any of the issues relevant to the trial as his opinions do not address evidence fabrication. *See Daubert*, 509 U.S. at 597 (federal trial judge must act as gatekeeper by ensuring expert testimony is both relevant and reliable). Instead, Palmbach's opinions seem to be offered to help re-try the plaintiff's criminal trial, where Plaintiff's guilt was central to the case. Here, the question of evidence fabrication is central to the case. An expert's admissibility is predicated on the relevancy of his testimony— his testimony must help the jury make decisions relating to facts of consequence in the determination of the action. *See Daubert,* 509 U.S. at 587. Because Palmbach's testimony is irrelevant to the central issues to be decided in this case, he should be barred from testifying.

Lastly, Palmbach's testimony does not assist the jury to the extent that his report contains opinions that do not require any expertise because they are within the ken of a juror. *See U.S. v. Hall*, 165 F.3d 1095, 1106 (7th Cir. 1999) (expert testimony unnecessary for matters "within the ken of most lay jurors"). As detailed in the previous section, in some of his opinions, Palmbach merely appears to read two documents, and without using any recognized standards in his field of expertise, draws conclusions from perceived inconsistencies in the documents. The ability to read two different exhibits with measurements of the kitchen in which the victim was murdered and observe inconsistencies in those measurements is a task the jury can accomplish without Palmbach's "specialized" assistance. "[E]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago*, No. 09 C 8082, 2011

17

WL 1838773, at *2 (N.D. Ill. May 12, 2011). Because the opinions in Palmbach's report do not satisfy Rule 702 requirements, he should be barred from testifying to the opinions at trial.

## CONCLUSION

The Court should bar Palmbach from testifying.

Date: January 17, 2025

Respectfully submitted,
/s/ *Brian Wilson (Atty. No. 6294099)*
One of the attorneys for Defendants

Kathryn Doi
Brian Wilson
Warren Fasone
Rob Crawford
**NATHAN & KAMIONSKI LLP**
206 S. Jefferson St.
Chicago, IL 60661
bwilson@nklawllp.com

*Counsel for all Defendants*