# EXHIBIT A

# EXPERT REPORT OF
# TIMOTHY M. PALMBACH
# In Matter of Danny Wilber v. City of Milwaukee, et al.

**Re:**  In Matter of Danny Wilber v. City of Milwaukee, et al.

**Nature of
Incident:**  Homicide

**Date of
Incident:**  January 31, 2004

**Location of
Incident:**  1128 West Mineral Street, Milwaukee, WI

**Parties
Involved:**  Accused: Danny Wilbur

Victim:  David Diaz, DOB- 01/23/1981,
68" tall, 259 lbs.

**Contacted By:**  Attorney Ben Elson, People's Law Office, 1180N. Milwaukee
Avenue, Chicago, IL

**Date of Report:**  May 9, 2024

**<u>Items Submitted for Review:</u>**

1) Detective Casper Report
2) Detective Casper Scene Diagrams, with and without measurements
3) (3) hand drawn diagrams of scene; Exh. 36A, Exh. 38, Exh. 51
4) Milwaukee County Medical Examiner's Office Report- autopsy of David Diaz, sketches and photographs
5) CDK Autopsy photos
6) Photos from DA File
7) Thomas Casper Trial Testimony
8) Richard Torres Trial Testimony
9) Mark Simonsen Trial Testimony
10) Jeranek Diaz Trial Testimony
11) Antonia West Trial Testimony
12) Donald Jennings Trial Testimony
13) Oscar Niles Trial Testimony
14) William Kohl Trial Testimony
15) Jeffrey Jentzen Trial Testimony
16) Affidavit of Richard Torres
17) Wisconsin Dept. of Justice, State Crime, Firearms report
18) Report and photographs from William Kohl
19) Trial Testimony of William Kohl

**Evidence Examined:** None

**<u>INTRODUCTION:</u>**

Prof. Emeritus Timothy Palmbach was contacted by Attorney Ben Elson to work as a forensic scientist, crime scene reconstruction expert in the matter of Danny Wilber v. City of Milwaukee, et al., which involved the death of David Diaz as a result of a gunshot wound to the head. Items for review were sent to Prof. Emeritus Palmbach electronically and are listed in the "Items Submitted for Review" caption above. The scope of this expert's work would involve issues related to the shooting incident and a reconstruction of the shooting incident.

**OBSERVATIONS and CONCLUSIONS:**

After reviewing the submitted documents and materials the following facts, observations, and conclusions were determined. The stated conclusions are based upon the material known to this expert at this time and are subject to change should additional pertinent information become available at a later date.

1) Medical Examiner Mary Mainland, M.D. conducted the post-mortem examination of David Diaz. Relevant details pertaining to the gunshot wounds include the following:
   - The GSW entrance wound was located 1.5 inches below the top of the head, and the exit wound was located 5.5 inches below the top of the head.
   - Gunpowder soot and stippling was noted all around the entrance wound.
   - The trajectory is from back to front, left to right, and downward.
   - Bullet fragments were recovered from the cranial cavity and the right maxillary sinus region.

   Dr. Mainland described this head wound as a "perforating, intermediate range gunshot wound to the head".

2) Photograph #1 is an overall view of the gunshot entrance wound (GSW) to the top and rear portion of Diaz's head. Photograph #2 is a close-up view of the entrance GSW depicting heavy soot and stippling in the rear portion of the injury, and stellate tearing of the skin in the front portion of the GSW. (See Photo Appendix). These factors are most consistent with a loose, angled contact wound (back to front and downward). The gun would have been held above and toward the rear of David Diaz's head when discharged. It should be noted that David Diaz is 5'8" in height. All of these factors are consistent with the shooter located behind David Diaz when the shot occurred.

   In addition, Dr. Mainland noted the presence of bullet fragments within the cranium. There is a high probability that some of the bullet fragments exited the wound track. Thus, no additional, post-muzzle impact would be necessary to further fragment the projectile (bullet).

3) Given the traumatic nature of the head wound to David Diaz, as identified and described by Dr. Mainland, it is most probable that David Diaz was facing the North when he was shot from behind, and then moved forward, landing in a prone position. (See Photographs #3-4).

4) There are elongated bloodstains on the East wall, door trim and baseboard, consistent with blood drops falling downward, adjacent to the wall, as David Diaz's body is moving into the kitchen toward the final resting position. (See Photo #4).

5) It is important to note that in his trial testimony, Detective Casper stated David Diaz's body was not moved from the point in time that he was shot to the point that he arrived on the scene, and that emergency personnel did not move him to perform any living saving measures, or any other reason.

6) Bullet fragments were located under the stove by Detective Casper. In addition, Det. Casper located a lead bullet jacket lying in the center of the kitchen table. All of these items were sent the Wisconsin State Crime Laboratory and examined in the Firearms Section. They were identified as being associated with a .38/357 caliber projectile. No further identification was possible. The general location of these fragments are consistent with having exited from David Diaz's face.

7) It should be noted that Detective Casper stated that an examination of objects and surfaces within the kitchen area of the scene failed to yield any indications of a bullet strike. This will have bearing on the potential orientation of David Diaz's body and head when he received the fatal gunshot wound and provide a basis for identifying the more probable orientation of Diaz's head.

8) There is no definitive explanation regarding the presence of the lead bullet jacket fragment on the kitchen table. As determined by available evidence and my subsequent reconstruction David Diaz would have been facing the north wall when shot from behind. The entrance wound was on the back portion of his head and travelling in a forward, left to right direction. That is most likely the pathway that the bullet fragments and jacket would travel. That is not consistent with the bullet lead fragment jacket landing on top of the kitchen table, given that there were no signs of a bullet impact or deflection in the kitchen. However, it is possible that a bullet fragment was created with the angled entrance shot in Diaz's cranium, and then landed on the kitchen table.

