IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| DANNY WILBER | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-951 |
| | ) | |
| v. | ) | Hon. J.P. Stadtmueller |
| | ) | |
| CITY OF MILWAUKEE, et al, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTON TO BAR PLAINTIFF'S FORENSIC RECONSTRUCTION AND ANIMATION EXPERT SCOTT RODER

Plaintiff disclosed Scott Roder as Plaintiff's forensic reconstruction and animation expert. (See Ex. A (Roder Report).) Along with his report, Roder submitted two video animations, an "Autopsy Visualization" (Ex. B) and a "Shooting Scene Reconstruction" (Ex. C). For the reasons discussed below, Defendants now ask the Court to bar Roder from testifying, and resultingly, to bar his animations from being used at trial.

### LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert,* 509 U.S. at 589; *see also C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827, 934 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

1

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

As emphasized by the Advisory Committee Notes to the 2023 Amendments to Rule 702, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. The Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d, 644 (7th Cir. 2010) (internal quotations omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017).

**ARGUMENT**

I. **Roder And His Animations Should Be Barred Because He Provides No Explanation Or Methodology Whatsoever Regarding How The Animations Were Created.**

It is difficult to explain based on Roder's report why he should be barred from testifying at trial, because it is difficult to call what Roder submitted an expert report at all. Instead, pages 1-55 of Roder's 57 page "report" either list the materials he reviewed or restates them. (Ex. A (Roder

Report), pp.1-55.) There does not appear to be anything in these 55 pages that Roder actually authored, as opposed to material he copied or seemingly summarized from another source. (*Id.*)

From this, two images of "Evidence Room Animation Reconstructions" appear. (*Id.* at p.56.) But not a word about how they were created. (*Id.*) Footnotes on this page reference the two video animations, but again, not a word as to how the animations were created. (*Id.*)

Then, the "report" ends with three short paragraphs of "Final Thoughts & Opinion," which says the 3D model of the incident was constructed using "industry-standard technology and methodology" to ensure its accuracy and reliability. (*Id.* 57.) Still, *absolutely nothing* is said about what this technology or methodology is.

Roder then concludes that "it is impossible for Mr. Wilber to have discharged the weapon in a manner that would have caused the injury…." (*Id.*) Roder spends two sentences explaining his conclusion by saying that he believes the shooter must have been behind Diaz, but witnesses placed Plaintiff in the kitchen during the shooting, so Plaintiff must be innocent. (*Id.*)

He finishes the "report" by saying his opinions "*along with the accompanying animations* and conclusions, are presented with a high degree of scientific certainty. They are rooted in standard forensic methods and methodologies, which have been rigorously applied throughout our analysis." (*Id.* (emphasis added).) But, again, he says *nothing* about what "standard forensic methods and methodologies" underly his conclusions and animations, how they were "rigorously applied," or what benchmark of "scientific certainty" he is talking about. (*Id.*)

Needless to say, this falls egregiously short of expert standards. An expert must use "reliable principles and methods" and his opinion must reflect a "reliable application of th[ose] principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). It is one thing to debate

3

if a proffered methodology satisfies this standard. It is another thing to debate if no methodology satisfies it (obviously not), the latter being the case here.

Defendants have located a report Roder authored in *Johnson v. Bonner County, et al.*, No. 2:18-cv-244 DCN in the District of Idaho. (*See* Ex. D.) In it, Roder has an entire section explaining how he created a "CGI shooting reconstruction" in that case. (*Id.* at p.20.) Specifically, Roder:

- Identifies the name of the 3D software application he used (Autodesk Maya), which allowed him to use "real world scale, texturing, and lighting for use of the 3D modeling and 3D animation." (*Id.* at p.20.) He also identifies how long he has been using this identified software. (*Id.*)

- He specifically identifies what materials he used as the "foundation for the CGI reconstruction" and which allowed him to build his 3D environment "to scale," such as google aerial imagery, aerial crime scene photos and evidence markers. (*Id.*) He even put these foundational items in their own exhibit so they were expressly identified apart from the general list he also provided of materials reviewed (the latter being provided here, but crucially, *not* the former). (*Id.*)

- He confirms "all 3D models and character rigs were built to scale and placed according to crime scene photos and aerial imagery taken during the investigation." (*Id.*)

- He gives a detailed description of what the markers in his reconstruction show, and explains that he created "two variants" of his reconstruction based on uncertain information in the record. (*Id.* at p.21.)

