

September 3, 2024

## *Report of Investigation — Wilber v, Milwaukee*

**Assignment:** Shooting Reconstruction

## Table of Content:

Materials Reviewed…………………………………………………………………………1
Incident Description………………………………………………………………………….2
Full Medical Examiner File Bates 1-46……………………………………………………...3
Detective Casper Police Report — Scene Description…………………………………………8
William Kohl Report on Measurements………………………………………………………10
Palmbach Report Re Danny Wilber…………………………………………………………...11
Victim's Clothing……………………………………………………………………………...21
Crime Scene Photos…………………………………………………………………………...23
Casper Computer-Generated Scene Diagram…………………………………………………51
Det. Casper Diagram of House With Measurements - Trial Exhibit 24………………………52
Antonia West Diagram………………………………………………………………………...53
Summary of Trial Testimony on Danny's Location at Time of Shot v.2………………………54
Evidence Room Animation Reconstructions…………………………………………………..56
Final Thoughts & Opinions…………………………………………………………………...57

## Materials Reviewed:

Circuit Court Trial Exhibits
- Exhibit 8 through 65

Crime Lab Reports
- 2004.01.31 MPD Supplemental Report Latent Print Report of David Diaz by Examiner Robinson
- 2004.02.01 Disposition of Property Reports
- 2004.02.01 MPD Supplemental Report Latent Print Report of Torres and Jeranek Diaz by Examiner Robinson
- 2004.02.01 MPD Supplemental Report Latent Print Report of Wilber by Examiner Robinson
- 2004.02.06 0925 Wisconsin State Crime Lab Receipt of Physical Evidence Items A-AF Received by Kathy Mahnke

1

- 2004.02.09 Wisconsin State Crime Lab Confidential Report on Ballistics by Analyst Mark Simonson
- 2005.01.07 Wisconsin State Crime Lab Receipt of Physical Evidence Item AG and AH by Carol Winke
- 2005.02.14 Wisconsin State Crime Lab Receipt of Physical Evidence Item AI by Carol Winke
- 2005.02.15 MPD Property Inventory for Wilber by Officer Randolph Olson
- 2005.02.15 Wisconsin State Crime Lab Report on Items AG, AH, and AI by Maly and Simonson
- MPD Transmittal of Evidence (Item A to AF) to Wisconsin Crime Lab by Det. Casper
- MPD Transmittal of Evidence (Item AG and AH) to Wisconsin Crime Lab by Det. Erwin
- MPD Transmittal of Evidence (Item AI) to Wisconsin Crime Lab by Det. Salazar

Medical Examiner
- Full Medical Examiner File Bates 1-46

Photos
- CD G - 10 Photos at ME's Office
- CD I - Scene Photos (84 total)
- CD K Autopsy Photos (47 total)
- Photos from DA File

Scene Diagrams
- Antonia West DIagram
- Det. Casper Diagram of House with Measurements - Trial Exhibit 24
- Det. Casper Diagram of House without Measurements
- Exhibit 36A
- Exhibit 38
- Exhibit 51

Trial testimony
- Antonia West Trial Testimony
- Donald Jennings Trial Testimony
- Jeffrey Jentzen Trial Testimony
- Jeranek Diaz Trial Testimony
- Mark Simonsen Trial Testimony
- Oscar Niles Trial Testimony
- Richard Torres Trial Testimony in Defense Case
- Richard Torres Trial Testimony
- Thomas Casper Trial Testimony
- William Kohl Trial Testimony

William Kohl Photos
- Danny CS Photo 15 through 18

1.17.23 Richard Torres Affidavit
Det. Casper Police Report
William Kohl Report on Measurements

## **Incident Description:**
**Incident Date:** January 31, 2004

2

**Incident Location:** 1128 W. Mineral Street, Milwaukee, Wisconsin.
Nature of Incident: Homicide
**Involved Persons:**

 <u>David Diaz Jr. — victim</u>
- Date of Birth: 01/23/1981
- Date of Death: 01/31/2004
- Age: 23 years
- Race: Hispanic
- Height: 5'8" (68")
- Weight: 259 lbs.

 <u>Danny Wilber — Accused</u>

## Full Medical Examiner File Bates 1-46[1]

### Description of Incident

*1/31/04 0350 hours*; Per Lt. Dubis: The informant had a person shot in the head in a residence at 1128 W. Mineral. The body is at the scene.

*1/31/04 0410 hours*; Per Det, Tom Casper: The deceased resided at the residence with his wife. There was a party of approximately 20-30 people. After the single shot, most of the friends left the house. The incident occurred at 0320 hours with Engine 11 and Med 3 arriving at 0326 hours. The first officers on the scene were PO Adams and Sosa #22.

### Scene Description

I arrived at the above address at 0410 hours and was met by Det. Tom Casper along with other officers and detectives. The residence is a single family two level house on the north side of the street. The deceased is seen lying face down with his hand under his hips in the kitchen with his head to the north. He is dressed in street clothes with blood trailing from his head to the west to the kitchen counter. There are beer bottles and cigarettes on the kitchen table with one chair turned on its side. There is a beer bottle on the floor that has liquid flowing from it to the kitchen cabinets. The temperature in the room is 70 degrees with the front door closed.

