## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

DANNY WILBER )
                                        )
                  Plaintiff, )       Case No. 23-cv-951
                                          )
       v. )       Hon. J.P. Stadtmueller
                                          )
CITY OF MILWAUKEE, et al, )
                                          )
                  Defendants. )

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION
## TO BAR PLAINTIFF'S POLICE PRACTICES EXPERT THOMAS TIDERINGTON

Plaintiff disclosed Thomas Tiderington as Plaintiff's police practices expert. (*See* Ex. A (Tiderington Report).) For the reasons discussed below, Defendants now ask the Court to bar Tiderington from testifying.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert,* 509 U.S. at 589; *see also C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827, 934 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

1

As emphasized by the Advisory Committee Notes to the 2023 Amendments to Rule 702, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. The Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d, 644 (7th Cir. 2010) (internal quotations omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017).

**ARGUMENT**

I.      **All Of Tiderington's Opinions Should Be Barred Because He Flouts His Own Methodology By Constantly Resolving Contested Issues And Making Credibility Determinations In Plaintiff's Favor.**

In describing his methodology, Tiderington states "[m]y analysis and report *avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts*, as that is outside the purview of my work and remains within the province of the fact finder." (Ex. A (Tiderington Report), p.6 (emphasis added).) But after paying lip service to this principle, Tiderington repeatedly violates it by saturating his report with statements that he can

2

only make by resolving contested matters, especially matters of credibility, in Plaintiff's favor. For example, even though the individual defendants (the "Detectives") deny that they fabricated or coerced inculpatory witness statements or withheld exculpatory statements, and even though resolution of such matters will depend on which witnesses the jury ultimately believes, Tiderington does the following:

- States that "the record contains substantial evidence indicating that the defendants created false evidence while also withholding and destroying crucial information…." (*Id.* at 2.)

- References a "failure to disclose relevant information…in the Diaz case." (*Id.* at 3.)

- References the "conduct of multiple detectives in the Diaz investigation" as "misconduct." (*Id.*)

- States that that disregard for proper protocols "contributed directly to the wrongful conviction of Mr. Wilbur [sic]." (*Id.* at 13.)

- Refers to Det. Casper's scene diagram as the "Fabricated Scene Diagram to Fit the Narrative." (*Id.* at p. 14.)

- Refers to Jeranek Diaz's, Antonia West's and Oscar Niles's documented statements as "Fabricated Witness Statements to Fit the Narrative." (*Id.* at pp.14-15.)

- Refers to Richard Torres' trial testimony as "Coerced Testimony to Fit the Narrative." (*Id.* at p.15.)

- States that "detectives coerced and fabricated witness statements to support the state's flawed narrative." (*Id.* at p. 16.)

- States that the Detectives' discretion led to "the omission of key exculpatory evidence." (*Id.* at p.20.)

- Refers to "Richard Torres' coerced testimony…." (*Id.* at p.21.)

- Refers to the "fabricated inculpatory statements of Jeranek Diaz and Antonia West." (*Id.*)

- States that if proper recording practices had been in place, "the coercion and fabrication might have been prevented, and exculpatory evidence could have been disclosed…." (*Id.*)

- States that flawed MPD policies "directly contributed to the wrongful conviction of Danny Wilber…." (*Id.*)

- References the "wrongful conviction of Danny Wilber…." (*Id.*)

- States that a separate lawsuit against Milwaukee involved fabrication of evidence, "as seen in the Wilber investigation." (*Id.*)

3

- States that "an additional example of apparent fabrication involves the interview report of witness Lea Franceschetti" (*id.* at n.10), even though the report was created by non-defendant detectives and Plaintiff has not brought a claim for such purported fabrication.

- Refers to a "pattern of fabrication of police reports and misconduct in the David Diaz Homicide Investigation…." (*Id.*)

- States that MPD policies allowed for fabrication of evidence, "as seen in…the Wilber…case[ ]." (*Id.* at p.23.)