9) There appears to be discrepancies in measurements taken at the crime scene. In his report dated 2/1/2004, Det. Casper stated that "the kitchen measured 10'7" x 13'." In his trial testimony, Det, Casper stated that "The kitchen from the North wall to the doorjamb is approximately 11' 8". The diagram, marked as Exhibit 24, shows the overall distance of the kitchen from the North wall to the entrance into the living room as 11'8". (It should be noted that the depth of the stove in the northeast corner of the kitchen is only 1'2" in the diagram. Yet, in the diagram it is drawn as a 4-burner unit and appears to be a larger unit in the scene photo showing the overall stove. Thus, the distance from the front of the stove to the North wall is likely greater than 14".) (See Photograph #5).

In addition, William Kohl, Private Investigator measured the kitchen and living room areas in 2005 and obtained the following measurements:
1) The distance from the North edge of the living room wall to the South edge of the kitchen is 3' 7 ½".
2) The distance from the North edge of the kitchen wall to the South edge of the kitchen wall is 11' 6".
3) The distance from the East wall of the kitchen to the West wall of the kitchen is 13'.

10) The determination of the bullet trajectory that passed through David Diaz's head can be calculated by the measurements obtained of the entrance and exit wounds, as documented by Dr. Mainland during the autopsy. The trajectory angle was calculated to be 24 degrees. (See Appendix A for additional information and a view of the trajectory.)

11) After calculating the trajectory angle of approximately 24 degrees it is possible to determine how far from David Diaz would the bullet that exited from his nose region travel before striking the kitchen floor. That distance was determined to be approximately 12'7". (See Appendix C for additional details and a view of the trajectory to the floor.) Even if the stove was only 14" in depth, the minimum distance from the North wall to David Diaz was minimally 13' 9". Since no bullet strike damage was observed on the face of the stove or surrounding walls it is less likely that David Diaz would have been any closer to the North wall than depicted in this diagram. Most likely, the bullet fragments stuck the floor at a low angle, reducing the potential for clearly visible damage to the floor, and came to a rest under the stove.

12) The trajectory depicted in Appendix C assumed that David Diaz's head was essentially level, facing forward when he was shot. If his head was facing downward then the trajectory would result in the bullet fragments striking the floor further from the north wall. However, this increased angle of impact (relative to the floor) would most likely increase the potential of damage to the floor. If his head was facing upward then the trajectory would result in the bullet fragments striking the oven, walls, or ceiling rather than the floor. Therefore, given the lack of visible defect damage from the bullet fragments on the stove face, walls, ceiling, or floor south of the oven the most probable head orientation of David Diaz when he was shot is essentially level. (See appendix B to view these three approximate potential head positions.)

13) The position of David Diaz when he was shot from behind would have been minimally 13' 9" from the North wall with his head in a relatively level position. This position is located South of the kitchen. The actual distance of the kitchen from the north wall to the south wall has been reported at various distances; 10'7" (Casper), 11'8 (Casper) or 11' 6" (Kohl).

Assuming that David Diaz was located at the minimal distance of 13' 9" from the North wall of the kitchen, he would have been standing within the walkway area between the North wall of the living room and the South wall of the kitchen. This would require the shooter to be standing behind David Diaz, minimally at the North edge of the living room, and possibly standing fully within the living room. (See Photo #6).

Det. Casper's measurement of the walkway between the north edge of the living room and south edge of the kitchen was 3', while Investigator Kohl's measurement of that area was 3' 7 ½".

Casper's diagram shows the left foot of Diaz 3'6" from the kitchen South wall and the right foot of Diaz 3' from the kitchen South wall. These measurements are demonstrably incorrect. Photographs # 3 and 6 depict Diaz's feet nearly adjacent to the kitchen south wall.

All of the observed data is inconsistent with the shooter located anywhere within the kitchen at the time David Diaz was shot. (See Photo # 7).

14) Richard Torres, Jeranek Diaz, Antonia West, Donald Jennings, and Oscar Niles all testified at trial that when the gunshot went off Danny Wilber was standing inside of the kitchen in front of and to the North of David Diaz.

*Timothy M. Palmbach*

_____

Prof. Emeritus Timothy Palmbach

# PHOTO APPENDIX:

**Photo #1: Overall view of GSW entrance, top and rear of head**



**Photo #2:  Close-up view of GSW entrance, with scale**



**Photo #3: An overall view of the deceased lying on the kitchen floor.  (Camera is facing Southeast).**



**Photo #4: Closer view of the deceased's head and upper torso, and blood stain patterns on the floor and East wall.  (Camera is facing East).**



8

**Photo #5: An Overall view of the kitchen, facing generally North.**



**Photo #6: Overall view of the kitchen/living room doorway area as viewed from the living room.**



**Photo #7: An overall view of the southern portion of the kitchen.**



Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 11 of 14    Document 102-1

## APPENDIX A
## CALCULATING ANGLE OF GUNSHOT TO HEAD



NOTES:
1) Side "O"= 4"  (Autopsy data- entrance 1.5' from top of head, exit 5.5" from top of head)
2) Side "A" = 9" (average length of adult male head; www.reference.com/science-technology/average-size-human-head-62364d028e431bf3)
3) Solve for Tangent(Opposite/adjacent); 4/9=.44, 24 degree angle

11




**APPENDIX C**
**David Diaz in Room- Calculated Location**



Height to GSW
Entrance=66.5

Side X

Stove

**NOTE:**
    1) X= 66.5/.44
       Side X=151" (12'7")