- Tellingly, he indicates that he did not build his animation(s) simply on distances measured by law enforcement's "approximations," and identifies what additional information he relied on "to accurately place evidentiary items." (*Id.*)

- He confirms the "use of Autodesk Maya's 3D distance tool was used to determine precise measurements" relevant to the animation. (*Id.*)

- Instead of just submitting an "autopsy visualization" as he does here, Roder explained that the autopsy visualization in *Johnson* "was developed based on the contents of the Autopsy report utilizing Mr. Johnson's height for scale (6'1") and the documented measurements for each gunshot wound entry and exit. A red trajectory line represents wound path, course and direction." (*Id.*)

- In his section marked "Animations and Exhibits," Roder again references everything he used as the "foundation" of his CGI shooting reconstruction, and gives almost a play-by-play description of what is depicted in the animation," mirroring what he would be expected to do on the witness stand. (*Id.* at 22-25.)

- He reiterates in detail how he created the "Autopsy Visualization," including what content it was created from, that it was "generated over to a 3D analog rig for

4

accuracy in scale," and the reason that the figure in the visualization was positioned the way it was. (*Id.* at 26.)

The contrast between that report and the one offered here is dramatic. The former shows that Roder knows how to at least attempt explaining his methodology if he wants to. Here, it is not hyperbole to say no attempt was even made. Instead, Roder merely lists a slew of materials reviewed (without identifying which ones actually provide the foundation for parts of his animations, contrary to what he did in *Johnson*), and then presents his animations.

Plaintiff may argue that what is depicted in the video is so plain that no methodology or explanation is needed. But that would be a grotesque shirking of the rigors of proper expert testimony. *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (noting experts must "explain the 'methodologies and principles' that support [their] opinion…."). Moreover, the *mandatory* requirement of disclosing expert methodology is more important here than it may initially seem.

There is no way to tell from Roder's report if the animations are drawn to scale or how Roder applied a scientific methodology to ensure that. For example, are the heights of the figures in his animation to scale? It was a well-publicized fact at the criminal trial that Plaintiff was significantly taller than David Diaz, but that *absolutely* is not represented in the animation. (See Ex. C at timestamp 00:16.) In the "Shooting Scene Reconstruction," Roder manipulates the angle and tilt of Diaz's head. (*See id.* at timestamp 1:05.) How did he determine that? What scientific method did he use to ensure that red bullet trajectory line accurately depicts where the bullet would travel if Diaz's head were so positioned (was the line hand-created/visually positioned, did the program auto-populate it based on a preset angle)? Relatedly, how and why was Roder able to determine that the bullet would travel in a perfectly straight line (if that is a straight line) once it exited Diaz's face? How is he able to mark Plaintiff's location in the kitchen to any degree of

5

scientific certainty when text in the Shooting Scene Reconstruction states witnesses placed Plaintiff "in the same *general* location…." (Ex. C at timestamp 1:30-1:47.) Why does Diaz's body suddenly leap forward three feet when it is depicted hitting the ground? (*Id.* at timestamp 2:00-2:05.) How did Roder determine to set the height of the hypothetical unknown killer shown behind Diaz (and why did he choose to put the killer at Diaz's apparent height – a not-so-subtle suggestion to the jury that the killer wasn't tall)? Why is nobody else who witnesses placed in the kitchen depicted in the reconstruction? What is being depicted in the portion of the Scene Reconstruction Video titled "Scene Diagram (Not To Scale)?" (*Id.* at timestamp 2:13-2:46.) And how was this portion of the video created, using what reliable and testable methods?