There is a perforating wound with blood and brain matter on the back of his head. After Dr. Mainland arrived, the hands were bagged by her and he was turned. There is a perforating wound to the right side of his nose. A tattoo is noticed on the back of his neck that says Tiffany". He is warm and limp without any other trauma noted.

There are two bloody shoe print impressions south of the body. One is on the kitchen tile and another on the carpet. There is evidence of beer bottles and cigarettes throughout the lower level. There did not appear to be any fight or forced entry. His keys were taken from his right front pocket and left at the scene for his family. No bullet, casing or gun were found at the scene.

---

[1] Full Medical Examiner File Bates 1-46 — https://www.dropbox.com/scl/fi/lqcl3w14zgb0enbmqq9g4/Full-Medical-Examiner-File-Bates-1-46.pdf?rlkey=1gox7og9gnpiqz409xm1askbx&st=l112ctoy&dl=0

**Final Cause of Death**

Immediate cause of death: cerebral lacerations and contusions, due to (a) perforating gunshot wound to the head. The decedent was shot by another person with a handgun.

**Autopsy Protocol**

Final Diagnoses:

    I.   Perforating, intermediate range gunshot wound to head
        A.  Entrance wound, left parietal scalp, soot and gunpowder stippling present.
        B.  Bullet path through calvarium, left cerebral hemisphere, brainstem, skill base and facial bones.
        C.  Exit wound, right side of nose.
        D.  Lead garments totaling 0.7 grams recovered from cranial cavity and face.
        E.  Trajectory: left to right, back to front and downward (anatomic position).
   II.  Obesity.
  III. Status post appendectomy, remote.

Scene Investigation:

The decedent is observed lying supine on the kitchen floor, with his feet toward the living-room and front door. Two defects, consistent with gunshot wounds, are present in his head, one on the right side of the face and one in the back of the head. The body is warm and limp. A large amount of blood has pooled under the head and run across the kitchen floor. Evidence of alcohol consumption and marijuana are noted. I bagged the hands at the scene.

Clothing:

The body is received clad in the following:

1. A taupe, fleece, pullover-style jacket with a partial zip front, "Footaction USA" brand, size XXXL. The shoulders and collar of the jacket are soiled with blood and brain.
2. A white, sleeveless, tank-style undershirt, size XXL, whose upper portion is soiled with blood.
3. A pair of tan-khaki twill slacks, "Ben Davis" brand, "Gorilla Cut", size 50.
4. A black woven web belt with a silver tone buckle into which the letter "A" is pierced.
5. A pair of blue, green, white and gray plaid boxer shorts, "Hanes" brand, size XXL.
6. A pair of white athletic socks with "Adidas" logos.
7. A pair of tan, suede, wallaby-style shorts, "Lugz" brand, size 10 1/2.

No gunshot defects or other irregularities are noted in the clothing.

Evidence of Injury:

    I.   **Gunshot Wound to Head:** On the left parietal scalp, centered 1-1/2 inch below the top of the head, 2-1/2 inches left of the posterior midline and above and toward the posterior aspect of the left ear, is a **GUNSHOT WOUND OF ENTRANCE** with a 0.9 cm central

round defect, from which radiate stellate lacerations covering an area of 3.0 x 3.5 cm. Fine black soot is deposited over the entrance defect. Gunpowder stippling extends in four directions around the entrance defect, 1-1/4 inch superior, 1-1/4 inch posteriorly, 1/2 inch inferiorly and 1-1/4 inch anteriorly. The stippling is most dense posteriorly and superiorly.

The bullet passes through the left parietal bone of the skull, causing severe comminuted fractures of the calvarium. Approximately two-thirds of the entrance wound in the skull is intact and forms a 1.5 cm, inwardly beveled defect with bullet wipe on its outer surface. The bullet passes through the left cerebral hemisphere, virtually destroying it, and separates the brainstem from the brain at the level of the midbrain. It destroys the sella turcica and passes through the facial bones, to exit via lacerated defect on the right side of the nose, 5-1/2 inches below the top of the head and 1 inch right of the anterior midline. Fragments of bullet totaling 0.7 grams are recovered from the cranial cavity and from the right maxillary sinus and orbital region.

The trajectory is from back to front, from left to right and downward, with the body in anatomic position.

II. **Other Injuries:** Scattered green to purple contusions are present on the left upper thigh.





Head, surface and skeletal anatomy, lateral view

Name

Age _____ Race _____ Sex _____

NAME:DAVID DIAZ
CASE NO:04-0485
DOD:01/31/04 -- 04:10AM
DATE OF AUTOPSY 01/31/04
SPECIMEN:

AGE:23YRS.
DOB:01/23/81

GSW exit 1.5X1.0cm

Not to scale

entrance GSW 1½"↓ 2½" LPM

.9 cm defect 3X3.5 lac fine 5ti fine soot

1.5 cm defect inward bevel

1¼" 1¾" ← →1' ½"