- States that investigative oversights contributed to Wilber's "wrongful conviction" and that the prosecutor relied on "coerced and fabricated testimony…." (*Id.*)

- States that "in Wilber's case, detectives ignored exculpatory evidence, fabricated witness testimony, and manipulated reports…." (*Id.*)

- Refers to Wilber's prosecution and conviction as "wrongful." (*Id.* at p. 25.)

- States that fabrication of evidence "has resulted in significant harm to individuals like Danny Wilber…." (*Id.*)

As Tiderington admits before doing the opposite, experts cannot usurp the fact-finder's role. *U.S. v. Scheffer*, 523 U.S. 303, 313 (1998) ("determining the weight and credibility of witness testimony…belongs to the jury…."). Yet throughout his report, Tiderington cannot help but suggest who to believe on matters like coercion and fabrication (unsurprisingly, always to his client's benefit). As discussed below, this is a symptom of Tiderington acting more like an additional member of Plaintiff's legal team than an expert. The Court cannot allow such improper and prejudicial advocacy from the witness stand. Because each of Tiderington's three opinions are infected with this advocacy, he should be barred from offering any of them at trial.

## II. Tiderington's Opinion 1 Should Be Barred.

Tiderington's Opinion 1 is that "Defendants' investigation of the Diaz homicide deviated from generally accepted police practices." (Ex. A (Tiderington Report), p.13.) For the myriad reasons discussed below, Tiderington's Opinion 1 must be barred.

**A. Tiderington's Opinion 1 is a closing argument disguised as an expert opinion.**

Defendants urge the Court to read Tiderington's Opinion 1 and imagine the same words coming from Plaintiff's attorney during closing argument; this transition is seamless. Throughout Opinion 1, Tiderington does not take evidence that is hard to understand and translate it as only an expert can. He takes evidence anyone can understand and argues to the jury how that evidence should be seen in plaintiff's favor.

For instance, Tiderington opines that the Detectives employed "tunnel vision" by "quickly decid[ing] that Wilber was responsible for the shooting and buil[ding] their case around this assumption instead of following the evidence where it led." (Ex. A, p.14.) This, he says, caused the Detectives to ignore evidence that pointed to other suspects. (*Id.*) These "opinions" are simply allegations that were taken from Plaintiff's complaint and dropped into Tiderington's report. (*Compare id. with* Dkt. 38, ¶¶ 34-35.) This copying from a pleading drafted by lawyers and pasting into a report by an expert shows that Tiderington is really wearing the hat of an advocate instead of an expert. Moreover, as his purported explanation for this "opinion," Tiderington merely describes some of the evidence the jury is likely to hear and then interprets it the way a juror would, albeit in a very plaintiff-friendly manner. (*Id.* at p.14.) For example, Tiderington explains that he feels the forensic evidence should have convinced officers that Plaintiff is innocent. (*Id.*; *see also id.* at p.16.) This does not help the jury understand anything other than how Tiderington would resolve this case if he were a juror.

Because Tiderington's entire Opinion 1 is a scripted closing argument, it does not help the jury "to understand the evidence or to determine a fact in issue" (other than Tiderington telling them what facts to determine). Fed. R. Evid. 702(a); *see Javier v. City of Milwaukee*, No. 07-C-204, 2010 WL 11492266, *6 (E.D. Wis. Jul. 27, 2010) (refusing to let an expert "attempt to induce

the jury to set aside its independent judgment and substitute [the expert's] opinion for its own" because the jury was "fully capable of assessing the same evidence [as the expert]" and reaching its own conclusions, and permitting the expert's testimony would have been "tantamount to allowing him to give a closing argument from the witness stand."); *accord McCloughan v. City of Springfield*, 208 F.R.D. 236 (C.D. Ill. 2002) (barring police practices expert from offering "any specific opinions regarding the specific facts of [the] case" because "most of the crucial facts [were] in dispute" and allowing such testimony would be allowing the expert to "make and relay credibility findings to the jury regarding the witnesses' testimony."). Opinion 1 must be barred.