Roder cannot simply explain this for the first time on the witness stand, as there are not just follow-up questions for defense counsel to ask in cross-examination, but the very methods and explanations Roder was legally obligated to provide with his "report." It is not Defendants' burden during trail to elicit from Roder what the law required him to have affirmatively shared. This chasm in Roder's report necessitates barring him and his animations from trial.

**II.  Even If Roder's Own Animations Satisfied The Requirements Of Rule 702, They Seemingly Rely In Part On A Calculation Of Plaintiff's Expert Timothy Palmbach, Which Itself Is Deeply Flawed.**

At a point in Roder's Shooting Scene Reconstruction, Roder indicates that the bullet trajectory through Diaz's head was at a downward 24-degree angle. (Ex. C at timestamp 00:25.) Roder does not actually say so (highlighting the problems discussed in Section I above), but Defendants assume he got this angle from the Appendix A to the report of Plaintiff's expert Timothy Palmbach. (*See* Ex. A, p.18.) But as described in Defendants' motion to bar Palmbach, this calculation is wholly inappropriate because it appears to be based on the "***average length of [an] adult male head***." (*See id.* at note 2 (emphasis added).) There is nothing in Roder's (or

6

Palmbach's) report establishing that David Diaz's head is the same length as that of the "average…adult male." In other words, this is *not* a calculation of how the actual bullet traveled through David Diaz's head.

Because this trajectory angle – which is completely irrelevant given it is not based on the dimension's of the victim's head – appears to be a foundational pillar of Roder's Shooting Scene Reconstruction, the entire construction is flawed, and allowing this to be presented to the jury would be extremely improper and prejudicial. Knowing that this calculation is not based on the actual forensic evidence, it cannot purposefully be shown to the jury, as doing so would leave it entirely up to defense counsel to undo the taint of improper evidence that should never have been shared in the first place. As the gatekeeper against such improper expert testimony, the Court must prevent such evidence from even becoming a variable that could influence the jury at trial. *See U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (noting that because this gatekeeping role is important because "expert testimony may be assigned talismanic significance in the eyes of lay jurors…."). There is simply no point wasting time and engendering confusion at trial addressing an animation that does not even attempt to depict the actual trajectory of the bullet through the real victim's head.

### III. All Other Problems Aside, Roder's "Report" And Animations Are Irrelevant Because They Do Not Help The Jury Decide A Material Fact.

Plaintiff's complaint alleges evidence fabrication and coercion in the form of witness statements and reports. Roder's opinions do not inform these issues. *See Daubert*, 509 U.S. at 597 (federal trial judge must act as gatekeeper by ensuring expert testimony is both relevant and reliable). Instead, Roder's aminations seem to be offered to help re-try the plaintiff's criminal trial, where Plaintiff's guilt was central to the case. Here, the question of evidence fabrication is central to the case. Exactly where the gunshot was fired from and the position of the victim are irrelevant

7

Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 7 of 8    Document 104

to addressing whether witness statements were made up or coerced. An expert's admissibility is predicated on the relevancy of his testimony— his testimony must help the jury make decisions relating to facts of consequence in the determination of the action. *See Daubert,* 509 U.S. at 587. Because Roder's animations are irrelevant to the central issue of evidence fabrication or coercion, he and his animations should be barred.

IV. **If Nothing Else, Roder Should Be Barred From Opining On Whether He Thinks Plaintiff Was Able To Shoot Diaz.**

Roder opines that it was "impossible" for Plaintiff to have shot Diaz. (Ex. A, p.57.) This appears to be based on his view of his own animation. To the extent the Shooting Scene Reconstruction is allowed at trial Roder should not be able to tell the jury what conclusions they should draw from it, as the jury is just as capable of looking at it and drawing conclusions as he is.

## CONCLUSION

The Court should bar Roder and his animations from trial.

Date: January 17, 2025

Respectfully submitted,
/s/ *Brian Wilson (Atty. No. 6294099)*
One of the attorneys for Defendants

Kathryn Doi
Brian Wilson
Warren Fasone
Rob Crawford
**NATHAN & KAMIONSKI LLP**
206 S. Jefferson St.
Chicago, IL 60661
bwilson@nklawllp.com

*Counsel for all Defendants*