Cat. No. 44-1-015-00

Medical Examiner 000020

Case 2:23-cv-00951-JPS     Filed 01/17/25     Page 6 of 57     Document 104-1



Head, surface and skeletal anatomy, anterior and

Name_____

Age _____ Race _____ Sex _____

**NAME:DAVID DIAZ**
CASE NO:04-0485
DOD:01/31/04 -- 04:10AM
DATE OF AUTOPSY:01/31/04
**SPECIMEN:**

AGE:23YRS.
DOB:01/23/81

comminuted fracture

comminuted fractures

deformed 2° to GSW

Cat. No. 44-1-014-00

**Medical Examiner 000021**

7

## Detective Casper Police Report — Scene Description[2]

The location of this incident is 1128 W. Mineral St. This location is a single family home located on the Northside of W. Mineral St. The home is 1.5 stories of a Victorian style and was built in 1900. The exterior of the residence os reddish brown aluminum siding with white trim. The front porch of the residence is at the south/east corner is composed of wood. There are 5 steps to the top of the porch.

Surrounding the property is a 4 foot metal chain link fence. There is a small enclosed yard to the east, within that chain link fence is a small red storage shed. There is a back door to the residence along the east side and a small wooden porch at that door.

The snow in all of these areas were undisturbed meaning there were no footprints of any kind found. There was also snow piled up in front of the doors to the storage shed that had not been disturbed.

The door to the residence was steel and was cream or white in color. There was a lock on the doorknob, as well as a separate deadbolt lock both which were in functioning order. There was no damage to the lock, the door or the door frame. The porch was illuminated by a single light fixture that contained one light bulb. That light was on when I arrived at the scene.

In the front of the house there were Christmas lights strung from the chain link fence to the peek of the house on the Southside. The light were not on, and did not appear to be connected. In addition to checking the exterior of the house the garage can and recycling bin near the house were also checked for any items of evidentiary value, however, none were located.

Inside the residence on the first floor there are the following rooms: a front parlor, a living room, a storage room, a kitchen, pantry and full bath. On the second floor there are 4 small bedrooms as well as a small 1/2 bath. Inside of the residence I observed that the back door opens into the kitchen. I observed that door also to be white or cream colored steel door.

It should be noted that there is no interior doorknob, and that the door is secured by two deadbolts that were in a thrown position.

It should also be noted that there were lights on and functioning in every room in the house.

Regarding the first floor in the bathroom there was a single overhead light fixture that contained one bulb that was functioning. In the pantry there was one bulb suspended from a light socket that was functioning. In the kitchen there was one overhead light fixture that contained one bulb that was functioning. In the front parlor there was one overhead light fixture that contained one bulb that was functioning, and in the west room off the living room there was one overhead light fixture that contained one bulb that was functioning.

On the second floor I also observed that there were lights that were on and functioning in all four bedrooms and the 1/2 bath. I also check the basement of the residence, and did not locate any individuals or items of evidentiary value. The light fixture in the basement were also functioning order.

The victim was found lying on his stomach with both his arms under his body, and head turned slightly to the right. His legs were out stretched. His head was facing north and his feet

---

[2] Det. Casper Police Report — https://www.dropbox.com/scl/fi/cwg5spppbkszu0j0lgpip/Det.-Casper-Police-Report.pdf?rlkey=9zoepffmpzzdorj3h8u6lb9km&dl=0

south. The victim's body was up against the east wall. The victim's head was 6'1" from the north wall of the kitchen, and his right foot was 3'1" from the door jamb that leads into the living room. His left foot was 3'6" from the same door jamb.

The victim was wearing a white shirt under a brown pull over long sweat shirt, tan or brown pants with a black cloth web belt, white socks and brown or tan Chucka boots. The victim had a tattoo of the word "Tiffany" written in script on the back of his neck. I observed a the victim had two wounds to his head, one on the top back left portion and one on the right side of his nose.

In the kitchen I made the following observations: There was a stove in the north/east corner. Along the north wall there was a garbage can under a window, and in the northwest corner there was microwave cart. Just off of the north/west corner is a pantry, and just south of the pantry is the door to the full bath. Along the south wall in the kitchen is the sink, and just west of the sink is the refrigerator. In the center of the room is a brown wood table. There were also two chairs near the table, one was standing upright and the other was laying on its side. The kitchen measured 10'7x13' There was a large amount of blood in the kitchen located under the victim, and the same pool of blood flowed west towards the refrigerator.

Just west of the victim in front of the sink was gray baseball cap. That cap was collected along with the victim's body and conveyed to the Medical Examiner's Office.

On the kitchen table I observed there to be two empty Budweiser Beer bottles, a quantity of cigar tobacco that had been dumped out of a cigar, an empty clear plastic baggie, and a small quantity of a green leafy plant like material that I suspected to be marijuana. On the stove was a single bottle of Smirnoff Twisted Apple flavor drink that was half full. There was also an empty Smirnoff Twisted on the floor beneath the kitchen table.

Along the north wall I observed there was an empty beer case where Miller Genuine Draft that held 18 bottles on top of the garbage can. There was a empty cardboard case for Corona Beer that held 12 bottles, and an empty for Budweiser Beer that held 20 bottles. The Corona case and the Budweiser case were on the floor near the stove.