**B.      Tiderington's opinion that it is a deviation of standard police practices to fabricate evidence, withhold exculpatory evidence, and coerce witnesses is so obvious as to be unhelpful.**

Expert testimony that is not helpful to the jury is excluded. Fed. R. Evid. 702(a). Such testimony includes opinions on matters that can be understood without specialized knowledge. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (expert "must testify to something more than what is obvious to the layperson") (citation and quotation omitted).

Here, Plaintiff alleges that the Detectives intentionally falsified police reports and/or coerced a witness to lie about Plaintiff's guilt, or put another way, that they framed Plaintiff. While the parties dispute if such conduct occurred, there is no dispute that intentionally framing someone for a murder he did not commit "deviate[s] from generally accepted police practices." (Ex. A, p.13.) Thus, the sub-opinions that make up Tiderington's Opinion 1 are so obvious that no jury would need an expert to explain them. (*See id.* at p.14 (opining that Detective Shuler violated standard practices if he fabricated Jeranek Diaz's inculpatory statement); *id.* at p. 15 (opining that Detectives violated standard practices if they omitted exculpatory evidence from their reports and coerced Richard Torres to falsely inculpate Plaintiff).)

6

If Tiderington testifies the way he wrote his report, then he is simply going to repeat Plaintiff's versions of events and then tack on a throwaway statement that "if these events are true, the officers violated standard practices." (*See*, *e.g.*, *id.* at p.15 (doing exactly that regarding the alleged coercion of Torres).) Such obvious "opinions" are entirely unhelpful to the jury, but the friendly recitation of facts and inferences that precede them is very helpful to Plaintiff. (*See* Section II.A, *supra*.) The Court should see through this tactic and bar Tiderington's Opinion 1.

### C. Tiderington's claimed methodology was either not applied in his Opinion 1, or it is an improper methodology based on his interpretation/application of the law.

At the beginning of his report, Tiderington claims that his methodology entailed reviewing case materials provided by Plaintiff's counsel and vetting them against "generally accepted practices in the field of law enforcement." (Ex. A., p.5.) These practices come from his "years of specialized education, training, and experience," from model policies such as the International Association of Chiefs of Police ("IACP") and the Commission of Accreditation for Law Enforcement ("CALEA"), from research-based organizations such as the Police Executive Resource Forum ("PERF"), and from caselaw. (*Id.*) He further references a "substantial body of knowledge and literature about the practices and standards that modern" police agencies should follow. (*Id.* at p.6.) Unfortunately, Tiderington's Opinion 1 is devoid of *a single citation or reference* to the source of any standard police practice he claims to apply other than caselaw, which leads to its own problem.

Specifically, while Tiderington's Opinion 1 begins on page 13 of his report and ends on page 18, it is not until (and only on) page 17 that Tiderington identifies the source of the standard police practices he is using to opine on the Detectives' conduct. That source is not the IACP, CALEA, PERF, some other identifiable part of the "substantial body of knowledge and literature" he referred to earlier, or even particular policies he read or enacted in his career. It is exclusively

7

federal caselaw. (*Id.* at p.17, n.5-7.) Given Tiderington provides no other specific reference of any other "standards" against which he compares the Detectives' conduct, it is apparent that he is merely opining on whether the Detectives complied with the law. An obvious example of this is when he states that one of the "basic police practices" the Detectives should have been aware of in 2004 is that officers should disclose "any exculpatory evidence" in a case. (*Id.* (citing as support a U.S. Supreme Court case).) This "police practice" is nothing more than Tiderington's explanation of an officer's "*Brady*" obligations. *See Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) (noting that *Brady v. Maryland*, 373 U.S. 83 (1963) requires turning over exculpatory/impeaching evidence). And by opining that the Detectives did not comply with this "standard," he is actually opining that the Detectives violated *Brady*.