On the sink I observed an empty 12 bottle Corona Beer case. I also observed an empty 6-pack cardboard case for the Smirnoff Twisters drinks. One empty Budweiser beer bottle, and one empty Smirnoff Twisted bottle. In the right portion of the sink there were 3 empty Budweiser beer bottles, and one empty Corona beer bottle. These bottles in the sink were all wet and partially submerged in water.

After the victim was removed I moved the stove, and recovered 3 lead bullet fragments. One larger deformed piece of lead, and two smaller fragments. The lead fragments were placed on Milwaukee Police inventory #247201, as items 7, 8 and 9. From the kitchen table I recovered a lead bullet jacket that was lying in the center of the table. That bullet jacket was placed on inventory #247201, as item #6. From the kitchen table I also recovered a clear plastic flap sandwich baggie that was placed on inventory #247201, as item #13.

Next to the sandwich baggie I recovered a small amount of a green leafy plant like material that I suspected to be marijuana. I conveyed the suspected marijuana to the Vice Control Division, where Officer Harold YOUNG who is trained in the administration of the Duquenois-Levine Field Test. That Field Test checks for the presents of Tetrahydrocannabinol, the active

9

ingredient in marijuana. The test was positive and the substance had weight of .30 grams, and was placed on Milwaukee Police inventory #245357.

From the garbage can on top in plain view was a pay stub that had been torn up in 8 pieces. That pay stub listed to a Richard TORRES and was for the pay period of 01-19-2004 to 01-25-2004. I took that pay stub taped it back together and placed it on Milwaukee Police inventory #247201, as item #12.

Next to the garbage can inside the empty Budweiser Beer bottle box, I observed there to be two cigarette butts. These cigarette butts were recovered and placed on inventory #247201, as items 10 and 11.

Just south of the victim's feet I recovered and gold an silver zipper pull. That item was placed on inventory #247201, as item #14.

In the living room on the floor in the north/west corner near a couch I observed two empty Corona Beer bottles, one empty Miller Genuine Draft bottle, and one empty Budweiser Beer bottle. On a wood divider between the living room and west room, I observed a Miller Beer bottle that was 1/3 full, one empty Budweiser Beer bottle, and one empty Corona Beer bottle. I also observed an empty box from Newport cigarettes.

In the west room I observed one bottle of Corona Beer that was approximately 1/6 full on a table in the south/west corner. I observed one bottle of Budweiser Beer that was approximately 1/6 full on a table near the doorway between west room and the living room. In the front parlor I observed one empty bottle of Corona Beer that was on a green plastic chair along the south wall of the residence. I also observed two empty Budweiser Beer bottles on the entertainment center that were in the north/west corner to the front parlor.

Also in the front parlor in the north/east corner on the floor was a ceramic dinner plate that plate was brown and tan in color and was 3'9" from the east wall, and 1'9" from the door jamb to the living room. That plate was being used an ashtray. There was one cigarette butt on the plate, and 4 on the carpet just to the north of the plate. Those cigarettes were collected and placed on Milwaukee Police inventory #247201, as items 1 through 5. There were no items of evidentiary value collected from either the full bath or the pantry.

Identification Technician George BALDUS processed a total of 19 beer and alcohol bottles inside the residence. Technician BALDUS also processed the kitchen table top, as well as the Newport cigarette box, and brown glass mug. Technician BALDUS recovered 4 lifts, which were assigned latent case #04-308.

The 19 alcohol bottles that Technician BALDUS processed in addition to two other that were located were taken and conveyed to the Criminal Investigation Bureau where they were swabbed for possible DNA evidence. These bottles were placed on inventory #247202.

Identification Technician Jeffery MUHAMMAD swabbed all of the bottles and placed the swabs on Milwaukee Police inventory #247216.

## William Kohl Report on Measurements[3]
*William C. Kohl, William C. Kohl Investigations; Shorewood, Wisconsin.*

---

[3] William Kohl Report on Measurements — https://www.dropbox.com/scl/fi/nf7cqznuju8u93wacdqoq/William-Kohl-Report-on-Measurements.pdf?rlkey=bb3ncnvcsznj8xohxkpkmrtm7&st=8hx2uxym&dl=0

On February 12, 2005 at 1128 West Mineral Street Milwaukee, Wisconsin I took certain measurements of the edge of the living room and the kitchen at this address. From the north edge of the living room wall to the south edge of the kitchen is 3 feet 7 ½ inches. From the north edge of the kitchen wall to the south edge of the kitchen wall is 11 feet finches. From the east wall of the kitchen to the west wall of the kitchen is 13 feet. The counter top in the kitchen extends from the south wall of the kitchen to the edge of the counter top. That measurement is 2 feet 1 and 3/8 inches. From the north edge of the living room to the end of the countertop is 5 feet 5 inches. The frame of the board next to the stairway is 7 inches. From the east wall of the kitchen to the edge of the countertop is 3 feet 8 and 3/8 inches. I took a series of photographs to document these measurements.

**Palmbach Report Re Danny Wilber[4]**

1.  Medical Examiner Mary Mainland, M.D. conducted the post-mortem examination of David Diaz. Relevant details pertaining to the gunshot wounds include the following:
    *   The GSW entrance wound was located 1.5 inches below the top of the head, and the exit wound was located 5.5 inches below the top of the head.
    *   Gunpowder soot and stippling was noted all around the entrance wound.
    *   The trajectory is from back to front, left to right, and downward.
    *   Bullet fragments were recovered from the cranial cavity and the right maxillary sinus region.