An expert cannot say what the law is or if it has been violated. *See*, *e.g.*, *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). Without Tiderington admitting as much, that is exactly what his Opinion 1 is designed to do. To the extent Tiderington claims his Opinion 1 is based on industry standards that are not just legal mandates put into practice, he does not identify the source of any of them, which is a violation of his own professed methodology. *See* Fed. R. Evid. 702(d) (noting expert's opinion must reflect a "reliable application of the principles and methods to the facts of the case."); *see also Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 12242781, *5 (N.D. Ill. Dec. 1, 2021) (noting police practices expert compared defendants' actions to "well-established police protocols and procedures…without identifying the specific ones he ha[d] in mind," and only permitting expert to testify as to portions of his report where he "cite[d] to *specific* policing protocols or standards….") (internal quotations omitted) (emphasis added). Because the only discernable

8

methodology in Opinion 1 is Tiderington giving his view of caselaw and stating whether the Detectives violated it, Opinion 1 must be barred.

**D. Tiderington's Opinion 1 is unhelpful because the Detectives are not being sued for violating standard police practices.**

Plaintiff is not suing the individual defendants for carelessly conducting an investigation the way a doctor can be sued for carelessly performing surgery or a contractor can be sued for carelessly constructing a building. Instead, Plaintiff is suing Defendants for *intentionally* violating his constitutional rights as established by the law (not some distinct industry standard). For example, if an officer complies with standard police practices but violates the law, he is liable in a section 1983 case. On the other hand, if an officer violates standard police practices but complies with the law, he is not liable. Measuring the officer's conduct by "standard police practices" is irrelevant and downright confusing. *See* Fed. R. Evid. 702(a) (expert must help factfinder understand evidence or "determine a fact in issue."). The question in this case is whether the Detectives' conduct violated the constitution, and that is answered by (1) determining what the Detectives did and (2) comparing that conduct with the law. Tiderington is not needed for either step (although as discussed above, he improperly opines on both of them).

**E.     Tiderington's Opinion 1 is littered with other random improprieties.**

In sections I.A-D above, Defendants point out "big picture" problems with Opinion 1. But there are other isolated problems strewn throughout. <u>First</u>, Tiderington makes several critical statements of the Detectives that are simply conclusions without any explanation or supporting sources. For example, Tiderington says that the Detectives "ignored or dismissed information that pointed to other plausible suspects, effectively closing off alternative lines of inquiry." (Ex. A, p.14.) But he does not identify what this information is, who the "other plausible suspects" were, or how "alternative lines of inquiry" were closed off. He similarly says that Detectives built their

9

case against Wilber instead of "following where the evidence led," but does not explain or cite what evidence was not followed or where it would have led. (*Id.* (further claiming Detectives "disregard[ed] credible evidence that could have pointed to other suspects" but not even hinting at what that was).) *See* Fed. R. of Civ. Proc. 26(a) (noting an expert must disclose not only his opinions but "the basis and reasons for them.")

<u>*Second*</u>, Tiderington judges the Detectives' investigation based on information the Detectives did not have at the time. Specifically, in criticizing the Detectives, Tiderington considered "[p]ost-conviction forensic experts" who examined the "trajectory and nature of the gunshot" and who claim it was not possible for Plaintiff to have killed Diaz. (*Id.* at p.14.) Putting aside Defendants' dispute of such experts' conclusions, obviously the Detectives could not have been influenced by post-conviction expert reports. This is another instance where Tiderington's opinions are pretext for Plaintiff to make his favorite arguments.

<u>*Third*</u>, Tiderington sneaks in mini-opinions that he is not qualified to make and which he makes no attempt to support. For instance, in footnote 4, Tiderington states that "[c]onfirmation bias, a psychological phenomenon where individuals seek out and interpret evidence to confirm their pre-existing beliefs, was clearly at play during the investigation." First, Tiderington is not a psychologist and should not be educating the jury about a "psychological phenomenon" such as confirmation bias. Second, Tiderington cannot opine on the Detectives' psychological state of mind. Third, even if he could, he does not make even the slightest attempt to explain the bases of his opinion that this "psychological phenomenon…was clearly at play during the investigation."

Later in Opinion 1, Tiderington seemingly opines on whether eyewitness testimony is reliable. It is hard to know what to make of this. Plaintiff alleges that certain statements of eyewitnesses were fabricated, but this case has never been about whether *un*fabricated eyewitness

statements are reliable. Tiderington's only half-hearted attempt to support this bizarre detour is a reference to a statistic from the American Judicature Society, but absolutely no context, citation or explanation is given.