    Dr. Mainland described this head wound as a "perforating, intermediate range gunshot wound to the head".

2.  Photograph #1 is an overall view of the gunshot entrance wound (GSW) to the top and rear portion of Diaz's head. Photograph #2 is a close-up view of the entrance GSW depicting heavy soot and stippling in the rear portion of the injury, and stellate tearing of the skin in the front portion of the GSW.  (See Photo Appendix). These factors are most consistent with a loose, angled contact wound (back to front and downward). The gun would have been held above and toward the rear of David Diaz's head when discharged.  It should be noted that David Diaz is 5'8" in height. All of these factors are consistent with the shooter located behind David Diaz when the shot occurred.

    In addition, Dr. Mainland noted the presence of bullet fragments within the cranium. There is a high probability that some of the bullet fragments exited the wound track. Thus, no additional, post-muzzle impact would be necessary to further fragment the projectile (bullet).

3.  Given the traumatic nature of the head wound to David Diaz, as identified and described by Dr. Mainland, it is most probable that David Diaz was facing the North when he was shot from behind, and then moved forward, landing in a prone position. (See Photographs #3-4).

---

[4] Palmbach Report Re Danny Wilber — https://www.dropbox.com/scl/fi/o3x6y56zg7fikobi8cw4f/Palmbach-Report-re-Danny-Wilber.pdf?rlkey=sx73keq7ned2xke1rg3kti1ng&dl=0

4. There are elongated bloodstains on the East wall, door trim and baseboard, consistent with blood drops falling downward, adjacent to the wall, as David Diaz's body is moving into the kitchen toward the final resting position. (See Photo #4).

5. It is important to note that in his trial testimony, Detective Casper stated David Diaz's body was not moved from the point in time that he was shot to the point that he arrived on the scene, and that emergency personnel did not move him to perform any living saving measures, or any other reason.

6. Bullet fragments were located under the stove by Detective Casper. In addition, Det. Casper located a lead bullet jacket lying in the center of the kitchen table. All of these items were sent the Wisconsin State Crime Laboratory and examined in the Firearms Section. They were identified as being associated with a .38/357 caliber projectile. No further identification was possible. The general location of these fragments are consistent with having exited from David Diaz's face.

7. It should be noted that Detective Casper stated that an examination of objects and surfaces within the kitchen area of the scene failed to yield any indications of a bullet strike. This will have bearing on the potential orientation of David Diaz's body and head when he received the fatal gunshot wound and provide a basis for identifying the more probable orientation of Diaz's head.

8. There is no definitive explanation regarding the presence of the lead bullet jacket fragment on the kitchen table. As determined by available evidence and my subsequent reconstruction David Diaz would have been facing the north wall when shot from behind. The entrance wound was on the back portion of his head and traveling in a forward, left to right direction. That is most likely the pathway that the bullet fragments and jacket would travel. That is not consistent with the bullet lead fragment jacket landing on top of the kitchen table, given that there were no signs of a bullet impact or deflection in the kitchen. However, it is possible that a bullet fragment was created with the angled entrance shot in Diaz's cranium, and then landed on the kitchen table.

9. There appears to be discrepancies in measurements taken at the crime scene. In his report dated 2/1/2004, Det. Casper stated that "the kitchen measured 10'7" x 13'." In his trial testimony, Det, Casper stated that "The kitchen from the North wall to the doorjamb is approximately 11' 8". The diagram, marked as Exhibit 24, shows the overall distance of the kitchen from the North wall to the entrance into the living room as 11'8". (It should be noted that the depth of the stove in the northeast corner of the kitchen is only 1'2" in the diagram. Yet, in the diagram it is drawn as a 4-burner unit and appears to be a larger unit in the scene photo showing the overall stove. Thus, the distance from the front of the stove to the North wall is likely greater than 14".) (See Photograph #5).

In addition, William Kohl, Private Investigator measured the kitchen and living room areas in 2005 and obtained the following measurements:

- The distance from the North edge of the living room wall to the South edge of the kitchen is 3' 7 ½".
- The distance from the North edge of the kitchen wall to the South edge of the kitchen wall is 11' 6".
- The distance from the East wall of the kitchen to the West wall of the kitchen is 13'.

10. The determination of the bullet trajectory that passed through David Diaz's head can be calculated by the measurements obtained of the entrance and exit wounds, as documented by Dr. Mainland during the autopsy. The trajectory angle was calculated to be 24 degrees. (See Appendix A for additional information and a view of the trajectory.)

11. After calculating the trajectory angle of approximately 24 degrees it is possible to determine how far from David Diaz would the bullet that exited from his nose region travel before striking the kitchen floor. That distance was determined to be approximately 12'7". (See Appendix C for additional details and a view of the trajectory to the floor.) Even if the stove was only 14" in depth, the minimum distance from the North wall to David Diaz was minimally 13' 9". Since no bullet strike damage was observed on the face of the stove or surrounding walls it is less likely that David Diaz would have been any closer to the North wall than depicted in this diagram. Most likely, the bullet fragments stuck the floor at a low angle, reducing the potential for clearly visible damage to the floor, and came to a rest under the stove.