Finally, in footnote 10, Tiderington seemingly opines (but more aptly argues) that a report regarding witness Lea Fanceschetti was fabricated by non-defendants Wilkerson and Salazar. (*Id.* at pp.22-23, n.10.) This too comes out of nowhere, and it is not even a claim in this case. Playing conspiracy theorist instead of expert, Tiderington apparently notices a name correction in the report and then jumps to the conclusion that this was done to help the prosecution argue its theory at trial. (*Id.* at 23.) Like many of the "opinions" discussed above, this is rank speculation and advocacy.

As if the problems discussed in Section II.A-D were not enough, these additional improprieties solidify the unpredictable and inappropriate tangents that Tiderington is prone to make in offering his opinions, and serve as further reasons why the Court should simply bar him from presenting Opinion 1 instead of risking this avalanche of overreach at trial.

III.    **Tiderington's Opinion 2 Should Be Barred.**

Tiderington's Opinion 2 is that "MPD's policies and practices concerning documentation, preservation, and disclosure in homicide investigations, particularly in the area of interviewing witnesses and suspects, and the training and supervision in these areas, were woefully inadequate and resulted in the routine failure to document and disclose the documents and information learned during the homicide investigation to criminal defendants." (Ex. A, p.18.) For the reasons discussed below, Tiderington's Opinion 2 must be barred.

**A.** **Despite referencing a "routine" failure to document homicide investigations and disclose the information learned, Tiderington does not provide a single instance of either (other than Plaintiff's allegations here).**

In his Opinion 2, Tiderington opines that the Milwaukee Police Department's purportedly inadequate practices of "documentation, preservation and disclosure in homicide investigations…resulted in the routine failure to document and disclose the documents and information learned during the homicide investigation to criminal defendants." (*Id.* (emphasis added).) But in the narrative following this opinion, Tiderington provides zero instances when relevant information in a homicide investigation was not documented. (Ex. A, pp.18-21.) Likewise, he provides zero instances of a failure to disclose information learned during a homicide investigation to criminal defendants. (*Id.*) Thus, his report relies on a complete absence of any cited instances of such conduct, and yet calls such conduct "routine." This is a total failure to apply any "reliable principles and methods" to the facts here. *See* Fed. R. Evid. 702(c)-(d). And not only is it unhelpful to the jury, it is downright misleading. *See id.* at 702(a).

Instead, if one pays careful attention to this portion of Tiderington's report, what he actually does is speculate that MPD officers *could have* omitted information from their reports or homicide files *if* they wanted to. (*See* Ex. A, p. 20 ("This discretion created a dangerous practice where important evidence *could be* selectively omitted or destroyed….") (emphasis added); *id.* ("By failing to implement strict documentation, MPD allowed for the *potential* manipulation or loss of critical evidence") (emphasis added); *id.* at p.21 (the purportedly flawed MPD policies "created an environment where evidence *could be* manipulated….") (emphasis added).) But he gives no examples of that ever happening (other than him accepting Plaintiff's allegations as true (*see id.*)). Thus, his Opinion 2 and its so-called explanation do not match. Because his Opinion 2 is not supported by anything in Tiderington's report, it must be barred.

**B.** **Tiderington's discussion of the Diaz investigation in Opinion 2 goes beyond, and is not supported by, Tiderington's purported methodology.**

Tiderington makes numerous assertions about what standard police practices were in 2004, but provides absolutely no examples or citations of any such practices so that anyone reading his report would know where to look or how to verify his claims. For instance, similar to Opinion 1, although Tiderington makes passing reference to IACP and PERF (Ex. A, p.18), he never cites or discusses them in Opinion 2 (*id.* at pp.19-21). The same is true for the standards he claims have been "documented in homicide guides and reference materials for decades," none of which he even identifies much less cites or discusses. (*Id.* at p.19.) As opposed to any of these resources that he mentions but never uses, it seems Tiderington bases his statements on his career experiences and his "familiarity with the policies used by departments nationwide." (*Id.* at p.19.) Again, he provides no specifics, examples, or references, essentially immunizing himself from verification.