12. The trajectory depicted in Appendix C assumed that David Diaz's head was essentially level, facing forward when he was shot. If his head was facing downward then the trajectory would result in the bullet fragments striking the floor further from the north wall. However, this increased angle of impact (relative to the floor) would most likely increase the potential of damage to the floor. If his head was facing upward then the trajectory would result in the bullet fragments striking the oven, walls, or ceiling rather than the floor. Therefore, given the lack of visible defect damage from the bullet fragments on the stove face, walls, ceiling or floor south of the oven the most probable head orientation of David Diaz when he ws shot is essentially level. (See appendix B to view these three approximate potential head positions.)

13. The position of David Diaz when he was shot from behind would have been minimally 13' 9" from the North wall with his head in a relatively level position.
This position is located South of the kitchen. The actual distance of the kitchen from the north wall to the south wall has been reported at various distances; 10'7% (Casper), 11'8 (Casper) or 11' 6" (Kohl).

Assuming that David Diaz was located at the minimal distance of 13' 9" from the North wall of the kitchen, he would have been standing within the walkway area between the North wall of the living room and the South wall of the kitchen. This would require the shooter to be

13

standing behind David Diaz, minimally at the North edge of the living room, and possibly standing fully within the living room.
(See Photo #6).

Det. Casper's measurement of the walkway between the north edge of the living room and south edge of the kitchen was 3', while Investigator Kohl's measurement of that area was 3' 7 ½".

Casper's diagram shows the left foot of Diaz 3'6" from the kitchen South wall and the right foot of Diaz 3' from the kitchen South wall. These measurements are demonstrably incorrect. Photographs # 3 and 6 depict Diaz's feet nearly adjacent to the kitchen south wall.

All of the observed data is inconsistent with the shooter located anywhere within the kitchen at the time David Diaz was shot. (See Photo # 7).

14. Richard Torres, Jeranek Diaz, Antonia West, Donald Jennings, and Oscar Niles all testified at trial that when the gunshot went off Danny Wilber was standing inside of the kitchen in front of and to the North of David Diaz.

**PHOTO APPENDIX:**

Photo #1: Overall view of GSW entrance, top and rear of head



**Photo #2: Close-up view of GSW entrance, with scale**



Page 14 of 41     MPD-WILBER-000880

**Photo #3: An overall view of the deceased lying on the kitchen floor. (Camera is facing Southeast).**



15

**Photo #4:** Closer view of the deceased's head and upper torso, and blood stain patterns on the floor and East wall. (Camera is facing East).



**Photo #5:** An Overall view of the kitchen, facing generally North.



16

**Photo #6: Overall view of the kitchen/living room doorway area as viewed from the living room.**



**Photo #7: An overall view of the southern portion of the kitchen.**



Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 17 of 57    Document 104-1

# APPENDIX A
## CALCULATING ANGLE OF GUNSHOT TO HEAD



NOTES:
1) Side "O"= 4" (Autopsy data- entrance 1.5' from top of head, exit 5.5" from top of head)
2) Side "A" = 9" (average length of adult male head; www.reference.com/science-technology/average-size-human-head-62364d028e431bf3)
3) Solve for Tangent(Opposite/adjacent); 4/9=.44, 24 degree angle

# APPENDIX B
## TRAJECTORY AND HEAD ORIENTATION







**APPENDIX C**
**David Diaz in Room- Calculated Location**

Height to GSW Entrance=66.5

Side X

Stove

NOTE:
1) X= 66.5/.44
    Side X=151" (12'7")

## Victim's Clothing[5]



Page 4 of 10          MPD-WILBER-000343



Page 5 of 10          MPD-WILBER-000344

[5] MPD-WILBER-000340-MPD-WILBER-000349 — https://www.dropbox.com/scl/fi/
nvv419hu2hhzr7crey3bh/MPD-WILBER-000340-MPD-WILBER-000349.pdf?
rlkey=9zskd8e9e3ymf33xls8fs7jzz&st=vbo6rhue&dl=0

Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 21 of 57    Document 104-1



Page 10 of 10     MPD-WILBER-000349



Page 9 of 10     MPD-WILBER-000348

## Crime Scene Photographs[6]



Page 1 of 84

MPD-WILBER-000908



Page 2 of 84

MPD-WILBER-000909

---

[6] CD 1 - Scene Photos (84 total) — https://www.dropbox.com/scl/fi/d1vwdlraxj6p6o0n89qhl/MPD-WILBER-000908-MPD-WILBER-000991.pdf?rlkey=qe100tl2m6bj274bo7ywgoq3c&st=xelglds9&dl=0