Nevertheless, Tiderington generally opines that standard police practice was to maintain all investigative information in one file so it could be disclosed to satisfy officers "constitutional Brady obligation to the prosecutors and criminal defendants." (*Id.* at p.18.) He then explains why documenting relevant information is a good thing (something that any juror can understand without an expert). (*Id.* at p.19.) But when he discusses the Diaz investigation, he holds the Detectives to different standards than these.

For instance, Tiderington claims that supervisors did not "actively monitor or participate in interviews and investigations." (*Id.* at p.19.) But he never opines that it was standard practice in 2004 for supervisors to do so. (*Id.* at pp. 18-19.) The same is true regarding his claims that (1) Supervisors failed to "sign off on handwritten reports" (*id.* at p.20), (2) that supervisors failed to "fact-check detectives' reports and notes for completeness and consistency" (*id.*), and (3) that the MPD did not have a policy requiring detectives "to write their reports within a specified time frame

13

after conducting interviews (*id.*). Nowhere earlier in Opinion 2 does Tiderington opine that doing these particular things were standard in 2004. (*See id.* at pp. 18-19.)[1]

Relatedly, Tiderington opines that "[n]ewly promoted detectives received 'very minimal' additional training in critical areas such as recording, documenting, and disclosing witness and suspect statements." (*Id.* at 20.) He again offers no citation, so it is impossible to know what he is quoting as "very minimal." Moreover, he does not discuss in any meaningful way what the training was that he deems so inadequate, or crucially, what *prior* training on these issues detectives already had. Throughout Opinion 2, Tiderington hides the ball by offering vague conclusions about standard police practices divorced from any supporting references, and as for those conclusions, they do not even match what he claims was wrong with the Diaz investigation. For these additional reasons, Opinion 2 should be barred.

## IV.     Tiderington's Opinion 3 Should Be Barred.

Tiderington's Opinion 3 is that the MPD has a "pattern of inadequately investigating homicides by fabricating witness and suspect statements and destroying exculpatory evidence." (Ex. A, p.22.) For the reasons discussed below, Tiderington's Opinion 3 must be barred.

### A.     Tiderington presents no expert methodology for Opinion 3; instead, he is simply embracing the role of layperson fact-finder.

At the beginning of his report, Tiderington claims that he applies a methodology of identifying general police practices and then vetting them against the materials he was provided by Plaintiff's counsel. (Ex. A, p.5.) Any semblance of this methodology is completely absent from Opinion 3. He does not explain a single standard police practice, much less vet it against any

---

[1] Regarding the MPD's purported failure to record interviews via audio, video or court reporters, Tiderington does quickly say that failing to do so was "contrary to accepted police practices at the time." (*Id.* at p.21.) Again, he does not provide a single citation, resource, or example that can be verified, but presents this merely as *ispe dixit*.

materials he was given. He provides no expert explanation or insight on anything. Instead, he fully assumes the role of juror and says that based on what Plaintiff's counsel has given him – and there is no indication a jury can't process those materials just as well as Tiderington – he has determined that a pattern of fabricating witness and suspect statements exists in the MPD. This is indistinguishable from what a jury is asked to determine in a *Monell* case, and this Opinion must be barred. *See Estate of Loury by Hudson v. City of Chicago*, No. 16-cv-4452, 2021 WL 1020990, *6 (N.D. Ill. 2021) (barring opinion that *Monell* violation was moving force behind underlying misconduct because it was an opinion about an element of the *Monell* claim that was "outcome determinative.") (internal citations omitted).

**B.      Tiderington bases his Opinion 3 on information that is not proper for such an "opinion."**

Tiderington's purported basis for concluding that the MPD has a policy of fabricating witness/suspect statements is improper as a matter of law. Other than assuming Plaintiff's allegations are true (*e.g.*, *id.* at p.22 (referring to a "[p]attern of fabrication in the David Diaz" investigation), which as discussed above is itself improper, he references only two instances that make up this "pattern" of fabrication: one from 1998 (six years before the alleged fabrication here), and one from 2010 (six years after). First, some background on these instances is useful.