MPD-WILBER-000910



MPD-WILBER-000911

24



MPD-WILBER-000914



MPD-WILBER-000916



MPD-WILBER-000917



MPD-WILBER-000918

26



Page 12 of 84

MPD-WILBER-000919



Page 13 of 84

MPD-WILBER-000920

Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 27 of 57    Document 104-1



Page 14 of 84

MPD-WILBER-000921



Page 15 of 84

MPD-WILBER-000922

28





MPD-WILBER-000924

29



Page 19 of 84

MPD-WILBER-000926



Page 20 of 84

MPD-WILBER-000927

30





MPD-WILBER-000929

31



Page 23 of 84

MPD-WILBER-000930



Page 24 of 84

MPD-WILBER-000931



MPD-WILBER-000941



MPD-WILBER-000942

33



MPD-WILBER-000943



MPD-WILBER-000945

34



Page 39 of 84

MPD-WILBER-000946



Page 40 of 84

MPD-WILBER-000947

35



MPD-WILBER-000948



MPD-WILBER-000950

36



Page 45 of 84

MPD-WILBER-000953



Page 46 of 84

MPD-WILBER-000953



Page 47 of 84                                    MPD-WILBER-000954



Page 48 of 84                                    MPD-WILBER-000955



MPD-WILBER-000956



MPD-WILBER-000958

39



Page 57 of 84

MPD-WILBER-000964



Page 58 of 84

MPD-WILBER-000965

40



MPD-WILBER-000966



MPD-WILBER-000967

41



Page 62 of 84



Page 61 of 84

MPD-WILBER-000968





MPD-WILBER-000972

43



MPD-WILBER-000973



MPD-WILBER-000975

44



0





MPD-WILBER-000977

45



Page 71 of 84

MPD-WILBER-000978



Page 72 of 84

MPD-WILBER-000979

Case 2:23-cv-00951-JPS   Filed 01/17/25   Page 46 of 57   Document 104-1



Page 73 of 84

MPD-WILBER-000980



Page 74 of 84

MPD-WILBER-000981

47



MPD-WILBER-000982



MPD-WILBER-000983

Case 2:23-cv-00951-JPS    Filed 01/17/25    Page 48 of 57    Document 104-1



Page 77 of 84     MPD-WILBER-000984



Page 78 of 84     MPD-WILBER-000985

49



Page 79 of 84

MPD-WILBER-000986

## Casper Computer-Generated Scene Diagram[7]



INCIDENT 04-0313016, M4168
OCC. 01-31-2004 AT 1128 W. MINERAL ST.
VICTIM-DAVID NMN DIAZ W/M 01-23-1981
1) 3 BULLET FRAGMENTS
2) BULLET JACKET
3) CHAIN SEGMENT
4) ASHTRAY
DRAWN BY DET. TOM CASPER-- NOT TO SCALE

[7] Casper Computer-Generated Scene Diagram — https://www.dropbox.com/scl/fi/ v0rq7t8d5uxnr1d0cvcyc/Casper-Computer-Generated-Scene-Diagram.pdf? rlkey=1vsbknklisj9bkwuc252sjq7l&st=d9mj2wds&dl=0

## Det. Casper Diagram of House With Measurements - Trial Exhibit 24[8]



---

[8] https://www.dropbox.com/scl/fi/tgkb9e90scx9p6k0g9mwd/Det.-Casper-Diagram-of-House-With-Measurements-Trial-Exhibit-24.pdf?rlkey=d6qpxrwr653jmazyxez4m99om&st=sltmvs49&dl=0

## Antonia West Diagram[9]



CONFIDENTIAL

Case 1:10-cv-00179-WCG   Filed 12/13/19   Page 1 of 1   Document 69-44

---

[9] Antonia West Diagram — https://www.dropbox.com/scl/fi/skbgwfqneomt0vex7uno7/Antonia-West-Diagram.pdf?rlkey=mmb9ckcdsxpd88oqhz8izeqlz&st=4uhu9o8w&dl=0

## Summary of Trial Testimony on Danny's Location at Time of Shot v.2[10]

Summary of Trial Testimony on Danny's Location at Time of Shot

**Antonia West:**

Antonia West testified that just before the shooting, Danny was fighting with two men and choking one of them. (Tr. Day 3 AM at 101). Using Exhibit 14 (attached), Antonia placed the choking incident in the north end of the kitchen, in the area between the flowered curtain and the outlet visible on the brick wall. (Id. at 104–05; Tr. Day 3 PM at 47). She also described the fight taking place near both the east wall of the kitchen and the kitchen table, and near the white door that went outside. (Tr. Day 3 PM at 41). All of those descriptions place Danny inside the kitchen to the north of David Diaz at the time he was shot. Antonia further testified that Danny was not behind David Diaz prior to the shooting. (Id.at 44–45, 57).

**Donald Jennings:**

Donald Jennings testified that Danny was involved in a tussle when the shot was fired. (Tr. Day 3 PM at 139). The tussle occurred in front of the back door of the house (the white door depicted in Exhibit 14). (Id. at 134–35). At the time of the shooting, Donald was leaning against the kitchen sink. (Id. at 125; Tr. Day 4 AM at 29). He testified that from his position, he could not see David Diaz because his view was obstructed by the cabinets, meaning he could not see anyone who was in the hallway or stairway. (Tr. Day 3 PM at 138–39). He testified that he did not recall seeing David Diaz in the kitchen, and he thought David was coming from the hallway at the time of the shot. (Tr. Day 4 AM at 48). He stated that he "[couldn't] really see what's on the side of me, unless whoever was in front of the door, that's as far as you can see, is the door," referring to the white back door. (Tr. Day 3 PM at 138–39). That testimony suggests that, at the time he was shot, David Diaz was standing south of the white door (and the fight), close to the doorway between the kitchen and living room. Donald further confirmed that Danny was in front of David Diaz at the time of the shot. (Tr. Day 4 AM at 26, 31–32, 45).