**i.      The *Avery* case.**

One of the two purported instances of witness fabrication Tiderington mentions in order to conclude a "pattern" of fabrication exists in the MPD is the case of *Avery v. City of Milwaukee, et al.*, case number 2:11-CV-408. (Ex. A, p. 22.) In February 1998, Maryetta Griffin was murdered. *Avery v. City of Milwaukee*, 847 F.3d 433, 435 (7th Cir. 2017). In March 1998, William Avery was interrogated by Milwaukee Police Detectives about the murder. Two detectives – Phillips and Hernandez – prepared police reports stating that Avery confessed at some point during the

15

interrogations. *Id.* at 435-36. The District Attorneys' office chose not to prosecute Avery for the murder based on the reports alone, but Avery was charged and convicted of drug offenses and sentenced to prison. *Id.* at 436.

In 2003, MPD detectives Hernandez and Hein (the latter now Spano) interviewed inmate Keith Randolph, who stated that Avery had admitted to killing Griffin. *Id.* Another inmate who had spoken to Avery in prison, Antron Kent, was interviewed several times by detectives Armbruster, Heier, Hernandez and Hein, and eventually also said Avery admitted to the murder. *Id.* at 436-37. Finally, the same detectives also conducted multiple interviews of inmate Jeffery Kimbrough, who also implicated Avery. *Id.* at 437.

In 2004, Avery was charged with Griffin's murder, and was convicted after trial in 2005. *Id.* Years later, DNA evidence from the crime scene was matched with Walter Ellis, who was eventually exposed as a serial killer of women in the Milwaukee area. *Id.* Avery's conviction was therefore vacated, and he sued the City of Milwaukee and the above-named detectives, claiming that (1) his March 1998 confession was fabricated by detectives Phillips and Hernandez, and (2) the jailhouse informants were coerced by the detectives to falsely inculpate Avery. *Id.* Avery also brought a "*Monell*" claim, alleging the City had a policy and practice of pursuing wrongful convictions through flawed police investigations.

Only detectives Phillips and Hernandez were found liable for fabricating Avery's 1998 confession. *Id.* at 437-38. The City of Milwaukee was also found liable on the *Monell* claim, finding that the City had "a policy, custom or practice of inadequately investigating homicides at the time in question which led to the fabrication of evidence" against Avery (Ex. B (*Avery* verdict form), p.5), although there is no indication what aspect of investigating homicides was inadequate.

Despite this history, in discussing the *Avery* case, Tiderington references the 'fabricated testimony of key individuals like…witnesses [Randolph and Kimbrough]" (Ex. A, p.22), *even though the jury returned a defense verdict regarding those witness statements* (*see* Ex. B). In reality, the only instance of fabrication in *Avery* was the 1998 fabrication of Avery's confession. *Avery*, 847 F.3d at 437-38. Regardless, Tiderington cannot help but re-argue the *Avery* case to Plaintiff's favor, again incorrectly claiming that "the court found detectives intentionally fabricated witness statements" (Ex. A, p.23), which is the exact opposite of what the jury found.

### ii.  Larnell Washington.

The second (and last) example of evidence fabrication Tiderington relies on to conclude there is a practice of fabrication involves the homicide of Annette Love. Tiderington describes a 2010 interview between non-defendant Gilbert Hernandez and non-defendant Katherine Hein (Spano) of a man named Ronald Brelove. (Ex. A, p.24.) He then concludes that Spano "used blatantly suggestive and pressuring tactics to convince Brelove to change his story and implicate Larnell Washington as the killer of homicide victim Annette Love." (*Id.*) This would be a coerced confession, not a wholly fabricated one like in *Avery*, which already disconnects the two.

As an important side-note, Tiderington is not being offered as a police interrogation expert. His characterization of Brelove's 2010 witness interview as "blatantly suggestive and pressuring" is not even superficially presented as an expert opinion (with application of a reliable methodology, etc.). *See* Fed. R. Evid. 702. He then goes on to further assail Spano[2] by claiming the report she wrote documenting the interview was "vague, materially incomplete and misleading." (*Id.* at p.24.)