**Oscar Niles:**

Oscar Niles testified that the tussle occurred in the kitchen near the stove. (Tr. Day 4 PM at 42). Using the computer-generated scene diagram (attached), he testified that the fight occurred off the top right-hand corner of the kitchen table (labeled with a number 2), above where David Diaz's head was depicted, in the area between the stove and the kitchen table. (Id.at 44, 49, 54). Oscar further testified that David Diaz was in the kitchen but was close to the door frame leading to the living room. (Id. at 47–49, 54–55). According to Oscar, David Diaz did not get too far into the kitchen. (Id. at 49). From Oscar's position near the southwest corner of the kitchen table, he could only see David Diaz "somewhat." (Id. at 47, 54). Oscar also stated that Danny was never behind David Diaz. (Id.at 102, 106).

---

[10] Summary of Trail Testimony on Danny's Location at Time of Shot v.2 — https://www.dropbox.com/scl/fi/wb1ke60gtu9yw5f0ji3yt/Summary-of-Trial-Testimony-on-Danny-s-Location-at-Time-of-Shot-v.2.pdf?rlkey=2qt14ko7hbd2c7adllb80vc94&st=uhcl40oj&dl=0

**Jeranek Diaz:**

Jeranek Diaz testified that Danny was fighting with two guys when the gun went off. (Tr. Day 5 at 145). Jeranek was positioned with his back to the wall near the south edge of the white back door. (Id. at 146, 172). Danny was right in front of Jeranek and a little bit on a diagonal, about three feet away, meaning he was inside the kitchen. (Id. at 146, 153). David Diaz was to Jeranek's left, meaning to the south, within arm's reach (about two feet away). (Id. at 146, 151, 172). David was farther south than the counter, in front of the entrance to the living room. (Id. at 172–73, 177). David Diaz was facing into the kitchen at the time he was shot. (Id. at 116, 151). Jeranek heard the shot come from his left (meaning from the direction of the living room). (Id. at 154–55). Jeranek never saw Danny behind David Diaz. (Id. at 175).

**Richard Torres:**

Using Exhibit 14, Richard Torres placed the initial altercation between Danny and Jeranek near the outlet (which is located on the wall to the north of the white backdoor). (Tr. Day 5 at 243). He placed David Diaz near the right side of the white backdoor (the south side). (Id. at 243, 279). Richard placed himself at the time Danny punched him (shortly before the shot) near the sink. (Id. at 243, 248–49). At the time of the shot, Richard was looking in a northeast direction and Danny was directly to his left, meaning inside the kitchen to the north. (Id. at 252). Richard confirmed that he placed David Diaz in the position reflected on the diagram annotated during his interrogation with police (attached), which shows David located near the doorway between the kitchen and living room and Danny inside the kitchen to the northwest of David. (Tr. Day 6 AM at 28).

# Evidence Room Animation Reconstructions

Exhibit 1 - Autopsy Visualization[11]



Exhibit 2_Shooting Scene Reconstruction[12]



[11] Autopsy Visualization — https://www.dropbox.com/scl/fi/z04qtgxmmtdkkfinwbbba/Exh-1_Autopsy-Visualization.mp4?rlkey=jhgy65gkes9o9lutyqkde8kgw&st=ozqxiiy5&dl=0

[12] Shooting Scene Reconstruction — https://www.dropbox.com/scl/fi/0zn4crix4y9osh7b4e3pb/Exh-2_Shooting-Scene-Reconstruction_8.30.24.mp4?rlkey=m8ycc2rytpc0ujlyo95z1vove&st=nv8ruuk0&dl=0

56

## Final Thoughts & Opinions:

The 3D model of the incident was constructed using industry-standard technology and methodology, ensuring accuracy and reliability in the reconstruction. After a thorough analysis, our overall conclusion in this case is that it is impossible for Mr. Wilber to have discharged the weapon in a manner that would have caused the injury, based on the bullet trajectory and the angle of incidence.

The evidence clearly indicates that, given the angle of incidence, the shooter must have been positioned directly behind the decedent at the time the shot was fired. Testimony from witnesses places Mr. Wilber in the kitchen during the critical moments of the incident, further contradicting the possibility of his involvement as the shooter.

These opinions, along with the accompanying animations and conclusions, are presented with a high degree of scientific certainty. They are rooted in standard forensic methods and methodologies, which have been rigorously applied throughout our analysis. This reconstruction not only aligns with the physical evidence but also challenges the narrative presented by the prosecution, highlighting significant inconsistencies in the case against Mr. Wilber.

Sincerely,

Scott G. Roder, Evidence Specialist
Roderevidence@icloud.com
216-502-0400

Megan Frate, MCJ., Forensic Analyst
megan_frate@icloud.com