---

[2] Strangely, Tiderington claims that the MPD's failure to record witness statements "contributed to an environment where detectives like Spano could manipulate evidence without accountability." (Ex. A, p.25.) But he admits that Spano *did record* her interview of Brelove. (*Id.* at p.24.)

This also is not even remotely presented as anything like an expert opinion.

Based on only the Avery and Washington examples, Tiderington concludes that the MPD had a practice of fabricating witness and suspect statements (but again, what Tiderington claims in Washington is coercion, not fabrication). While this is not an expert opinion, even if it were, it could not be admitted because it is contrary to the law. Specifically, a widespread municipal policy cannot exist based on two incidents 10 years apart, one of which (Washington) has not even been established to have happened, and which *post-dates* the alleged fabrication here by six years.

In *Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994), the plaintiff brought an excessive force claim against police officers who arrested him. *Id.* at 933. Plaintiff also brought a *Monell* claim and attempted to prove it with evidence "regarding another incident three and one-half years *after* [the plaintiff] was arrested where [officers] allegedly used excessive force while making an arrest…." *Id.* at 936 (emphasis in original). The Seventh Circuit held that the evidence was properly excluded, explaining that "subsequent conduct is irrelevant to determining [a municipality's] liability for the conduct of its employees on [a given date]." *Id.* Holding a municipality liable for a custom or usage "is predicated on the theory that it knew or should have known about the alleged unconstitutional conduct on the day of the incident. Evidence of an incident that occurred years after the conduct in issue" is properly excluded. *Id.*[3]

Moreover, while there is no brightline rule on how many instances of misconduct are sufficient to constitute a *de facto* policy, two instances ten years apart is not enough (again, especially when one of them post-dates the relevant timeframe by six years). *See Gable v. City of*

---

[3] Defendants incorporate their arguments in their motion in limine seeking to bar evidence or argument of the *Avery* case at trial, as a further explanation of why Tiderington should not be allowed to use it to support his Opinion 3 (including the reason that the City's Chief of Police – the relevant policymaker for Plaintiff's *Monell* claim – was different during the Avery timeframe than during the Diaz and Washington timeframes).

*Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (holding that three incidents during a four-year period "were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware of."); *see generally Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (noting "widespread practice" must be "so permanent and well settled as to constitute a custom or usage with the force of law").

Finally, it must be reiterated that unlike in *Avery*, there has been no finding of misconduct at all regarding Washington. Tiderington merely determines on his own, as a juror empaneled in a hypothetical lawsuit brought by Washington, that Brelove's statement was coerced. All of this makes it wholly improper to let Tiderington offer this legally deficient "opinion" to the jury.

### C. Tiderington cannot be allowed to slip a completely unsupported and undeveloped theory of inadequate police discipline procedures into this case.

As he does with Opinion 1, in Opinion 3 Tiderington tries to slip a mini-expert opinion into his narrative. (*See* Section II.E.) Specifically, he claims that the MPD failed to "meaningfully investigate or discipline" detectives he claims were involved in evidence fabrication (the detectives in *Avery*, this case, and purportedly the Love investigation). (*Id.* at p.25.) Again, there is no methodology whatsoever presented to support this opinion. Nowhere in his report does Tiderington explain what standard police disciplinary procedures or practices were in 2004, nowhere does he compare them to the MPD's practices, and nowhere does he even discuss the disciplinary history of the detectives he loosely alludes to. Given not a single element of Rule 702 is met, this purported opinion must be barred with the rest of Opinion 3.

**CONCLUSION**

The Court should bar Tiderington from testifying at trial.


Date: January 17, 2025

Respectfully submitted,
/s/ *Brian Wilson (Atty. No. 6294099)*
One of the attorneys for Defendants

Kathryn Doi
Brian Wilson
Warren Fasone
Rob Crawford
**NATHAN & KAMIONSKI LLP**
206 S. Jefferson St.
Chicago, IL 60661
kdoi@nklawllp.com

*Counsel for all Defendants*